## <u>AFFIDAVIT OF SPECIAL AGENT JAMES KECZKEMETHY</u>

I, James Keczkemethy, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

## <u>INTRODUCTION</u>

1.      I am a Special Agent of the DEA and have been so employed since October 2017. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Prior to my employment with DEA, I was a police officer in Hartford, Connecticut, for more than six years and was responsible for enforcing State of Connecticut motor vehicle and criminal laws, including narcotic violations.

2.      During my law enforcement career, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846.  Many of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. My investigations have included the use of surveillance techniques, tracking warrants, and the execution of search, seizure, and arrest warrants. I have participated in various aspects of narcotics investigations, including controlled and undercover purchases. Based on my training and experience, I am familiar with the appearance, packaging, and texture of many controlled substances, including fentanyl, cocaine base, and others.

3.      During my career in law enforcement, I have received training and gained experience related to a variety of criminal activities. In the course of my training and experience,

I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds and the organization of drug trafficking conspiracies. I have participated in all aspects of drug investigations, including Title III wiretaps, physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4.     Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of telephone calls to avoid speaking over the telephone. I am familiar with the "street"

language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

5.     I have participated in the below-described investigation since July 2018. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

    a.  My training and experience investigating drug-trafficking and money-laundering crimes;

    b.  Oral reports, written reports, and documents that I have received from DEA and other federal, state, and local law enforcement agents;

    c.  Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

    d.  Confidential sources of information;

    e.  Public records;

    f.  Business records;

    g.  Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

    h.  Precise location information for cellular telephones;

    i.  Controlled purchases of narcotics;

    j.  Evidence obtained from consensually-recorded wire and electronic communications;

    k.  Queries of law enforcement records and intelligence databases;

    l.  Execution of search warrants and tracking warrants;

    m.  Arrests of co-conspirators; and

    n.  Evidence obtained from judicially-authorized intercepted communications over Target Telephones (as described below).

## PURPOSE OF AFFIDAVIT

9.     This affidavit is being submitted in support of a criminal complaint against the following individuals:

(1)     Anny CRUZ ("CRUZ");

(2)     Jorge Luis Diaz, a/k/a Y.R.M. a/k/a "Gringuito", a/k/a "COSITA" ("COSITA") [1];

(3)     Oliver Alexander Perez Soto, a/k/a E.A., a/k/a "Perezoso", a/k/a "DEMONIO" ("DEMONIO");

(4)     FNU LNU, a/k/a R.C.R., a/k/a "Vecino", a/k/a "FLACO" ("FLACO");

(5)     Oscar David Mejia Rodriguez, a/k/a "MANGUERA" ("MANGUERA");

(6)     Jorge Ramon Rodriguez Jimenez, a/k/a "CIBAO" ("CIBAO");

(7)     Junior Rafael De La Rosa Martinez, a/k/a "GUAYACAN" ("GUAYACAN");

(8)     Rosalba Bernechea, a/k/a "REBUSERA" ("REBUSERA")

(9)     Elvin MENDOZA ("MENDOZA");

(10)     James Richard CANN, a/k/a "Rick", a/k/a "Rich" ("CANN");

(11)     Hector Mejia, a/k/a "TIO" ("TIO");

(12)     Jesus ROJAS, a/k/a "Gordo" ("ROJAS"); and

(13)     Erick Andres MARTINEZ ("MARTINEZ")

(collectively, the "Target Subjects") charging that beginning at least in or about May 2018 and continuing until the present, each did knowingly and intentionally combine, conspire, confederate,

---

[1] Initials are used to represent the fraudulent identities used by Target Subjects to protect the true individuals, who are not involved in the criminal conduct described in this affidavit.

and agree with others known and unknown, to possess with intent to distribute and to distribute 400 grams or more of fentanyl, a Schedule II controlled substance, and cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 841(a)(1)(C),  and 846.[3]

      10.    This affidavit is also being submitted in support of applications for search warrants for the following Target Locations, which are described in greater detail below and in attachments to the relevant warrant applications and warrants:

1) 36 Lake Street, Lawrence, Massachusetts (hereinafter, "36 Lake Street" or "Target Location 1");

2) 115 Thoreau Way, Apartment 413, Lawrence, Massachusetts (hereinafter, "FLACO's residence" or "Target Location 2");

3) 103 Ferry Street, #1, Lawrence, Massachusetts (hereinafter, "DEMONIO's residence" or "Target Location 3");

4) 114 Monsignor Patrick J. Lydon Way, Apartment 9, Dorchester, Massachusetts (hereinafter, "FLACO's second residence" or "Target Location 4");

5) 22 Fairmont Street, #2, Lawrence, Massachusetts (hereinafter, "Alamo's residence" or "Target Location 5"); and

6) 9 Granite Street, #5, Methuen, Massachusetts (hereinafter, "MANGUERA's residence" or "Target Location 6")

7) 1 Utopia Road, Billerica, Massachusetts (hereinafter, "CANN's residence" or "Target Location 7")

8) 4 Inman Street, Apartment 20, Lawrence, Massachusetts (hereinafter "CIBAO's residence" or "Target Location 8")

(collectively, the "Target Locations").

---

[3] The government further alleges that 400 grams or more of fentanyl were reasonably foreseeable by and attributable to (1) CRUZ, (2) COSITA, (3) DEMONIO, and (4) FLACO, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi). The government further alleges that 40 grams or more of fentanyl were reasonably foreseeable by and attributable to (9) MENDOZA, (10) CANN, (11) TIO, and (13) MARTINEZ, in violation of 21 U.S.C. §§ 841(a)(1) and 841(a)(1)(B)(vi).

11.     This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are sufficient to establish probable cause to believe that the Target Subjects identified herein have committed the above-described offense and that evidence, fruits, and instrumentalities of these offenses will be found in the Target Locations as described below. All times referenced herein are approximate.

## SUMMARY OF INVESTIGATION

### A.  Background of the Investigation

12.     Since May 2018, DEA investigators have been investigating a drug trafficking organization (hereinafter, the "FLACO DTO") that advertised the sale of narcotics by telephone. Based on the investigation discussed below, investigators learned that FLACO is a major drug supplier to the FLACO DTO. Further, as will be discussed below, the FLACO DTO is led by COSITA, who directs the actions of DTO managers CRUZ and DEMONIO. The FLACO DTO has used various telephone numbers as its customer telephone number (hereinafter, the "Customer Telephone Number"), and has intermittently changed its Customer Telephone Number since the start of this investigation.  The Customer Telephone Number is used by customers of the FLACO DTO to place orders for a variety drugs, including cocaine, cocaine base, and fentanyl. Based on the investigation and as discussed below, I believe that COSITA is the operator and user of the FLACO DTO Customer Telephone Number.

13.     During the investigation, the FLACO DTO has changed the Customer Telephone Number numerous times.  Based on the investigation, whenever the FLACO DTO changed its Customer Telephone Number, the FLACO DTO sent a text message from the new Customer Telephone Number to drug customers informing them of the new telephone number for placing drug orders and advertising the sale of illicit drugs.  For example, on March 10, 2020, at 4:20 p.m.,

a confidential informant ("CS-1") received a text message from telephone number (978) 376-8310, believed to be a new Customer Telephone Number, which stated: "Iam goku new Number got ultimate best quality guaranteed around brown, white, hard white, e pill, and [sic]. Delivery everywhere." Based on the investigation, I believe that this introductory text message from the FLACO DTO advertised the sale of heroin and/or fentanyl, cocaine, crack cocaine, and ecstasy pills ("brown, white, hard white, e pill," respectively). During the investigation, similar text messages have been received by an undercover telephone used by a DEA investigator conducting controlled purchases from the FLACO DTO. During the investigation, the FLACO DTO has used at least four different monikers to advertise the sale of narcotics, including "Flaco," "Peter," "Goku," and "Vegueta." Based upon the diction in the telephone conversations, and manner and means of operation, I believe that all of these monikers are used by the FLACO DTO. Based upon my training and experience, I know that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change telephone numbers and nicknames in an effort to thwart law enforcement's use of electronic surveillance. Based on the investigation, I believe that COSITA controls the Customer Telephone Number and is engaging in this pattern of behavior by frequently changing telephone numbers, including the Customer Telephone Number.

14.     Since May 2018, investigators have conducted numerous controlled purchases of narcotics from the FLACO DTO. On each controlled purchase, DEA investigators have used an undercover police officer (the "UC") to conduct controlled purchases of fentanyl from the FLACO DTO by contacting the Customer Telephone Number. After negotiating the quantity of fentanyl and purchase price, FLACO directed the UC to various locations in Lawrence, Lowell, Methuen, and Haverhill (the "Merrimack Valley region") and arranged for a drug courier to meet the UC to complete the drug transaction. After conducting controlled purchases from May 3, 2018 to

February 11, 2019, a number of drug couriers and stash house operators working for the FLACO DTO were arrested and indicted, and some have been sentenced. *See United States v. Jose Hernandez, et al.,* 18-CR-10348-LTS; *United States v. Antonio Camillo*, 19-CR-10024-DJC; and *United States v. Jesus Rojas*, 19-CR-10112-LTS.[4]  Drug analysis reports from the controlled purchases confirmed the presence of fentanyl and/or cocaine base, depending on which substance was ordered.

15.     As detailed below, investigators have made several drug and money seizures from the Target Subjects during the course of the investigation. Based on the scope and long-term and daily drug trafficking activities of the Target Subjects, there is probable cause to believe that evidence of distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); the use of a communication facility in the commission of controlled substances trafficking offenses, in violation of Title 21, United States Code, Section 843(b); conspiracy to commit controlled substances trafficking offenses, in violation of Title 21, United States Code, Section 846; and money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957 (collectively, the "Target Offenses") will be found in each of the Target Locations.

16.     Overall, based on the investigation, investigators have learned the following roles for each Target Subject:

(1)     CRUZ – Manager of the FLACO DTO

(2)     COSITA – Leader of the FLACO DTO and user of the Customer Telephone Number

---

[4] ROJAS was arrested on February 22, 2019 and released on conditions of release on September 4, 2019. On February 11, 2020, ROJAS entered a guilty plea and is awaiting sentencing. Since his release on conditions of release, the investigation has shown that ROJAS continues to participate in the charged conspiracy. On December 8, 2020, ROJAS was arrested on domestic violence charges involving a firearm. ROJAS is currently detained in state custody on that pending charge.

(3)     DEMONIO – Manager of the FLACO DTO

(4)     FLACO – Drug supplier to the FLACO DTO

(5)     MANGUERA – Drug supplier to the FLACO DTO

(6)     CIBAO – Drug supplier to the FLACO DTO

(7)     GUAYACAN – Drug courier for and partner of CIBAO

(8)     REBUSERA – Drug and money courier for the FLACO DTO

(9)     MENDOZA – Drug courier for the FLACO DTO

(10)    CANN – Drug courier for the FLACO DTO

(11)    TIO – Drug courier for the FLACO DTO

(12)    ROJAS – Drug courier for the FLACO DTO

(13)    MARTINEZ – Drug Courier for the FLACO DTO

**B.  Title III Electronic Surveillance**

17.     On July 6, 2020, the Honorable Patti B. Saris, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial interception of wire and electronic communications to and from (917) 325-2975 ("Target Telephone 1"), used by CRUZ.

18.     On August 19, 2020, the Honorable Denise J. Casper, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial interception of wire and electronic communications to and from (1) (646) 348-4879 ("Target Telephone 2"), used by CRUZ; (2)  (917) 209-9230 ("Target Telephone 3"), used by FLACO; and (3) (781) 513-1118 ("Target Telephone 4"), used by CIBAO.

19.     On September 18, 2020, the Honorable Patti B. Saris, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial and/or continued interception of wire and/or electronic communications to and from (1) Target Telephone 3; (2)

(646) 249-3303 ("Target Telephone 5"), used by CRUZ; and (3) (978) 242-3410 ("Target Telephone 6"), used by DEMONIO.

20.     On November 4, 2020, the Honorable Patti B. Saris, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial and/or continued interception of wire and/or electronic communications to and from (1) Target Telephone 3; (2) (978) 566-4660 ("Target Telephone 7"), used by MANGUERA; and (3) (617) 407-7964 ("Target Telephone 8"), used by CRUZ.

21.     On December 1, 2020, the Honorable Patti B. Saris, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial and/or continued interception of wire and/or electronic communications to and from (1) Target Telephone 3; (2) Target Telephone 7; and (3) (617) 515-9539 ("Target Telephone 9"), used by CRUZ.

22.     Throughout the course of this investigation, the Honorable Marianne B. Bowler has signed numerous warrants authorizing the government to obtain precise location information about the Target Telephones and other phones used by Target Subjects, to use a cell-site simulator device, and to install GPS devices on vehicles used by the Target Subjects.

## PROBABLE CAUSE

23.     This section details the intercepted communications of, surveillance of, and controlled purchases made from the Target Subjects in the charged conspiracy.  This section is divided into three parts:  Part I focuses on the Target Locations and the links to criminal activity at those locations; Part II focuses on controlled purchases of fentanyl from the FLACO DTO; and Part III focuses on intercepted communications and surveillance of various Target Subjects.

24.     All of the intercepted communications detailed below have been summarized, but in many cases not yet been fully transcribed. The quotations from intercepted calls below are

derived from summaries and/or preliminary transcripts. Many of the conversations are in Spanish and were translated by Spanish-speaking contract personnel to summaries and/or preliminary transcripts. Some of the pertinent conversations also include coded, cryptic, and/or slang language. For each of the calls discussed below, my interpretation of code words or other terminology, as well as my interpretations of the general substance of the calls, are based on my familiarity with this investigation and my training and experience.

## Part I: Target Locations

1. ### 36 Lake Street, Lawrence, Massachusetts ("Target Location 1")

25.     36 Lake Street, Lawrence, Massachusetts is the right side of a duplex, 34-36 Lake Street. 36 Lake Street has one side of the residence and its rear on Washington Street. The residence has light blue vinyl siding and a white front door. There is one mailbox hanging to the left of the front door. The number "36" is affixed to the left-hand side of the front door. The rear door of the address is on Washington Street and is recessed from the sidewalk. There are two rear doors, adjacent to each other, both white, and they are both accessible from Washington Street. A further description of Target Location 1 is found in Attachment A-1, which is attached hereto and incorporated herein by reference.

26.     Numerous drug transactions, detailed below, have occurred outside the rear door of Target Location 1. On at least one occasion, on July 14, 2020, investigators observed Anilza Reinoso enter Target Location 1 using the front door.[5] On the same day, investigators observed a group outside the front door of Target Location 1 with a small dog. Investigators have seen CRUZ walking this small dog outside of Target Location 1 on several occasions. The group with the small

---

[5] Reinoso was in CRUZ's vehicle when CRUZ was arrested on February 26, 2020. Officer seized various narcotics from CRUZ's vehicle that day.

dog entered Target Location 1 using the front door. Utility records from National Grid detail that 36 Lake Street is a single-family residence. I believe that the FLACO DTO uses 36 Lake Street as a drug stash location and supplies drug couriers from this location. CRUZ's vehicle was last seen parked outside Target Location 1 on December 8, 2020. Investigators observed CRUZ's vehicle parked outside of Target Location 1 during the overnight hours on December 6-7, 2020, December 7-8, 2020, and December 9-10, 2020. CRUZ's vehicle is depicted parked outside of Target Location 1 in Attachment A-1.

27.     In December 2020, investigators spoke with a confidential informant ("CI-4"). CI-4 has a criminal history including arrests for assault. CI-4 is cooperating for monetary compensation and at this time is unwilling to testify. CI-4 is familiar with members of the FLACO DTO. Based on independent corroboration of CI-4's information, I believe that the information received from CI-4 is reliable. CI-4 detailed that CRUZ uses Target Location 1 to conduct drug business and frequently uses the rear door on the right-side. The specific rear door is circled in red in Attachment A-1.

**2.  115 Thoreau Way, Apartment 413, Lawrence, Massachusetts ("Target Location 2")**

28.     115 Thoreau Way, Apartment 413, Lawrence, Massachusetts is an apartment within a large, beige apartment building, which is further part of a large apartment complex known as TGM Andover Park.  Apartment 413 has a front door on the first floor of the building. The apartment is accessible through a steel gate outside of the building. There is a brass door knocker in the middle of the door with a black sign bearing the white numbers "413." The door, which is red in color, is encased in beige trim with a white light on the upper right-hand side on the wall. A further description of Target Location 2 is found in Attachment A-2, which is attached hereto and incorporated herein by reference.

29.     I believe that FLACO resides at Target Location 2. As described below, from September 10, 2020 until present, a GPS device used on FLACO's vehicle indicates that approximately 75% of the time, the vehicle is parked outside Target Location 2 during the overnight hours. The other approximate 25% of the time, the vehicle is parked outside his paramour's residence in Dorchester, his second residence. As discussed below, investigators have observed FLACO leaving from and returning to Target Location 2 around the time of drug transactions with the FLACO DTO. FLACO was last seen outside of Target Location 2 on December 8, 2020, and his vehicle was located outside Target Location 2 on December 8, 2020.

30.     On December 8, 2020, at 2:16 p.m., investigators were conducting surveillance outside Target Location 2. Investigators observed FLACO's vehicle enter the parking lot to Target Location. Investigators observed FLACO exit his vehicle and approach Target Location 2. FLACO opened the steel gate to the building of Target Location 2 and went out of view on the first-floor area of the building.

### 3.   103 Ferry Street, #1, Lawrence, Massachusetts ("Target Location 3")

31.     103 Ferry Street, #1, Lawrence, Massachusetts is the first floor of a three-family, three-story residence. The building is beige with a wood-colored front door. There are three mailboxes hanging to the left of the front door on the front porch. I have reviewed Google Street View images of 103 Ferry Street and recognize that the Google Street View image depicts a front screen door with the number "103" affixed to the screen window. The screen door is no longer on the front of 103 Ferry Street. Unit #1, which is the first floor apartment, is accessed by common front and rear doors.  The rear door to the apartment is on Saxonia Avenue and has a steel-colored screen door and wood-colored rear door. A further description of Target Location 3 is found in Attachment A-3, which is attached hereto and incorporated herein by reference.

32.     I believe that DEMONIO resides at Target Location 3. The utilities subscriber of the first-floor unit is Soveria Alamo, DEMONIO's wife and Edwin Alamo's sister.[6] As described below, Edwin Alamo is a suspected drug processor for the FLACO DTO and drug distributor. Also described below, DEMONIO has arranged to meet drug couriers and suppliers in the area of Target Location 3 and CRUZ has picked up DEMONIO from Target Location 3 prior to distributing drugs to couriers.  In addition, surveillance agents have observed DEMONIO entering the building of Target Location 3 as recently as December 8, 2020, as described below regarding calls intercepted over Target Telephone 9.

33.     In December 2020, CI-4 detailed that DEMONIO resides at Target Location 3. CI-4 was able to independently describe Target Location 3 and stated that CI-4 has witnessed DEMONIO at this location.

<u>DEMONIO's relationship with Edwin Alamo and Soveria Alamo</u>

34.     On September 28, 2020, at 2:45 p.m., CRUZ, using Target Telephone 5, called Alamo. The telephone number that CRUZ used to call Alamo throughout the investigation ((351) 277-5225) is associated with him in the law enforcement database Clear.[7] This call was intercepted over Target Telephone 5. CRUZ stated, "Tell DEMONIO that he can't be without a phone because I have been calling Sove (a nickname for Soveria Alamo) for 100 years now and now that he left with you, she answers the phone… Tell him he can't be without a phone."[8] Alamo described fixing

_____

[6] For clarity, Soveria Alamo is referred to by her full name or Soveria. Edwin Alamo is referred to as Alamo.

[7] Clear is an investigative platform that searches proprietary sources and public records to obtain information on individuals and businesses.

[8] In the call directly preceding this, CRUZ, using Target Telephone 5, called Soveria Alamo. CRUZ asked, "Sove, where is DEMONIO?" Soveria Alamo replied, "DEMONIO left a while ago. He is with Edwin."

DEMONIO's phone and then stated, "He's not with me right now… What's up?" CRUZ replied, "He's got a *regalo* (Spanish meaning, gift) that he has to hand over." Alamo and CRUZ then discussed someone who was in the hospital with high blood pressure. Alamo then stated, "Hold on. Hold on." In the background Alamo could be heard saying, "You have to hand over a *regalo*." DEMONIO then began using Alamo's phone. DEMONIO stated, "I've got a phone. Call me." CRUZ replied, "I have been calling Sove all morning." DEMONO stated, "I am here with Edwin… What time?" CRUZ responded, "I am waiting on Jesus right now." I believe that CRUZ contacted DEMONIO's wife, Soveria Alamo, to try to reach him because DEMONIO's phone was broken. I believe that CRUZ could not reach DEMONIO through Soveria, so she called Alamo, his brother-in-law. I believe that CRUZ informed Alamo that DEMONIO had a drug package ("a *regalo*") to deliver and that she was waiting for ROJAS ("Jesus") to decide when DEMONIO should make the delivery to him ("I am waiting on Jesus right now.").

### 4. **114 Monsignor Patrick J. Lydon Way, Apartment 9, Dorchester, Massachusetts ("Target Location 4")**

35.     114 Monsignor Patrick J. Lydon Way, Apartment 9, Dorchester, Massachusetts is an apartment within a multi-unit brick apartment building. The building has multiple points of entry and egress. Investigators are unable to make entry into the building of Target Location to determine the exact location of Apartment 9 without risking detection. A further description of Target Location 4 is found in Attachment A-4, which is attached hereto and incorporated herein by reference.

36.     I believe that FLACO and his paramour, Jessica Diaz-Marinez, reside at Target Location 4. As discussed below, on September 4, 2020, after FLACO received drug proceeds from the FLACO DTO, investigators surveilled FLACO travel to the building of Target Location 4.

Intercepted communications showed that FLACO was staying with "Jessica" and that he felt safe at that residence. Jessica Diaz-Marinez is the registered owner of the vehicle that FLACO drives. Jessica Diaz-Marinez also has a vehicle that is registered to Target Location 4. Jessica Diaz-Marinez is also associated with Target Location 4 in Clear. I believe that FLACO stores drug proceeds at Target Location 4 with the belief that it is a safe location to stash money because it is geographically separated from his drug business in Lawrence. FLACO's vehicle was last located outside of Target Location 4 on December 8, 2020.

**5. 22 Fairmont Street, #2, Lawrence, Massachusetts ("Target Location 5")**

37.     22 Fairmont Street, #2, Lawrence, Massachusetts is the second floor of a yellow, two-family, two-story residence. It has yellow siding and a red front door. The number "22" is affixed above the front door and there are two mailboxes hanging on either side of the front door. A further description of Target Location 5 is found in Attachment A-5, which is attached hereto and incorporated herein by reference.

38.     I believe that Alamo resides at Target Location 5. Alamo's listed residence with the Registry of Motor Vehicles and the Board of Probation is Target Location 5. Alamo is also the utilities subscriber at Target Location 5. The utilities record describes Target Location 5 as the second floor of 22 Fairmont Street. As discussed below, investigators have observed drug transactions outside of the building in which Target Location 5 is located and have intercepted communications about the FLACO DTO using Target Location 5 to process and package drugs. Alamo's vehicle, registered to Target Location 5, was last observed outside Target Location 5 on December 7, 2020.

**6. 9 Granite Street, #5, Methuen, Massachusetts ("Target Location 6")**

39.     9 Granite Street, #5, Methuen, Massachusetts is an apartment within a large brick multi-unit apartment building, which is part of an apartment complex spanning 9-13 Granite Street. The building has multiple points of entry and egress. Apartment #5 is located on the garden level and is accessed through the rear down a flight of stairs. The apartment door has a gold-colored number "5" on the door. A further description of Target Location 6 is found in Attachment A-6, which is attached hereto and incorporated herein by reference.

40.     I believe that MANGUERA resides at Target Location 6. As discussed below, investigators have observed MANGUERA leaving from and returning to Target Location 6 around the time of drug transactions with the FLACO DTO. The vehicle that MANGUERA drives is registered to Target Location 6. Further, on numerous occasions investigators have observed MANGUERA's vehicle parked in a spot labeled "9-5," which I believe corresponds to the address 9 Granite Street and Apartment 5. Investigators have observed MANGUERA enter 9 Granite Street from a rear door and descend a flight of stairs into the garden level of the building. An investigator has been inside 9 Granite Street and confirmed that Target Location 6 is down a flight of stairs on the garden level of 9 Granite Street.

## 7.  1 Utopia Road, Billerica, Massachusetts ("Target Location 7")

41.     1 Utopia Road, Billerica, Massachusetts is a single-family residence. The property has a driveway that sets the residence back from the road approximately 20 yards. The residence has white siding and a dark green front door. There is a dark green garage door to the right of the front door. The garage door has two light sconces on either side of the garage door. A further description of Target Location 7 is found in Attachment A-7, which is attached hereto and incorporated herein by reference.

42.      I believe that CANN resides at Target Location 7. As discussed below, On September 21, 2020, investigators observed CANN leave Target Location 7 to receive drugs from DEMONIO at Target Location 1 at CRUZ's direction. On that evening, after leaving Target Location 1, police attempted to stop CANN's vehicle, which is registered to CANN at Target Location 7. CANN fled police, crashed his vehicle, and disposed of the drugs. CANN was arrested the following day on September 22, 2020 at Target Location 7. On December 7, 2020, investigators surveilled TIO delivering drugs to CANN at Target Location 7. CANN also has a company, Wilmington Plumbing & Heating LLC that is registered with the Massachusetts' Secretary of State at Target Location 7. CANN has posted public advertisements with his name listing Target Location 1 as the place of his business.

**8.  4 Inman Street Apartment 20, Lawrence, Massachusetts ("Target Location 8")**

43.      4 Inman Street, Apartment 20, Lawrence, Massachusetts is an apartment within a brown brick apartment building. The building has a glass front door. Apartment 20 is on the second floor of the building. The door to Apartment 20 is labeled with the number "20." A further description of Target Location 7 is found in Attachment A-7, which is attached hereto and incorporated herein by reference.

44.      I believe that CIBAO resides at Target Location 8. As described below, during intercepted communications over Target Telephone 9, CIBAO asked CRUZ to come to 4 Inman Street in Lawrence in the evening hours for a drug related meeting. The following day, CIBAO informed CRUZ that he fell asleep and missed their meeting. I believe this indicates that Target Location 8 is CIBAO's residence. Investigators also surveilled CIBAO return to the building of Target Location 8 and enter the building. Investigators later reviewed surveillance footage from the interior of 4 Inman Street and observed CIBAO unlock and enter Target Location 8.

## Part II: Controlled purchases

45.     On November 29, 2018, an undercover officer (the "UC") contacted the FLACO

DTO Customer Telephone Number. The UC sent a series of text messages to the user of the

Customer Telephone Line (603) 503-5008.[9] The UC stated, "Can you give me a good price for 4."

The user of the Customer Telephone Number responded, "How much you money." The UC

responded, "What's the best you can do for 1,000." The user of the Customer Telephone Number

stated, "4. For 1000." The user of the Customer Telephone Number then directed the UC to

"Cherry st Lawrence ma." Based on my training and experience and the investigation, the UC

ordered 40 grams or 4 "fingers" of fentanyl when asking, "Can you give me a good price for 4."

A finger is a common street term for 10 grams of fentanyl. Based on the investigation, I believe

that, in the past, the FLACO DTO charged $200 per "finger" of fentanyl. However, I believe that

due to the recent arrests, in late-November 2018, the FLACO DTO charged $1,000 for these 40

grams of fentanyl ("4. For 1000"). I believe that the user of the Customer Telephone Number

directed the UC to Cherry Street in Lawrence to complete the deal. Prior to leaving for the meeting,

the UC was equipped with an audio- and video-recording device and $1,000 of recorded agency

funds.

46.     At 12:23 p.m., the UC arrived on Cherry Street in Lawrence.  At 12:31 p.m., the

user of the Customer Telephone Number sent a text message, "Walk to 38 Woodland St." The UC

walked to 39 Woodland Street in Lawrence and observed a Hispanic male, later identified as

---

[9] In September 2018, investigators arrested several drug couriers working for the FLACO
DTO. The arrests were the culmination of numerous controlled purchases of fentanyl from the
FLACO DTO using a Customer Telephone Number. The arrests resulted in the FLACO DTO
changing its Customer Telephone Number. This Customer Telephone Number was obtained after
the FLACO DTO advertised the sale of narcotics to the UC telephone used to make the
aforementioned controlled purchases.

MENDOZA, in the porch area. MENDOZA motioned for the UC to come into the porch. MENDOZA asked for the money to which the UC replied that he wanted to see the "stuff" first. The UC counted the $1,000 in front of MENDOZA and MENDOZA removed a plastic sandwich bag from his sweatshirt pocket. The plastic bag contained four plastic baggies of a tan powdery substance. Based on my training and experience and the investigation, I believe that the plastic bag contained 40 grams of fentanyl. MENDOZA then stated, "He wants me to check you," and motioned for the UC to lift his shirt. MENDOZA also motioned to his phone as if a caller on the other end of a phone call directed him to do so. The UC lifted his shirt exposing his waistline. MENDOZA then handed the UC the plastic bag with 40 grams of suspected fentanyl. The UC in turn provided $1,000 of recorded agency funds. All of the text messages between the UC and the Customer Telephone Number are preserved. The suspected fentanyl received from MENDOZA was transported to the DEA Northeast Regional Laboratory for confirmatory analysis, and confirmed be 38.8279 grams of a substance containing fentanyl.

47.     The UC had conducted one prior controlled purchase of 2.8 grams of lab-confirmed fentanyl from MENDOZA on November 13, 2018 at 38 Woodland Street. On December 20, 2018, Andover Police arrested MENDOZA for motor vehicle offenses. The UC identified MENDOZA from his booking photograph after that arrest and identified him as the individual who sold him 10 grams of suspected fentanyl on November 13, 2018 and 38 grams of fentanyl on November 29, 2018.

48.     Unrelatedly, on January 1, 2019, Tewksbury Police arrested MENDOZA at the Motel 6 in Tewksbury with approximately 47 grams of suspected cocaine. This is the same Motel 6 that ROJAS was staying at when he was arrested in February 2019, as described below. Based on the investigation, and as discussed below, I believe that ROJAS and MENDOZA are cousins.

October 19, 2020: Controlled purchase of 12 grams of suspected fentanyl from Courier-1

49.     On October 19, 2020, the UC sent a series of text messages to the user of the Customer Telephone Line (978) 376-3010.[12] The UC stated, "Workn in dracut today. Can somone meet me ther on my break?" The user of the Customer Telephone Number responded, "What time?" The UC responded, "After noon." The user of the Customer Telephone Number responded, "k." The UC then informed the user of the Customer Telephone Number, "I hav 240." Based on my training and experience, this text message from the UC informed the user of the Customer Telephone Number that the UC wished to purchase $240 worth of fentanyl. The user of the Customer Telephone Number responded, "Help me couple Friend number is." The UC responded, "u wan customer?" The user of the Customer Telephone Number responded, "Yes." Based on my training and experience, as well as my knowledge with this investigation, I believe that the user of the Customer Telephone Number was soliciting the UC to introduce new customers to the FLACO DTO. The UC was then directed by the user of the Customer Telephone Number to "Jamaica st lawrence ma." Shortly thereafter, the UC was then redirected by the user of the Customer Telephone Number to "10 diamond st lawrence ma." Prior to leaving for the meeting, the UC was equipped with an audio-recording device and $240 of recorded agency funds.

50.     At 12:19 p.m., the UC arrived to the parking lot of 12 Diamond Street in Lawrence. At 12:27 p.m., the UC observed a black Acura TL, bearing registration 1FDC49, (hereinafter, the "Acura TL") arrive in the same parking lot and park directly next to the undercover vehicle. The UC made eye contact with the driver of the Acura TL, later identified as Courier-1 (as described

---

[12] This Customer Telephone Number was obtained from CS-3, discussed below, after investigators surveilled MENDOZA deliver fentanyl to CS-3 on behalf of the FLACO DTO. The suspected fentanyl was seized from CS-3 and CS-3 provided this Customer Telephone Number to investigators.

below).  The UC then observed Courier-1 pull the hood from his hooded sweatshirt over his head, exit the Acura TL, and approach the undercover vehicle. The UC asked Courier-1 what he was providing.  Courier-1 responded, "You wanted a stick and two?"  Based on my training and experience, the street value of $240 worth of fentanyl, and the term "stick" referring to 10 grams of fentanyl, I believe that Courier-1 asked the UC if he was the individual who ordered 12 grams of fentanyl. The UC affirmed and provided $240 of recorded agency funds to Courier-1. Courier-1 provided the UC with a compressed powdery substance wrapped in yellow plastic and two small, clear, knotted plastic bags, containing a tan powdery substance.  All of the text messages between the UC and the Customer Telephone Number are preserved. The suspected fentanyl received from Courier-1 was transported to the DEA Northeast Regional Laboratory for confirmatory analysis, which remains pending. Due to officer safety, the suspected fentanyl was not field tested. After the controlled purchase, the UC viewed a photograph of Courier-1 from the Registry of Motor Vehicles and confirmed that Courier-1 was the individual who sold him the 12 grams of suspected fentanyl on this date.

<u>October 28, 2020: Controlled purchase of 20 grams of suspected fentanyl from Courier-2</u>

51.     On October 28, 2020, the UC sent a series of text messages to the user of the Customer Telephone Line (978) 376-3010. The UC stated, "U got anybody in dracut? Im working ther 2day." The user of the Customer Telephone Number responded, "What do you want?"  The UC responded, "2 finger." Based on my training and experience, this text message from the UC informed the user of the Customer Telephone Number that the UC wished to purchase 20 grams of fentanyl ("2 finger"). The user of the Customer Telephone Number then directed the UC to "60 ferry st Lawrence ma." Prior to leaving for the meeting, the UC was equipped with an audio-recording device and $400 of recorded agency funds.

52.     At 3:23 p.m., the UC arrived in the area of 72 Ferry Street in Lawrence. The UC sent a text message to the Customer Telephone Number stating, "Here."  Investigators observed an individual later identified as Courier-2 (as described below) leave the driveway of 66 Ferry Street speaking on cellphone. Courier-2 had a quick interaction with an individual in a pickup truck bearing a New Hampshire registration and then returned to the driveway of 66 Ferry Street. Moments later, Courier-2 approached the UC's vehicle and approached the UC's passenger side window. The UC lowered the window and Courier-2 provided two blue, opaque plastic bags containing a compressed powder to the UC. The UC provided Courier-2 with the $400 of recorded agency funds. Based on my training and experience and the investigation, I believe that Courier-2 provided the UC with 20 grams of suspected fentanyl.

53.     As Courier-2 was walking away, the UC asked Courier-2 for his telephone number, which Courier-2 provided as (978) 876-4887. Courier-2 identified himself to the UC using a common nickname for the first name of Courier-2. Investigators observed Courier-2 return to the driveway of 66 Ferry Street. After the controlled purchase, investigators located the Facebook page for Courier-2 and his photograph from the Registry of Motor Vehicles. The UC identified Courier-2 as the individual who sold 20 grams of fentanyl to him on October 28, 2020.  All of the text messages between the UC and the Customer Telephone Number are preserved. The suspected fentanyl received from Courier-2 was transported to the DEA Northeast Regional Laboratory for confirmatory analysis, which remains pending. Due to officer safety, the suspected fentanyl was not field tested.

<u>November 16, 2020: Controlled purchase of 10 grams of suspected fentanyl from Courier-2</u>

54.     On November 14, 2020, the UC received a text message from telephone number (603) 289-4557. The text message stated, "Iam vegueta this is my New number I got the amazing

stuff I called blue magic, I do delivery everywhere, Down , white , e pill.. stop buying garbage you deserve good quality and safe product." I am familiar with "Vegeta" as a character from the animated series Dragon Ball Z. In the past, the FLACO DTO has advertised the sale of drugs using the moniker "Goku," another character from Dragon Ball Z. Based on the contents of the text and my knowledge of the investigation, I believe that the FLACO DTO had the UC's telephone number from the three prior controlled purchases and sent the UC a text message advertising the sale of drugs (Down (meaning, heroin and/or fentanyl), white (meaning, cocaine), e pill (meaning MDMA a/k/a Ecstasy) using the new moniker "Vegueta."

55.     On November 16, 2020, at 11:46 a.m., the UC sent a text message to the Customer Telephone Number (603) 289-4557 and stated, "Can i see u." The user of the Customer Telephone Number responded, "What do you want?" The UC stated, "Fingr," meaning a finger of fentanyl. The user of the Customer Telephone Number then sent a text message to the UC and stated, "K come. 35 computer dr Haverhill ma."   I believe the user of the Customer Telephone Number directed the UC to 35 Computer Drive in Haverhill, Massachusetts to complete the deal for 10 grams of fentanyl. Based on the investigation, investigators knew that the FLACO DTO charged $200 for 10 grams of fentanyl. At 12:11 p.m., the UC received another text message from the Customer Telephone Number stating, "Summit ave Lawrence ma." I believe that the user of the Customer Telephone Number changed the meeting location to Summit Avenue in Lawrence, Massachusetts.

56.     Prior to travelling to Summit Avenue, the UC was equipped with an audio-recording and surveillance device and $200 of official agency funds. At 12:39 p.m., the UC arrived and parked on Summit Avenue in Lawrence. The UC then sent a text message to the Customer Telephone Number stating, "Here." At 12:44 p.m., investigators observed Courier-2 leave his

residence, a short walk from Summit Avenue, and directly approach the UC's vehicle. Courier-2 opened the front passenger door of the UC's vehicle and provided one blue, opaque bag containing a compressed, powdery substance to the UC. The UC provided the $200 of official agency funds to Courier-2. Based on my training and experience and the investigation, I believe that Courier-2 provided the UC with 10 grams of fentanyl. Courier-2 then approached a white vehicle bearing New Hampshire plates and leaned into the passenger window for a brief interaction. The UC then departed the area and provided the suspected fentanyl to investigators. The suspected fentanyl was transported to the DEA Northeast Regional Laboratory for confirmatory analysis, which remains pending. The suspected fentanyl was not field tested due to officer safety concerns. All the communications between the UC and the Customer Telephone Number are preserved.

57.     Suspecting that Courier-2 had also provided fentanyl to the occupants of the white New Hampshire vehicle, investigators followed the vehicle to Salem, New Hampshire. In Salem, a marked Salem Police officer stopped the vehicle at a rest stop on Route 93 northbound. An investigator approached the vehicle and observed in plain view hypodermic needles, cotton swabs, (all tools for ingesting fentanyl) and a blue plastic bag containing approximately 5 grams of suspected fentanyl. Investigators provided *Miranda* warnings to the driver of the vehicle. The driver then stated she understood the *Miranda* warnings and told investigators she had just purchased 5 grams of fentanyl from a Hispanic male in the area of Summit Avenue and High Street in Lawrence. The suspected fentanyl was seized and was transported to the New Hampshire Drug Laboratory for analysis, which remains pending. The suspected fentanyl was not field tested due to officer safety concerns. The driver was arrested and charged in state court with drug possession. Prior to her arrest, the driver showed the investigators a text message from telephone number (603) 952-0304 on September 19, 2020 that stated, "IAm vegueta this is my new number I have new

material as strong as you can imagine I don't think you have ever tried something so original so pure down. Hard white, white soft, e pill. My product is going to called. Blue magic very powerful down. We have deliver."  I believe that the driver of the New Hampshire vehicle had also received an advertisement from the FLACO DTO from a different Customer Telephone Number advertising the sale of drugs ("Down (meaning, heroin and/or fentanyl). Hard white (meaning, cocaine base), white soft (meaning, cocaine), e pill (meaning, MDMDA, a/k/a Ecstasy)."). Based on the investigation, I believe that the FLACO DTO operates multiple Customer Telephone Numbers.

December 2, 2020: Controlled purchase of 45 grams of suspected fentanyl from MARTINEZ

58.    On December 2, 2020, at 10:14 a.m., Customer Telephone Number (603) 289-4557 sent a text message to the UC stating, "I got new amazing stuff the [fire emoji], I called blue magic." The UC understood this text message to mean that the FLACO DTO was advertising high-quality fentanyl nicknamed "blue magic." The UC sent a text message to the Customer Telephone Number and stated, "If I bring new custmr can u throw me 5g free? I am in metun wrkn need 4." By stating this, the UC asked if the UC introduced a new drug customer to the FLACO DTO, it would provide five grams of fentanyl for free ("If I bring new custmr can u throw me 5g free?"). The UC further ordered 40 grams of fentanyl or four "fingers" ("I am in metun wrkn need 4."). The user of the Customer Telephone Numbers wrote, "K." The UC understood this to mean that the FLACO DTO was ready to provide the 45 grams of fentanyl requested. The Customer Telephone Number sent a text message that stated, "59 Bellevue ave Haverhill ma." The UC understood this to mean that that drug deal would occur in the area of 59 Bellevue Avenue in Haverhill.

59.    Prior to travelling to Bellevue Avenue, the UC was equipped with an audio- and video- recording and surveillance device and $800 of official agency funds. At 11:50 a.m., the UC

arrived and parked on Bellevue Avenue in Haverhill. The UC then sent a text message to the Customer Telephone Number stating, "Here." Minutes later, the UC observed an individual later identified as MARTINEZ (described below) come from the driveway of 59 Bellevue Avenue, using a cellular telephone. MARTINEZ approached the driver's window of the UC's vehicle. MARTINEZ informed the UC that he only had "big bags." The UC understood this to mean that MARTINEZ only had "fingers" and did not have a five-gram bag of fentanyl. The UC informed MARTINEZ that he would call the Customer Telephone Number because the UC was supposed to receive an extra five grams for free. Thereafter, MARTINEZ stepped away from the UC's vehicle. The UC made a recorded call to the Customer Telephone Number and the user of the Customer Telephone Number agreed to provide the UC with 45 grams of fentanyl. Minutes later, MARTINEZ returned to the driver's window of the UC's vehicle while operating a moped. The UC provided MARTINEZ with the $800 of recorded agency funds and MARTINEZ provided the UC with a clear bag containing five multi-colored plastic bags and one "Dove" soap bag, all containing an off-white powdery substance. Based on my training and experience, and the appearance and packaging of the substance, I believe that MARTINEZ provided the UC with 45 grams of fentanyl.

60.     The UC then asked MARTINEZ for his phone number. MARTINEZ declined saying that "he," meaning the user of the Customer Telephone Number would be upset if MARTINEZ attempted to engage in drug deals directly with customers of the FLACO DTO. MARTINEZ further detailed how the use of multi-colored bags is a method for which the FLACO DTO supervises and monitors drug couriers. Thereafter, MARTINEZ rode the moped back into the driveway of 59 Bellevue Avenue. This meeting was audio- and video- recorded. MARTINEZ is clearly observed and heard on the video. The UC departed the area and provided the suspected

fentanyl to other investigators. Due to officer safety concerns, the suspected fentanyl was not field tested. The suspected fentanyl will be sent to the DEA Northeast Regional Laboratory for analysis, which remains pending. All the communications between the UC and the Customer Telephone Number are preserved.

61.     Later that day, investigators reviewed police department databases and located a police report wherein MARTINEZ was previously arrested for drug distribution in Haverhill. On multiple occasions, MARTINEZ was associated with the residents of 59 Bellevue Avenue. Investigators also located the Facebook page of MARTINEZ under the username "Erick Andres," which depicted photographs of MARTINEZ. The UC viewed photographs of MARTINEZ from booking photographs, the Registry of Motor Vehicles database, and Facebook, and the UC identified MARTINEZ as the individual who sold him 45 grams of fentanyl that day.

<u>December 8, 2020: Controlled purchase of 20 grams of suspected fentanyl from Courier-1</u>

62.     On December 8, 2020, at 11:14 a.m., the UC sent a text message to the Customer Telephone Number (603) 289-4557 and stated, "Can i see u." The user of the Customer Telephone Numbers wrote, "What do you want?" The UC responded, "2 fingr," meaning two fingers of fentanyl or 20 grams of fentanyl.  The user of the Customer Telephone Number then sent a text message stating, "Oakwood ave Lawrence ma." The UC understood this to mean that the deal would be completed in the area of Oakwood Avenue in Lawrence.

63.     Prior to travelling to Oakwood Avenue, the UC was equipped with an audio recording and surveillance device and $400 of official agency funds. At 12:02 p.m., the UC arrived and parked on Oakwood Avenue in Lawrence. The UC then sent a text message to the Customer Telephone Number stating, "Here." Minutes later, the UC observed the Acura TL (the same vehicle driven by Courier-1 on October 19, 2020) travelling on Oakwood Avenue from Ferry

Street. The Acura TL travelled down Oakwood Avenue to Ridge Road, turned around on Ridge Road, proceeded back onto Oakwood Avenue, and stopped alongside the UC's vehicle so that both vehicles' passenger windows were facing each other. The UC rolled down the passenger seat window as the Acura TL's passenger window also rolled down. The UC observed Courier-1 as the driver and sole occupant of the Acura TL. The UC exited the UC vehicle and walked to the passenger side of the Acura TL. The UC leaned into the open passenger seat window and observed Courier-1 holding one clear plastic bag containing two compressed objects tied in yellow wax paper. The UC exchanged the $400 of recorded agency funds for the plastic bag. Based on my training and experience and the investigation, I believe that Courier-1 provided the UC with 20 gram of fentanyl in the two bundles of wax paper. The UC and Courier-1 parted ways and the UC provided the suspected fentanyl to other investigators. Due to officer safety concerns, the suspected fentanyl was not field tested. The suspected fentanyl will be sent to the DEA Northeast Regional Laboratory for analysis, which remains pending. All the communications between the UC and the Customer Telephone Number are preserved.

COSITA identified as the user of the Customer Telephone Number

64.     On November 18, 2020, the UC exchanged text messages and phone calls with the user of the Customer Telephone Number (603) 289-4557. These communications are preserved. During a phone call, an unidentified male conversed in English, but had a side conversation in Spanish overheard on the call. On November 25, 2020, a Spanish speaking agent familiar with this investigation reviewed the Spanish portion overheard on the call with the UC and compared it with a call between CRUZ, using Target Telephone 5, and COSITA, who was using (603) 952-0317. COSITA was identified as the user of (603) 952-0317 because CRUZ identified him by that name during intercepted calls and based on surveillance (as described further below). This call was

intercepted over Target Telephone 5 (Session 3564). The Spanish speaking agent conducting the voice comparison believes that COSITA was the user of the Customer Telephone Number on November 18, 2020 during the call with the UC.

65.     On November 25, 2020, investigators obtained a warrant to identify the precise location of the Customer Telephone Number (603) 289-4557. From November 27, 2020 to December 7, 2020, the precise location information for telephone number (603) 289-4557, located it within feet of 4205 Martin Luther King Street, Ayden, North Carolina. As described below, on October 15, 2020, an investigator observed COSITA (identified from social media photos) and his paramour, Tatiana Lopez, outside of this address. COSITA was carrying a new rolled-up carpet into the residence. The agent also observed a Honda Accord, bearing North Carolina registration HLR7250, at the residence. The vehicle is registered to Lopez at the Target Location. 4205 Martin Luther King Street, Ayden, North Carolina is a single-family residence. Credit reports also associate Lopez with this address. I believe that COSITA is the user of the Customer Telephone Number, and he receives orders from drug customers and dispatches drug couriers to fulfill those orders from his residence in North Carolina.

## Part III: Intercepted communications and surveillance

### A.  Communications intercepted over Target Telephone 1, Used By CRUZ

66.     Over the course of this investigation, investigators have intercepted communications and conducted surveillance of numerous Target Subjects. Below, I also describe numerous intercepted calls and identify the participants in those calls. Those identifications are based on a combination of several factors, including the following: (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) identification, by name, of the users of the telephones during the intercepted

communications; (3) cell phone subscriber information; and (4) public and law enforcement databases.

<u>July 7, 2020: CRUZ and DEMONIO discussed moving drug processing equipment into Target Location 3.</u>

67.     CRUZ was identified as the user of Target Telephone 1 based on surveillance conducted during controlled purchases of cocaine base from CRUZ on June 23, 2020 and voice comparison from prior controlled purchases of cocaine base from CRUZ using her prior telephones. Subsequent Target Telephones used by CRUZ were identified through voice comparison, common call analysis, and surveillance. DEMONIO was identified as the user of his phones through voice comparison and surveillance. Throughout intercepted calls in this investigation, CRUZ identified DEMONIO by name ("DEMONIO"). Throughout intercepted calls in this investigation, callers referred to CRUZ as "Anny." All communications between CRUZ and DEMONIO were in Spanish.

68.     On July 7, 2020, at 5:18 p.m., CRUZ, who was using Target Telephone 1, called DEMONIO, who was using telephone number (978) 397-7839. CRUZ greeted the user of the telephone as "DEMONIO." CRUZ stated, "Tell me." DEMONIO replied, "Um… I already brought all the machinery over there, to the place." CRUZ stated, "To your house?" DEMONIO replied, "Yes. You know, if we are going to do the stuff… No one is going to come in or out." CRUZ stated, "You don't have to tell me that!" DEMONIO replied, "You already know. Are we going to work today?" CRUZ stated, "I don't know, I'm checking." I believe that DEMONIO updated CRUZ that he had moved drug processing machinery into his apartment, Target Location 3. As discussed below and after further investigation, agents learned that DEMONIO's "house" is Target Location 3. I further believe that the drug processing location is a secure location that only

members of the FLACO DTO access ("You know, if we are going to do the stuff… No one is going to come in or out."). Lastly, I believe that during this call DEMONIO asked CRUZ if they were going to process and/or distribute drugs that evening ("Are we going to work today?").

<u>July 8, 2020: CRUZ arranged to supply drugs to CANN and collect drug proceeds at Target</u>

<u>Location 1</u>

69.     On July 8, 2020, at 12:25 p.m., CANN used telephone number (978) 761-9900 to call CRUZ, who was using Target Telephone 1. CANN was identified as the user of the phone as described below and because his business is the subscriber of this phone.  CANN asked, "Any luck with paint?" CRUZ replied, "Yeah, I have some." CRUZ and CANN discussed meeting in approximately one hour. CRUZ then stated, "Are you going to see me with the remaining of Pete's money or not?" CANN replied, "Yes, I do, I have that." CRUZ confirmed, "Ah, Okay, I will tell him that." I believe that CANN called CRUZ to be re-supplied with drugs (CANN: "Any luck with paint (code, meaning drugs)?" CRUZ: "Yeah, I have some."). CRUZ then asked if CANN had money owed to the FLACO DTO (CRUZ: "Are you going to see me with the remaining of Pete's (an alias/moniker used by the FLACO DTO) money or not?"). At 2:25 p.m., CANN again called CRUZ looking to meet in the area of "53 Washington Street" in Lawrence, Massachusetts.  There is no building at this address, but the address is one house-length away from Target Location 1, which is situated on the corner of Lake and Washington Streets in Lawrence. The rear door of Target Location 1 faces Washington Street, and is recessed from the building making it difficult for investigators to surveil the door itself. During the call, CANN had difficulty locating a blonde woman who CRUZ sent to meet CANN because of construction on Washington Street (CRUZ: "Okay. If you pass 60, there should be 55, then 53, then the end of the street with a fence. There is a big old fence, Mike [unintelligible]. It's a company, at the end of Washington Street. It's right

before the end. She is going to be outside. She is blonde. You're going to see her."). Investigators later learned that REBUSERA is "the blonde woman" who CRUZ frequently directs to meet couriers and suppliers.[13] CANN was later overheard meeting with an unidentified female and told her, "You're welcome. Thank you." The unidentified female was overheard replying, "You were kind of lost, right?" While CANN was still overheard meeting with the unidentified female, CRUZ stated, "I left you two. You heard? You heard Rich?" CANN replied, "Okay." I believe that CANN met with REBUSERA to receive two units of drugs ("I left you two. You heard? You heard Rich?"). CANN's full name is James Richard CANN, and I believe CRUZ refers to him as Rich and/or Rick.[14]

<u>July 9, 2020: UF-4248 sampled fentanyl for CRUZ and described the poor quality</u>

70.     On July 9, 2020, at 6:29 p.m., CRUZ, using Target Telephone 1, called an unidentified female (hereinafter, "UF-4248") using (978) 566-4248 and stated, "You home, ma?" UF-4248 replied, "Yeah." CRUZ stated, "Okay. I'm dropping that off now, okay?" UF-4248 replied, "Alright. Thank you. Okay." Based on the following call, I believe that CRUZ was dropping off fentanyl for UF-4248 to sample and review. At 7:15 p.m., CRUZ, using Target

---

[13] Investigators determined a top telephone contact to CRUZ was a telephone number subscribed to Rosalba Bernechea Veras. Upon viewing a photograph of Bernechea from the Registry of Motor Vehicles, investigators confirmed that Bernechea, a/k/a REBUSERA is the blonde woman observed by investigators throughout the investigation accompanying CRUZ and delivering money and receiving drugs on her behalf. During intercepted calls, CRUZ referred to her as REBUSERA (Spanish meaning, troublemaker). Further surveillance observations of REBUSERA are detailed in this affidavit.

[14] A cooperating defendant identified CANN as "Rick the plumber," who was a drug courier for the FLACO DTO. This cooperating defendant has purchased fentanyl from CANN in the past and has witnessed CANN with amounts of fentanyl consistent with re-distribution. CANN is in fact a plumber who owns his own plumbing business. This cooperating defendant was a drug user and has convictions for drug distribution offenses. Based on the corroboration described herein, I believe that the information received from the cooperating defendant is reliable and credible. The cooperating defendant is available to testify.

Telephone 1, called UF-4248 and after greeting one another, UF-4248 stated, "Has that been the 'fen' that you guys been using for the food?" CRUZ replied, "No, that one is different. That one is from…" UF-4248 interrupted, "Yea, but it shouldn't… mind you I didn't go get my medicine and I had opened up a five…" CRUZ interrupted, "How much you put on it?" UF-4248 replied, "No, I didn't girl. I opened up the fentanyl and then I crushed it and I took two lines for me. Because I been feeling crappy all day, and I feel the same. Like I didn't even take anything. Nothing! Nothing! Nothing! That fentanyl is no good." CRUZ replied, "You took…" UF-4248 interrupted, "I'm just telling you, so he doesn't… so you don't make no more food with that, because the food is weak." I believe that UF-4248 advised CRUZ that she opened a five-gram bag of compressed fentanyl, crushed it, and ingested two lines of fentanyl ("I had opened up a five… I crushed it and I took two lines for me."). I believe that after ingesting the fentanyl, UF-4248 advised CRUZ not to dilute the fentanyl any further because the fentanyl was weak (UF:4248: "I'm just telling you… so you don't make no more food (slang meaning, drugs) with that, because the food is weak.").

### July 9, 2020: CRUZ informed DEMONIO about the poor quality of fentanyl

71.     After the poor review from UF-4248, on July 9, 2020, at 10:21 p.m., DEMONIO called CRUZ, who was using Target Telephone 1. CRUZ stated, "Supposedly, there is some gifts (code meaning, drug packages) that are good and there is some gifts that are not good." DEMONIO replied, "You know that's not true. Okay? If you want to come to my house right now." CRUZ said, "I told him, one cannot be good and the other one be bad, because all of that… I said to him, that can't happen. Maybe you are doing something somewhere else, because if one half is bad the other half also has to be bad. That's what I told him." DEMONIO replied, "Listen… all the gifts have to be bad." CRUZ stated, "That's what I told him. After that has been blended, we process it

all together again through that same thing." DEMONIO replied, "I said, listen, I'm the one that takes care of that… Don't start now. Okay. Yeah. Where are you? Are you going to swing by the house?" I believe that DEMONIO was concerned that an entire batch of fentanyl was processed poorly, resulting in poor quality fentanyl ("Listen… all the gifts have to be bad… I'm the one that takes care of that… Don't start now. Okay.") and that DEMONIO and CRUZ did not believe that only half the batch of fentanyl could be poor quality because they were processed together ("After that has been blended, we process it all together again through that same thing.").

### July 10, 2020: CRUZ arranged to be resupplied with drugs

72.     On July 10, 2020, at 10:43 a.m., an unidentified male known only as Pepe contacted CRUZ by calling Target Telephone 1. Pepe stated, "You are probably out of what I usually ask you for, but it is very high demand. I need like four of them… I need it ASAP." CRUZ replied, "Let me call right now." Pepe stated, "Let me know the price on it, on two and then four… Let me know. I won't rush you, just let me know. I will wait on your text or your call." I believe that Pepe ordered four units of an unknown drug type from CRUZ and that CRUZ needed to make a phone call before she could supply Pepe with the drugs.

73.     On July 10, 2020, at 12:07 p.m., CRUZ, who was using Target Telephone 1. called an unidentified male (hereinafter, "UM-4240") who was using (857) 269-4240 and stated, "My love, I need to see you urgently." UM-4240 replied, "Where are you?" CRUZ stated, "I am at Sonesta now, so if you want to, you can come through the back." UM-4240 asked, "Where?" CRUZ clarified, "At Sonesta in Andover… At 4 Tech Drive, after La Quinta, on the left-hand side." I believe that CRUZ needed to obtain drugs from UM-4240 in order to supply Pepe. I further believe that CRUZ directed UM-4240 to her former residence at the Sonesta Hotel at 4 Tech Drive in Andover (hereinafter, the "Sonesta Hotel"). Through records from Sonesta Hotels Corporation,

investigators learned that CRUZ was staying in a room at the Sonesta Hotel at the time. CRUZ

later stated, "Listen. Bring me four. I will pay you for two now and the other two later." UM-4240

replied. "Be ready on the phone. Alright." I believe that CRUZ ordered the four units of drugs

from UM-4240 to be delivered to Pepe. I further believe that CRUZ would pay for two units at the

time of delivery and receive an additional two units on consignment from UM-4240.

74.     At 12:20 p.m., UM-4240 called CRUZ and stated, "I am here next to your car."

CRUZ replied, "Alright, I'll be right out." I believe that UM-4240 met CRUZ outside the Sonesta

Hotel in order to complete the deal they discussed minutes earlier.

<u>July 11, 2020: CRUZ and DEMONIO discussed leaving cutting agents for their drug testers</u>

75.     On July 11, 2020, at 10:56 a.m., DEMONIO called CRUZ, who was using Target

Telephone 1. After greeting one another CRUZ stated, "The 'decoracion' (Spanish, meaning

decoration, slang meaning, cutting/diluting agents) for the sample… he wants to give it to his

junkies, so that he doesn't have to be involved." I believe that CRUZ told DEMONIO that "he"

(meaning, COSITA) wanted to provide his drug testers with a bulk supply of cutting or diluting

agents so that they can sample and review drugs for the FLACO DTO without having to be

supplied with cutting agents for each review.

<u>July 12, 2020: CRUZ called TIO to facilitate a drug delivery to Ossipee, New Hampshire</u>

76.     On July 12, 2020, at 11:56 a.m., CRUZ, who was using Target Telephone 1,

received a text message from an unidentified female (hereinafter, "UF-6877") who was using (603)

733-6877. UF-6877 stated, "Hey." Shortly after the incoming text message, CRUZ called UF-6877

and UF-6877 stated," Good morning, baby, Just getting up?" CRUZ replied, "Yea… He woke me

up." CRUZ then stated, "What you need? He didn't give me the order, he just told me that you

called." I believe that UF-6877 called the FLACO DTO Customer Telephone Number and placed

an order. I believe that COSITA then contacted CRUZ and directed her to contact UF-6877 to complete the deal. UF-6877 stated, "Um… Alright, so um… Just 50 and 14." CRUZ replied, "Okay." I believe that UF-6877 ordered 50 grams and 14 grams of two unknown drugs and CRUZ acknowledged that she would arrange the delivery.

77.     At 12:49 p.m., CRUZ, using Target Telephone 1, called TIO who was using (978) 566-6575. TIO was identified as the user of this phone through surveillance. CRUZ stated, "Ossipee (referring to UF-6877) called me." TIO replied, "Sounds good. Damn, why didn't she go yesterday?" CRUZ responded, "She called me like 20 minutes ago." During the call, CRUZ indicated she was getting a call from COSITA before ending the call ("COSITA is calling me. Let me see."). TIO said COSITA was calling him also ("Calling you and me as well."). CRUZ said she would talk to COSITA ("Let me see what he wants."). No incoming call from COSITA was intercepted or identified on Target Telephone 1. Investigators learned that throughout this investigation CRUZ communicated with COSITA by telephone and on Whatsapp, an end-to-end encrypted communication platform, to avoid law enforcement detection. At 1:42 p.m., CRUZ called (857) 361-9959 and spoke with TIO. TIO was identified as the user of this second telephone through voice comparison. TIO occasionally used this second telephone to contact CRUZ. As described above, it is common practice for drug traffickers to use multiple cellular telephones while conducting drug business. The two of them complained about COSITA insisting that CRUZ meet with TIO, but at the time TIO was packing his apartment. TIO later stated, "No, regarding Ossipee's, I can take care of that easily. I am going to go get my nails done right now." CRUZ replied, "Listen, don't even tell him (I believe CRUZ was referring to COSITA) later that you are seeing Ossipee. When you leave, just tell him that you have something to do." TIO stated, "No, of course." CRUZ replied, "Because then he will start complaining asking why I gave you that call

when you've got people to see." I believe that TIO offered to meet with UF-6877 to complete the

deal for 50 grams and 14 grams of an unknown drug. I believe that CRUZ did not want COSITA

to find out that CRUZ arranged for TIO to meet UF-6877 because TIO had other drug deals to

complete ("He will start complaining asking why I gave you that call when you've got people to

see."). Then TIO stated, "He asked me to go to Hampton to see someone, and it was no other than

the neighbor from across the police… So the guy comes and asks, 'What are you guys doing there?'

I was talking to the guy, and I had all the *regalos* (Spanish, meaning gifts, code meaning, drug

packages) on me." I believe that TIO complained to CRUZ that COSITA had sent him to deliver

drugs, to a customer in Hampton, New Hampshire, who lived across the street from a police officer.

78.     At 6:09 p.m., UF-6877 called CRUZ and stated, "You got the half then?" CRUZ

replied, "TIO is gonna go see you, okay?" UF-6877 stated, "Okay. Good." I believe that during

this call CRUZ confirmed that TIO would deliver UF-6877's order of drugs from earlier that

morning.

<u>July 16, 2020: CRUZ facilitated a drug delivery to CANN, surveilled by agents at Target</u>

<u>Location 1</u>

79.     On July 16, 2020, at 12:54 p.m., CANN called CRUZ, who was using Target

Telephone 1. CANN stated, "Hey, do you have any paint?" CRUZ replied, "Yes." CANN

requested, "I need two. You sound tired. You need a little time?" CRUZ replied, "Yea, I just woke

up." CANN acknowledged and stated, "Alright, I will call you back in a half-hour or an hour." At

2:01 p.m., CANN again called CRUZ and stated, "I need two." CRUZ replied, "Okay, I am

bagging it up right now." CANN and CRUZ then discussed meeting in 15 minutes. At 2:29 p.m.,

CANN called Target Telephone 1 and an unidentified female answered the phone. The

unidentified female stated, "She's in the shower, she said if you could meet her at Washington

Street." CANN replied, "Okay, the same place I met before?" Based upon the investigation and the intercepted phone call between CANN and CRUZ on July 8, 2020, investigators believed that the unidentified female directed CANN to the area of Target Location 1. At 3:25 p.m., CANN again called CRUZ. CRUZ stated, "Go to Washington." CANN replied, "I am on Washington now." CRUZ stated, "Okay, I am at the light with a little traffic." Based upon this investigation thus far, I believe that CANN ordered two "sticks," meaning 20 grams of fentanyl, from CRUZ (CANN: "Do you have any paint?... I need two.") and that CRUZ directed him to the area of Target Location 1 to complete the deal. After the 2:29 p.m. call between CANN and Target Telephone 1, agents established surveillance in the area of Target Location 1. Concurrent with the call at 3:25 p.m., a surveillance agent observed CANN in a red Mini Cooper, bearing Massachusetts registration JF399Y, registered to CANN at Target Location 7, turn onto Washington Street from Manchester Street and park in the area of Target Location 1. At 3:29 p.m., agents observed a Liberty Taxi arrive and park in the area of Target Location 1. Agents observed CRUZ and REBUSERA approach Target Location 1 on foot and walk out of view. Agents then observed REBUSERA (observed with blonde hair) exit Target Location 1 from the door on Washington Street and approach CANN's vehicle. Agents observed her reach into the front passenger seat window and return into Target Location 1. CANN then departed the area. The interaction between REBUSERA and CANN was video-recorded by a surveillance officer. Based upon the investigation and the intercepted calls, I believe that REBUSERA delivered 20 grams of fentanyl to CANN, as arranged by CANN and CRUZ. Thereafter, surveillance agents terminated surveillance.

<u>July 20, 2020: DEMONIO recruited new drug couriers</u>

80.     On July 20, 2020, at 3:41 p.m., DEMONIO called CRUZ, who was using Target Telephone 1. Prior to DEMONIO and CRUZ greeting one another, DEMONIO was overheard speaking with an unidentified male in the background of the call. After greeting CRUZ, DEMONIO stated, "Listen, I have the *pichones* (Spanish, literal translation meaning birds, and code meaning, drug couriers) and you haven't called him nor told him anything. You have it on standby. What's up with that?" CRUZ replied, "Ah, on standby. Well, I told COSITA and he said he would let me know." DEMONIO instructed, "Well, call him because they're here with me." CRUZ explained, "But what am I going to call him for? To just tell him, 'I will call you later or I will call you when [unintelligible]? I'm not the boss DEMONIO. I have to wait for COSITA to say it's alright. Because you tell me… I'm not the one who's going to be [unintelligible]." DEMONIO replied, "Listen! Take out the *freco* (Spanish, meaning a person who is fresh and/or rude)." CRUZ clarified, "The *Prepotente* (Spanish, meaning the conceited one) f*****, that one?" DEMONIO replied, "That one, throw that one away and insert one of the *pichones* for me because the other is a *freco*, okay? Throw that one away and insert one of those guys… Tell *el soldado* (Spanish, meaning the solider). If not, then I'm not going to hand anything out." Based upon the investigation, I believe that DEMONIO recruited new drug couriers for the FLACO DTO (DEMONIO: "Listen, I have the *pichones*."). CRUZ explained to DEMONIO that she needed COSITA's approval before she could put a new drug courier to work for the FLACO DTO (CRUZ: "I'm not the boss DEMONIO. I have to wait for COSITA to say it's alright."). I further believe that DEMONIO refused to re-supply drug couriers with drugs unless *Prepotente*, a drug courier that DEMONIO disfavored, was replaced with one of the new drug couriers that DEMONIO recruited (DEMONIO: "Throw that one away and insert one of the *pichones* for me because the

other is a *freco*, okay? Throw that one away and insert one of those guys… Tell *el soldado*

(meaning, COSITA). If not, then I'm not going to hand anything out.").

July 14, 2020: FLACO and CRUZ arranged a drug deal and identification of Target Location 2

81.     On July 14, 2020, at 5:13 p.m., FLACO, using Target Telephone 3, called CRUZ,

who was using Target Telephone 1. FLACO was identified as the user of Target Telephone 3

through surveillance. CRUZ asked FLACO, "Does DEMONIO owe you still?" FLACO replied,

"Sure he owes me, he knows he owes me." CRUZ responded, "So look, I will take it so you can

tell him, DEMONIO, what's up." FLACO agreed, "Yes, like that. Bring it to me so I can go out

and talk to him." CRUZ added, "Without him knowing, okay." FLACO then asked, "Look, and

yours, your little crazy friend, what does the f***** say?" CRUZ asked, "COSITA?" FLACO

asked, "Is he into nothing yet?" CRUZ replied, "He still has some left there buddy." FLACO urged,

"Well he better get prepared because I have something here and that has, that is good." I believe

that CRUZ asked FLACO if DEMONIO owed FLACO money ("Does DEMONIO owe you

still?"). I believe that CRUZ intended to take out the money DEMONIO owed FLACO from

DEMONIO's pay without telling him ("So look, I will take it so you can tell him, DEMONIO,

what's up… Without him knowing, okay."). Then, FLACO could confront DEMONIO about the

money that was owed ("Yes, like that. Bring it to me so I can go out and talk to him."). I further

believe that FLACO wanted to know if CRUZ knew if COSITA had drugs left because FLACO

had a good supply of drugs (regarding COSITA, FLACO: "Is he into nothing yet?" CRUZ: "He

still has some left there buddy." FLACO: "Well he better get prepared because I have something

here and that has, that is good.").

82.     On the same day, at 9:38 p.m., CRUZ, using Target Telephone 1, called an

unknown male identified as "Papo," a drug tester for the FLACO DTO, and asked him to come to

Washington Street. Based upon the investigation, I believe that CRUZ requested Papo to go to Target Location 1 to test drugs for the FLACO DTO.

83.     On the same day, at 9:57 p.m., CRUZ, using Target Telephone 1, called FLACO, who was using Target Telephone 3. CRUZ stated, "I gave them both the sample and the dude is here with me. He is going to sample it now. He asks if you are going to be ready right away so he can call you." FLACO replied, "Yes, it's alright. He can hit me up. I had to go to Boston, but hit me up. He needs to check it well so there won't be issues later." CRUZ interrupted, "It's for now, for right now. I just gave him mine first to see what's up… I am here with him now. That's why I am calling you because the dude is going to do it with the tubes now. I will hit you up right away. That way you can see me and be on your way." FLACO acknowledged, "Alright." I believe that during this call, CRUZ advised FLACO that she provided Papo with a sample fentanyl and that he would smoke the fentanyl shortly to provide a review of the drugs ("It's for now, for right now. I just gave him mine first to see what's up… I am here with him now. That's why I am calling you because the dude is going to do it with the tubes now. I will hit you up right away.").

84.     Shortly after hanging up with FLACO, at 10:01 p.m., CRUZ called Papo and asked, "Did you sing yet?" Papo replied, "Yes." CRUZ asked, "How is it?" Papo explained, "Better than yesterday." CRUZ asked, "But, can you feel the, the thing? Is it good?" Papo answered, "The other one was more powerful." CRUZ asked, "Okay, what about that one, what would you give? Like an eight?" Papo agreed, "Yes, it's an eight." I believe that CRUZ provided Papo with a sample of fentanyl at Target Location 1 and Papo thereafter, left to dilute and smoke it. I further believe that Papo provided a positive review of the drugs, remarking that it was a 8 out of 10 in terms of quality, and that the drugs received the day prior were less satisfying, but more potent (Papo: "Better than yesterday… The other one was more powerful." CRUZ: "Okay, what about that one, what would

you give? Like an eight?" Papo: "Yes, it's an eight.").

85.     On the same day, at 10:06 p.m., CRUZ, using Target Telephone 1, called FLACO, who was using Target Telephone 3. CRUZ stated, "Listen, he says that it's not like… from out of this world, but at least it can be up another. The one I made, I made at six, right?" FLACO affirmed, "Yes." CRUZ stated, "And it gave me some seven and a half, and he made it at five and the guy gave him an eight in front of me and he put it through the pipe." FLACO asked, "So, it's good then. What does he want?" CRUZ replied, "How is it good? If it worked low, it's not as good as it's supposed to be. It's supposed to give him a ten if he made it at five, and he works at four and a half, and raised half a point to see if it will be like that." FLACO asked, "At what did he make it?" CRUZ answered, "He made it at five to try it out but…" FLACO interrupted, "At five, okay. I understand you, yes." Based upon Papo's review and this intercepted call, I believe that CRUZ explained to FLACO that the sample of fentanyl she gave to Papo was not strong enough because she expected that even adding five grams of cutting agent, Papo's review would be 10 out of 10 ("It's supposed to give him a ten if he made it at five.").

86.     On the same day, at 10:07 p.m., a surveillance agent observed Liberty Taxi #56 outside of Finest Cutz barbershop at 55 Broadway, Methuen, Massachusetts. At 10:38 p.m., a surveillance agent observed CRUZ inside of Finest Cutz with three other unidentified individuals. All of them appeared to be cleaning the barbershop and preparing it for closing. At 10:41 p.m., all of the individuals exited the barbershop. CRUZ and the three individuals all got into the Liberty Taxi. Agents surveilled the vehicle to the area of 34 Easton Street in Lawrence. There, a gray Mercedes C300, registered to Alamo, parked behind the Liberty Taxi. Due to lighting conditions, surveillance agents could not identify who was driving the Mercedes. At 11:04 p.m., one of the unidentified males ("UM1") exited the Liberty Taxi and walked towards 34 Easton Street and out

of view. Upon returning to the sidewalk outside of 34 Easton Street, UM1 was carrying a trash

bag, which he placed into the driver's side rear seat of the Mercedes. Minutes later, CRUZ removed

the trash bag from the Mercedes and placed it into the trunk of the Liberty Taxi and entered the

taxi. Agents then surveilled Liberty Taxi #56 meet with Liberty Taxi #77 in the area of Lafayette

Avenue in Lawrence, a half-mile away from 34 Easton Street. While on Lafayette Avenue, another

unidentified male approached Liberty Taxi #56, opened the trunk, and carried a trash bag from the

taxi towards the area of 27-29 Lafayette Avenue. Liberty Taxi #56 then returned to Easton Street

and parked behind the Mercedes. At 11:26 p.m., Liberty Taxi #77 arrived in front of 34 Easton

Street. CRUZ entered the front passenger seat of Liberty Taxi #77 and the other occupants of

Liberty Taxi #56 entered the rear passenger compartment of Liberty Taxi #77. Agents continued

their surveillance and at 11:35 p.m., an agent observed Liberty Taxi #77 stopped at the front

entrance of Target Location 2.  At 11:39 p.m., an agent observed CRUZ exit the front entryway of

Target Location 2 and re-enter Liberty Taxi #77. Agents terminated surveillance shortly thereafter.

Based on surveillance observations, investigators believe that CRUZ exited Liberty Taxi #77 and

enter Target Location 2 before exiting Target Location 2 and re-entering Liberty Taxi #77.  Based

on the lighting conditions and street configuration, investigators were not able to observe Liberty

Taxi #77 continuously and lost sight of the taxi for a few minutes.

87.     Simultaneous to agents' observations above, intercepted calls showed

communication between CRUZ, who was using Target Telephone 1 and FLACO, who was using

Target Telephone 3. At 10:48 p.m., CRUZ called FLACO. FLACO stated, "Give me 15 minutes

there?" CRUZ acknowledged, "Okay." At 11:17 p.m., FLACO called CRUZ. CRUZ asked,

"Hello? Can I go now?" FLACO replied, "Yeah, tell me." CRUZ asked, "Can I swing by?"

FLACO affirmed, "I am telling you, it seems like there is a bad signal. Why don't you send me a

message or something? Because there is a bad signal." I believe that during the calls at 10:48 p.m. and 11:17 p.m., FLACO and CRUZ arranged to meet in person. I believe that CRUZ met FLACO at Target Location 2. As will be discussed below, investigators identified Target Location 2 as FLACO's residence.

<u>July 10, 2020: CRUZ attempted to order drugs from CIBAO</u>

88.    On July 10, 2020, at 8:39 p.m., CIBAO, using Target Telephone 4, returned a phone call CRUZ made minutes earlier over Target Telephone 1. After greeting, CRUZ asked, "I wanted to ask you if you had some food?" CIBAO replied, "There is some here, but imagine, what do you give me? Tell me." CRUZ asked, "Can you give me some of what has that horse thing?" CIBAO inquired, "What do you mean horse?" CRUZ clarified, "The thing that you gave that…" CIBAO interrupted, "Don't talk to me about that. I have some *Purina* that I can give you some, a five." CRUZ replied, "Give me five so I can check." CIBAO stated, "But it will have to be in the morning because I'm at Cava having some drinks. If you wait until morning when I wake up around 10 or 11." CRUZ replied, "Alright, call me tomorrow. This is my new number." During this call, I believe CRUZ asked CIBAO if he had any drugs available ("I wanted to ask you if you had some food?") I believe that CRUZ asked if CIBAO had any fentanyl mixed with carfentanil ("Can you give me some of what has that horse thing?"). Carfentanil is an analogue of fentanyl that is several more times potent and is used to anaesthetize large animals. I believe that CIBAO declined and stated that he had fentanyl, nicknamed *Purina*, for CRUZ ("Don't talk to me about that. I have some Purina that I can give you some, a five."). I believe that CRUZ ordered five grams of the fentanyl, nicknamed *Purina*, to check its potency ("Give me five so I can check."). I believe that CIBAO was socializing at the time and unavailable to meet with CRUZ until the following morning ("But it will have to be in the morning because I'm at Cava having some drinks. If you

wait until morning when I wake up around 10 or 11.").

### July 11, 2020: CIBAO agreed to provide a sample of fentanyl to CRUZ

89.      On July 11, 2020, at 1:05 p.m., CIBAO, using Target Telephone 4, called CRUZ in response to the order from the prior night. The call was intercepted over Target Telephone 1. CIBAO stated, "Are you guys going to be positive, because I am going to meet with the person in about an hour." CRUZ replied, "Give me a photo (slang, meaning sample) first, and I will let you know." CIBAO agreed, "Alright then, when I have the photo in hand, I will call you so you can go by and get it." I believe that CIBAO arranged to provide a sample of his fentanyl to CRUZ as discussed during the prior night ("Give me a photo first, and I will let you know." CIBAO: "Alright then, when I have the photo in hand, I will call you, so you can go by and get it."). At 7:42 p.m., CIBAO called CRUZ and asked to meet at Mamajuana Restaurant at 118 South Union Street in Lawrence. At 8:16 p.m., CRUZ called CIBAO and informed him that she was outside in a taxi and that she saw him. Based upon the calls at 7:42 p.m. and 8:16 p.m., I believe that CRUZ and CIBAO met to complete the deal for a sample of fentanyl.

### July 13, 2020: CRUZ received a supply of suspected fentanyl from CIBAO and obtained a positive review of the drugs from Papo.

90.      On July 13, 2020, at 1:51 p.m., CRUZ, using Target Telephone 1, called CIBAO, who was using Target Telephone 4. CRUZ greeted the user of Target Telephone 4 as CIBAO. CRUZ stated, "They are going to do the sample later." CIBAO replied, "That's fine, just let me know." CRUZ stated, "If it's good just like the sample, four or five." CIBAO responded, "But you know it… are you going to collect the seven that are pending for me?" CRUZ replied, "I am going to hit COSITA up, and I will let you know." At 1:55 p.m., CIBAO called CRUZ, who was using Target Telephone 1, and stated, "The only thing I am asking is to confirm if he wants 300 or 400

and confirm that he has the 7,000." CRUZ replied, "400, get him 400. I am going to tell him right

now." At 5:34 p.m., CRUZ, using Target Telephone 1, called CIBAO and stated:

> "He says that you guys agreed on something, that he was going to give you 1,000 pesos
> monthly. Don't forget that he was not able to get rid of that. But since he mixed it, he had
> to come through with it, right? So, you know it's monthly and the month is still not over,
> and this week you will be paid the 1,000 pesos that you are supposed to be paid monthly.
> How can you expect him to give you money, 7,000 pesos, for something that you know it's
> just sitting there, and he is just paying you for that because of the responsibility, because
> you know what happened with that. So, he is saying for you not to treat him like this,
> because even if he pays late, you know that he will pay you."

91.    CIBAO replied, "Yeah, but if I get this for you guys, he can't take too long because

this is good." CRUZ later replied, "I am going to see if I can bring you at least 3,000 pesos." CRUZ

then continued, "Call, but make sure it's the same. I am waiting for the lady to come, so she can

try it in front of me. Because if I leave it for him to tell me yes or no, you know how it is with

him." I believe that CRUZ ordered a sample of fentanyl from CIBAO. Contingent upon a positive

review of the sample, CRUZ ordered 400 grams of fentanyl ("If it's good like the sample, four or

five… 400, get him 400.") I believe that COSITA owed CIBAO $7,000, but that COSITA was

unsatisfied with the fentanyl received from CIBAO on a prior deal because COSITA could not sell

it ("How can you expect him to give you money, 7,000 pesos, for something that you know it's

just sitting there."). Nonetheless, CRUZ assured CIBAO that COSITA would pay $1,000 per

month for the debt and that she would try to bring CIBAO $3,000 to go towards the outstanding

debt ("I am going to see if I can bring you at least 3,000 pesos.").

92.    Unrelated to meeting with CIBAO, at 5:55 p.m., CRUZ called UM-4240 and stated,

"My love... please allow me a little while so I can give you the 200 that I owe you, and that way I

will be clear." UM-4240 agreed, "Alright then." I believe that CRUZ wanted to arrange to pay

UM-4240 $200 that was outstanding from a prior drug transaction ("My love... please allow me a

little while so I can give you the 200 that I owe you, and that way I will be clear."). As discussed

below, agents surveilled this meeting at the same time she met with CIBAO.

93. At 5:39 p.m., CIBAO, using Target Telephone 4, called CRUZ, who was using Target Telephone 1. CIBAO stated, "It won't be until tomorrow. That guy will receive a whole thing, and he only has 150 right now." I believe that CIBAO's drug supplier only had 150 grams of fentanyl and that he would receive another kilogram ("a whole thing") the next day, from which CIBAO could complete the order for 400 grams of fentanyl. CIBAO and CRUZ then discussed the deal for 150 grams of fentanyl and receiving another sample from the kilogram of fentanyl that was scheduled to arrive the following day (CIBAO: "That's what's left and then tomorrow, he's going to break another one." CRUZ: "Do not complete [the order] from that one. You will give me a smaller picture (meaning, sample)." CIBAO: "In an hour and a half I will get you one and a half (meaning, 150 grams of fentanyl) … I will get you a taste (meaning, sample), like you said, and then I will complete the rest, okay?" CRUZ: "Alright.") At 7:44 p.m., CIBAO called CRUZ and arranged to meet in the area of Target Location 1 (CIBAO: "Give me an address so I can put it in the GPS." CRUZ: "53 Washington." CIBAO: "53 Washington? Okay. North?" CRUZ: "Uh-huh." CIBAO: "53 Washington. Okay, I'm coming."). Target Location 1 is on the north side of Lawrence.

94. Related to the payment of UM-4240, at 7:34 p.m., UM-4240 called CRUZ and CRUZ answered, "I'm coming down from Walmart, I will tell you when I am by Washington." UM-4240 replied, "Okay, I'll start heading there now because I am in the south anyways." I believe that CRUZ arranged to meet UM-4240 at the same time she met CIBAO, in the area of Target Location 1. I believe that UM-4240 agreed to start heading in that direction because he was on the south side of Lawrence. Prior to this meeting, agents established surveillance in the area of Target Location 1.

95.     At 7:55 p.m., agents observed a gray Lexus SUV arrive in the area of Target Location 1. Based upon a review of RMV records, and agents' prior observations of UM-4240, agents believe that the operator of the gray Lexus SUV may be UM-4240. At 8:01 p.m., agents observed CRUZ arrive in the area driving Liberty Taxi #59. CRUZ parked, exited the Liberty Taxi, and approached the gray Lexus SUV with a small package, which she handed to the driver through the driver's window. The Lexus SUV then left the area. Shortly thereafter, CRUZ then approached a brown Ford Escape, registered to Junior De La Rosa Martinez ("GUAYACAN"),[15] at 158 Water Street, Apartment 15, Lawrence, Massachusetts, and approached the passenger's side window and spoke with the driver. Due to agents' obstructed and distant view, they could not observe the entire interaction between CRUZ and the driver of the Ford Escape. Based upon the intercepted calls, I believe that CRUZ delivered money to UM-4240, who was driving the Lexus SUV, and received a sample of fentanyl from CIBAO, who was driving the Ford Escape.

96.     At 8:42 p.m., CRUZ called Papo. CRUZ stated, "I have something for you." Papo stated, "I am at my house." CRUZ replied, "Alright, I am going to swing by there then." At 9:08 p.m., Papo called CRUZ and stated, "I give you a nine *mamita*. It's not leaving a lot of cut, it's good, you know?" CRUZ replied, "So, this one was neat on the spoon?" Papo stated, "It's good on the spoon, yeah. It does not leave a lot of cut." Based upon the timing of the intercepted calls and this investigation, I believe that CRUZ supplied Papo with a sample of the 150 grams of fentanyl that she received from CIBAO ("I have something for you."). I further believe that Papo injected the fentanyl and provided a positive review because the fentanyl heated uniformly prior to injection (Papo: "I give you a nine… it's not leaving a lot of cut." CRUZ: "This one was neat

---

[15] As will be discussed below, GUAYACAN is a drug courier working at the direction of CIBAO.

on the spoon?" Papo: "It's good on the spoon.").

**B.  Communications intercepted over Target Telephone 2**

August 20, 2020: UM-2226 ordered drugs from CRUZ

97.     On August 20, 2020, at 2:49 p.m., CRUZ, using Target Telephone 2, called an unidentified male (hereinafter, "UM-2226"), who was using (603) 213-2226. After greeting one another, UM-2226 asked, "Are you around right now?" CRUZ replied, "Yeah, what you need?" UM-2226 answered, "Uh…a quarter and… 20 brown if you can." CRUZ clarified, "A quarter and what else?" UM-2226 replied, "20 brown." CRUZ asked, "Okay. You in Lawrence?" UM-2226 answered, "No, I'm not. I'm in, uh, Nashua right now. So, uh…" CRUZ stated, "I don't have a driver right now and neither does Pete (meaning, COSITA). And I don't want the same thing that always happens. I give the driver the shit, they take forever... and then… you know what I mean? So, until there's not a driver I don't know what to tell you. I got it. So… when he finds a driver, I'll let you know."  Based upon the investigation thus far, I believe that UM-2226 ordered a quarter-ounce of cocaine and 20 grams of fentanyl ("Uh…a quarter (slang meaning, a quarter ounce of cocaine) and… 20 brown (slang meaning, heroin and/or fentanyl) if you can."). Lastly, I believe that CRUZ did not want to establish a meeting time and location until she or COSITA could locate a drug courier for UM-2226's order ("I don't have a driver right now and neither does Pete. And I don't want the same thing that always happens. I give the driver the shit, they take forever... and then… you know what I mean? So, until there's not a driver I don't know what to tell you. I got it. So… when he (meaning, COSITA) finds a driver I'll let you know.").

August 20, 2020: CIBAO discussed a drug debt with CRUZ

98.     On August 20, 2020, at 3:39 p.m., CRUZ, who was using Target Telephone 2, received an incoming call from CIBAO, who was Target Telephone 4. After greeting one another, CIBAO

stated, "Now I'm going to, … I'm waiting for two [unintelligible] mine. We have a problem, man." CRUZ responded, "Yes. I spoke with him. I'm waiting." CIBAO stated, "Alright." CRUZ requested, "Send me, uh… the total. So, I can send it to him, and I don't have to go looking through my messages." CIBAO agreed, "Alright." CIBAO then sent a series of text messages to CRUZ stating, "8200. Minus. 2000. You gave me. 6200. Subtract. From that. You heard?" I believe that CIBAO contacted CRUZ to collect a $6,200 drug debt owed to him from COSITA ("We have a problem, man…. 8200. Minus. 2000. You gave me. 6200. Subtract. From that. You heard?"). I believe CRUZ needed to check with COSITA about the payment of the debt and wanted to confirm the amount ("Send me, uh… the total. So, I can send it to him, and I don't have to go looking through my messages.").

### August 22, 2020: CANN ordered cocaine from CRUZ

99.     On August 22, 2020, at 11:10 a.m., CANN called CRUZ, who was using Target Telephone 2. CANN asked, "Hey. You got white paint?" CRUZ replied, "I can get you some within the next half hour or so." CANN replied, "Okay. I'm leaving Billerica. Where can I go, Washington Street?" CRUZ replied, "Yeah, you could meet me there." CRUZ later clarified, "How many you need? Just one?" CANN answered, "Yea, just one. Um… I might need two actually. I only, I think I have enough money for one and a half, but I'll get it to you." Based on the investigation, I believe that CANN ordered two units of an undetermined amount of drugs from CRUZ, possibly cocaine (white is a common street term for cocaine) ("You got white paint?"; "I might need two actually."). I believe that CRUZ agreed to meet CANN in the area of Target Location 1.

### August 21, 2020: DEMONIO and CRUZ discussed picking up a drug press

100.    August 21, 2020, at 12:09 p.m., CRUZ, using Target Telephone 2, called

DEMONIO, who was using telephone number (978) 242-3410. CRUZ stated, "Um… COSITA called me back. He said to bring it to the guy on Tenney." DEMONIO replied, "Alright. Let me go to Sove's (a nickname for Soveria Alamo who is DEMONIO's wife and Edwin Alamo's sister)." CRUZ clarified, "Five 50s. Yellow ones." Based on this investigation, I believe that COSITA directed CRUZ to deliver five fifty-gram packages of fentanyl to a drug courier on Tenney Street in Methuen for re-distribution ("Five 50s."). I believe that DEMONIO needed to go to Target Location 3, the residence he shared with his wife to retrieve the drugs.[16]

<u>August 22, 2020: DEMONIO and CRUZ discussed using a drug press</u>

101.   On August 22, 2020, at 12:09 p.m., DEMONIO called CRUZ, who was using Target Telephone 2. DEMONIO stated, "*Bori* is going to work. To pick up the press." CRUZ replied, "He's going to work over at..." DEMONIO stated, "You already know where." CRUZ replied, "The auto shop?" DEMONIO stated, "Yes. He's…" CRUZ interrupted, "Is he going to leave you the key?" DEMONIO stated, "No, no, no… he is there. He is going to work right there." CRUZ replied, "Oh, okay. Listen, in the meantime, until we figure things out… we have to make a *tableta*. Um… let me see… when I get to La REBUSERA, I will check if the small amount of *decoracion* (slang meaning, cutting agent) that's there will be enough to make that *tableta*. That way we can get that cocksucker off our backs."  DEMONIO asked, "Just you? Just you?" CRUZ replied, "Yes, just me! No, you are going to meet me. Let me get there and I will call you to see if it's there." DEMONIO stated, "I'm on foot." CRUZ replied, "Call a taxi. Why would you go pick up a *tableta* to then leave right away? It's so you can make it hard at your house, because you have

---

[16] In other intercepted communications, DEMONIO discussed being intimate with other women, and I believe that he may stay with other women on occasion. Thus, I believe that DEMONIO needed to clarify to CRUZ that was going to the residence he shared with his wife, Target Location 3.

the machine at your house. You know that we have to make it hard." DEMONIO stated, "Alright. Call me." Based on the investigation, I believe that CRUZ and DEMONIO discussed processing and packaging drugs for distribution ("We have to make a *tableta*. Um… let me see… when I get to La REBUSERA, I will check if the small amount of *decoracion* that's there will be enough to make that *tableta*."). I further believe that CRUZ reminded DEMONIO that they needed to compress the drugs for distribution, a common method of processing drugs for distribution using a drug press ("Why would you go pick up a *tableta* to then leave right away? It's so you can make it hard at your house, because you have the machine (meaning, the drug press) at your house (meaning, Target Location 3). You know that we have to make it hard.").

   C. **Communications intercepted over Target Telephone 3**

   September 4, 2020: CRUZ discussed providing drug proceeds to FLACO

   102.   On September 4, 2020, at 6:15 p.m., FLACO, using Target Telephone 3, called CRUZ. This call was intercepted over Target Telephone 3. During this call, CRUZ conveyed that she had been trying to reach FLACO and was trying to get his phone number from an unidentified third party. FLACO stated, "But you had to tell him straight forward, 'Of course! It's for the tickets (slang meaning, drug proceeds)!'" CRUZ stated, "I am here in Methuen. If you would like, we can meet there in twenty minutes, on Washington." FLACO, replied, "Alright, in twenty minutes, I will head over there." I believe that CRUZ asked to meet FLACO in the area of Target Location 1.

   103.   After the call, on the same day, investigators established surveillance in the area of Target Location 1. Investigators observed REBUSERA walking a dog in the area of Target Location 1. At 6:52 p.m., an investigator observed a Jeep Grand Cherokee, bearing Massachusetts

registration 1CEF18, (hereinafter, "FLACO's vehicle") arrive in the area. FLACO's vehicle is registered to Jessica Diaz-Marinez. I believe that Jessica Diaz-Marinez is FLACO's paramour.[17]

104.    At 6:52 p.m., FLACO, using Target Telephone 3, called CRUZ. FLACO stated, "I'm here." CRUZ replied, "Oh… knock. The girl's there." FLACO acknowledged, "She's outside, call her." I believe that FLACO and CRUZ were referring to REBUSERA ("the girl").

105.    Approximately one minute later, investigators again observed REBUSERA outside of Target Location 1 walking a dog and carrying a package. Investigators observed REBUSERA approach the driver's side of FLACO's vehicle and hand the package to the driver. Based on investigators' vantage points, investigators could not identify the driver. Based in the intercepted calls preceding the meeting, however, I believe that FLACO was driving FLACO's vehicle. Thereafter, REBUSERA walked back towards Target Location 1 and FLACO's Vehicle left the area. At 7:01 p.m., CRUZ called FLACO, who was using Target Telephone 3. During the call, FLACO asked, "How much is there?" CRUZ answered, "5,500, my love." FLACO clarified, "Who are they from, yours?" CRUZ replied, "No, from my friend. That's not from *Perezoso* (Spanish meaning, the lazy guy, a reference to DEMONIO)." FLACO asked, "So, *Perezoso* for when then?" CRUZ replied, "*Perezoso* called me. I am going to go get him. He will most likely give me the money." FLACO stated, "Oh, see if it happens, please. I'm collecting money because the people are around. I will get on that today." Based on the investigation, I believe CRUZ directed

---

[17] Jessica Diaz-Marinez is the subscriber to utilities at Target Location 2. As described above, investigators observed CRUZ enter the building of Target Location 2 after calls were intercepted between her and FLACO about the potency of drugs. As discussed below, I observed FLACO approach the building of Target Location 5 (FLACO's second residence) after collecting drug proceeds from CRUZ. Diaz-Marinez has another vehicle registered to Target Location 5. Investigators further identified FLACO's alias, R.C.R., through photographs of Diaz-Marinez and FLACO on Diaz-Marinez's social media account. The true R.C.R. resides in Puerto Rico and has no involvement in this investigation.

REBUSERA to deliver $5,500 in drug proceeds to FLACO because FLACO needed to pay drug suppliers ("the people"). I further believe that CRUZ was going to see DEMONIO for the purpose of collecting drug proceeds from him ("*Perezoso* called me. I am going to go get him. He will most likely give me the money.").

106.    At 8:05 p.m., investigators observed FLACO's vehicle parked outside of Target Location 2 unoccupied. At 8:47 p.m., investigators observed FLACO come out of the building of Target Location 2 speaking on a cellular telephone. No corresponding call was intercepted on Target Telephone 3. I believe that FLACO utilizes multiple cellular telephones to thwart law enforcement detection. Investigators observed FLACO walk directly to FLACO's vehicle and enter the driver's seat. Investigators followed FLACO's vehicle as it travelled directly from the building of Target Location 2 to the area of Target Location 4.

107.    At 8:53 p.m., while FLACO was en route to Dorchester (Target Location 4), FLACO, used Target Telephone 3 to call an individual identified as "Andy," who was using (978) 397-0823. Based on intercepted calls, I believe Andy is FLACO's brother. Investigators have not fully identified Andy. During the call, FLACO stated, "Um... the five from the lesbian (meaning, CRUZ) brings it up to 22." Andy later stated, "We have to be careful leaving from there because I saw an SUV that I didn't like." FLACO responded, "Yes, I saw an SUV there too. It's what I'm telling you. We have to get out of there." Andy agreed, "I didn't like that." FLACO stated, "We have to leave from there because they might be looking at us and so... I'm telling you. We have to get out of there." FLACO continued later, "I don't know if you agree because I can stay at ease with Jessica there." FLACO further explained to Andy that he was turning off his phone for the night. Based on the investigation, I believe that FLACO explained to Andy that he had collected $22,000 in drug proceeds, including $5,500 from CRUZ ("Um... the five from the lesbian

(meaning, CRUZ) brings it up to 22."). I further believe that FLACO told Andy that he was staying in his second residence with Diaz-Marinez in Dorchester to avoid law enforcement detection ("I don't know if you agree because I can stay at ease with Jessica there."). At 9:32 p.m., investigators observed FLACO's vehicle park in the area of Target Location 4, a multi-unit apartment building. At 9:35 p.m., investigators observed FLACO walk down the driveway and approach the building of Target Location 4 and then out of view. Thereafter, surveillance was terminated.

108.    From September 10, 2020 until present, investigators have used a GPS tracking device on FLACO's vehicle. *See* 20-mj-2483-MBB. The GPS tracking device has indicated that approximately 75% of the time FLACO's vehicle is outside of Target Location 2 in the overnight hours and the remaining 25% of the time it is outside Target Location 4 during the overnight hours. I believe that FLACO's primary residence is Target Location 2 and his secondary residence is with Jessica Diaz-Marinez at Target Location 4. FLACO's vehicle was most recently located outside Target Location 2 on December 7, 2020 and Target Location 4 on December 8, 2020.

109.    On November 18, 2020, at 7:08 p.m., FLACO, using Target Telephone 3, called an unidentified male who is believed to be an unwitting landlord (hereinafter, "the Landlord"). The Landlord asked, "I have an apartment available and I'm showing it this weekend. Are you interested? Is it for you?" FLACO stated, "Yes, for me and my wife." The Landlord asked, "Do you live here in Lawrence?" FLACO answered, "Yes, I live in Lawrence and she lives in Boston. That's why I'm looking for an apartment over here." I believe that FLACO was interested in renting a new apartment and confirmed that he lived in Lawrence (Target Location 2) and that his paramour, Jessica Diaz-Marinez lived in Boston (Target Location 4). No further communications were intercepted between the Landlord and FLACO over Target Telephone 3. Further,

investigators continue to surveil FLACO's vehicle at Target Locations 2 and 4. Therefore, I do not believe that FLACO rented a new apartment.

<u>September 8, 2020: FLACO and CRUZ discussed a drug purchase</u>

110.    On September 8, 2020, at 4:46 p.m., CRUZ called FLACO, who was using Target Telephone 3. The call was intercepted. FLACO asked, "What about the crazy one?" CRUZ clarified, "*Perezoso*?" FLACO answered, "Yes, him." CRUZ answered, "He is with me calling his woman because she came last night. He's been with me all day. He will call you. Not sure for what." FLACO stated, "If he's going to call, he should hurry up. If not, he is out." CRUZ asked, "What should I tell him? I'm with him, so I can tell him if he has something, okay?" FLACO replied, "If he will want to work. I have a good one there." CRUZ asked, "The same you gave me from that guy to try?" FLACO stated, "Yes, the same I gave to you, but I think his one is better than that one. This one has to be… You know already. Tell him to call me." CRUZ asked, "How much should he bring?" FLACO answered, "He needs to pick up the tickets." CRUZ asked, "How much he needs?" FLACO answered, "He knows his debt. He knows how much he is at. He just needs to put something down." Based on the investigation, I believe that DEMONIO owed FLACO money. ("He knows his debt. He knows how much he is at."). I further believe that FLACO had one kilogram of fentanyl available for DEMONIO if he paid his debt ("If he will want to work. I have a good one there.").

111.    At 8:36 p.m., on the same night, FLACO, using Target Telephone 3, called CRUZ. CRUZ stated, "I think he will give me 20 and he said if you will give him one." FLACO replied, "Yes. I'll see him with something because we are cool." Based on the investigation, I believe that CRUZ told FLACO that DEMONIO had $20,000 to provide to FLACO in exchange for one

kilogram of fentanyl. ("I think he will give me 20 and he said if you will give him one."). Based on this call, investigators established surveillance in the area of Target Locations 1 and 2.

112.   At 9:33 p.m., on the same night, FLACO, using Target Telephone 3, called CRUZ. CRUZ stated, "My love, go to Washington." FLACO asked, "What's up?" CRUZ stated again, "Go to Washington." FLACO asked, "Are you going to be there?" CRUZ stated, "I'm arriving there." FLACO stated, "Okay, give me a few. Let me stop and get my SUV so I don't take a cab." Based on the investigation, I believe that CRUZ and FLACO agreed to meet at Target Location 1 for CRUZ to exchange DEMONIO's $20,000 with FLACO for one kilogram of fentanyl. At 10:20 p.m., investigators observed a male resembling DEMONIO arrive at Target Location 1 riding a moped. Numerous cooperating defendants have confirmed that DEMONIO is known for riding a moped and investigators have observed DEMONIO riding a moped throughout the investigation. No registration is required for a moped in Massachusetts, and no registration was observed.

113.   At 10:32 p.m., the same night, CRUZ called FLACO, using Target Telephone 3. CRUZ asked, "How long?" FLACO replied, "I'll be there in about 10." CRUZ asked, "Is that ready, right? DEMONIO is here so he can take that right away." FLACO asked, "Okay. Did you finish with the tickets?" CRUZ answered, "I already fixed them." Based on the investigation, I believe that FLACO was planning to meet CRUZ and DEMONIO to collect $20,000 and provide DEMONIO with one kilogram of fentanyl. At 10:48 p.m., investigators observed two Hispanic males exit the building of Target Location 2 and enter an Acura MDX. Based on investigators' vantage points, they could not positively confirm that one of the Hispanic males was FLACO but could see that neither individual was carrying anything. The Acura MDX was surveilled directly to the area of Target Location 1. Investigators had not previously seen this Acura MDX and were also not familiar with the name or address of the registered owner. Once in the area of Target

Location 1, investigators observed a tall Hispanic male approach and open the front passenger door of the Acura MDX. Investigators did not observe where the tall Hispanic male came from. Shortly after opening the door, the tall Hispanic male went into Target Location 1. After several minutes, investigators observed the same tall Hispanic male return to the Acura MDX. After a brief interaction, the Acura MDX left the area. Several minutes later, CRUZ was also observed leaving the area of Target Location 1 in a black Honda Accord, bearing Massachusetts registration 5CT326, registered to her. Investigators were unable to determine where CRUZ came from. Around that time, investigators were unable to intercept communications to and from Target Telephone 3 due to a computer system failure. The pole camera observing Target Location 1 also malfunctioned. Based on the observations that the two individuals leaving the building of Target Location 2 were not carrying anything, CRUZ leaving the area of Target Location 1, and the computer system failure, surveillance was terminated. Investigators do not believe that FLACO provided CRUZ and DEMONIO with the kilogram of fentanyl at Target Location 1, but may have made arrangements for the transfer at another location.

> September 18, 2020: FLACO confirmed that he resides at Target Location 2

114.     On September 18, 2020, at 9:37 p.m., FLACO, using Target Telephone 3, called an unidentified individual using (603) 461-0557 (hereinafter, "UM-0557"). FLACO stated, "Listen, let me know because there's 2 entrances, you know?" UM-0557 replied, "I'll be there in 2 minutes, I'm turning by the Boston Market." FLACO stated, "Okay. Well, I'm behind you then. Don't turn into the first entrance, but at the second entrance of the apartments. I also turned by Boston Market. I'm doing something." UM-0557 stated, "I haven't seen you. I turned already." FLACO replied, "Well, go into the second entrance. It's on your right-hand side because the apartments have 2 entrances, you know?" FLACO later stated, "Okay. Go in on that one and go to the back, to the

end, to the very last, you heard?" Target Location 2 is in an apartment building within an apartment complex that spans two streets. Based on the investigation and my knowledge of 115 Thoreau Way (the building of Target Location 2), I know that after the Boston Market on Waverly Road in Lawrence, the apartment complex has an entrance first at Hawthorne Way, and then a second entrance at Thoreau Way. I further know that 115 Thoreau Way is at the back of Thoreau Way. I believe that FLACO was giving UM-0557 directions to meet him at his residence at Target Location 2 ("second entrance… go to the back, to the end.").

<u>September 23, 2020: FLACO agreed to supply CRUZ with 700 grams of fentanyl.</u>

106.    On September 23, 2020, at 1:45 p.m., FLACO, using Target Telephone 3, called CRUZ. During the call, FLACO stated, "Listen, what I'm going to do is the following. If it's a sure thing…because I don't want to bother the man… but if it's a sure thing that he's coming…" CRUZ responded, "Yes. It's a sure thing because he called me. Let me call him to tell him to hurry up and see if he's going to have the complete amount of money. The $27,000." FLACO stated, "I will call my man and bother my man and tell him to have that 700 there. So, when I go, I will give him the tickets right away and see you right away, at once." CRUZ stated, "Okay. Let me call him because he had like 15 and he was missing 12. He told me. So, he was going to call his brother." FLACO stated, "No. No. Tell him to collect it all." CRUZ stated, "No, I know, that's why I told him, 'If you want more food you have to pay in full. This way things are all set. We have to work well.'" FLACO replied, "Of course, yes…" CRUZ stated, "So he told me, 'yes.' I think he's going to Miami for two weeks and wants to leave his brother all set because his little brother is fast. He's one of those criminals, so he doesn't like… you know." FLACO stated, "It's okay… for food, there's no problem and he doesn't have to stop. We can fill his house with food." I believe that FLACO discussed calling his supplier to deliver 700 grams of fentanyl to CRUZ ("I will call my man and

bother my man and tell him to have that 700 there."). I further believe that CRUZ knew that she had to pay in full for the 700 grams, a total of $27,000 ("Yes. It's a sure thing because he called me. Let me call him to tell him to hurry up and see if he's going to have the complete amount of money. The $27,000."). $27,000 for 700 grams of fentanyl is consistent with the wholesale price of fentanyl in the Merrimack Valley region of Massachusetts. I further believe that the "he" referred to by CRUZ was COSITA, the leader of the FLACO DTO. I also believe that CRUZ was looking to receive 700 grams of fentanyl because COSITA was leaving town and leaving his brother in charge ("I think he's going to Miami for 2 weeks and wants to leave his brother all set."). Lastly, I believe that FLACO was boasting that he could fill a house with drugs if COSITA needed it ("We can fill his house with food.").

107.    Precise location information for Target Telephone 3 indicated that it was in the area of Target Location 2 at the time of this call. Investigators established surveillance in that area in anticipation of a deal between FLACO and CRUZ. Simultaneously, investigators had already established surveillance in the area of the Sonesta Hotel. An investigator observed that CRUZ's Honda Accord was parked in the lot.

108.    At 1:50 p.m., an investigator observed REBUSERA exit the hotel and enter CRUZ's Honda Accord. After a brief moment, REBUSERA returned into the hotel. At 1:56 p.m., REBUSERA exited the hotel with CRUZ and COSITA.[18] CRUZ entered the driver's seat, REBUSERA entered the front passenger seat, and COSITA entered the rear passenger seat. Investigators surveilled CRUZ as she drove into Lawrence, and then lost sight of her shortly after entering the city.

109.    At 2:15 p.m., CRUZ called FLACO, who was using Target Telephone 3. CRUZ

---

[18] The identification of COSITA is discussed further below.

stated, "Positive. He got happy." I believe that CRUZ indicated to FLACO that COSITA was pleased that FLACO could provide 700 grams of fentanyl. No calls were intercepted between CRUZ and COSITA during this time period. I believe that COSITA exited the hotel and got into the car with CRUZ, and that they discussed the purchase of 700 grams of fentanyl in person.

Identification of COSITA

110.    On April 19, 2019, investigators utilized the precise location information of the Customer Telephone Number to locate it in the vicinity of 115 Thoreau Way in Lawrence. On that date, investigators observed an individual later identified as COSITA exit 115 Thoreau Way and enter Liberty Taxi #77.  As stated in this affidavit, investigators have observed Liberty Taxis used throughout this investigation. Investigators maintained surveillance of the Liberty Taxi after it left the apartment complex. While agents maintained surveillance, a Lawrence Police Officer stopped the taxi after it failed to stop for a red light. During the stop, the officer identified three occupants in the taxi. COSITA provided the officer a Puerto Rican photo identification card identifying himself as Y.R.M. I have reviewed the photograph of the true Y.R.M. in Puerto Rico and believe that COSITA was using a false identity. COSITA had a photograph of himself on the fraudulent photo identification card.

111.    In April 2019, investigators issued a subpoena for utility subscribers and lessees at 115 Thoreau Way. As a result of the subpoena, investigators identified that Tatiana Lopez was the utility subscriber for 115 Thoreau Way, Apartment 424, in Lawrence. A review of Lopez's social media account showed that she was in a relationship with COSITA and has a child with him. In a photograph posted on February 24, 2019, COSITA and Lopez are together at an apparent baby shower, wherein COSITA is depicted with a fake pregnant belly. Based on the photographs and social media postings, I believe that COSITA was the father of the expected child at that baby

shower.

112.    During the period between September 6, 2018 and October 4, 2018, investigators obtained the precise location information of the Customer Telephone Number. During certain periods of the evening hours, the Customer Telephone was located in the area of Crest Drive in Methuen. In October 2018, Tatiana Lopez listed a mailing address of 2 Crest Drive, Methuen, Massachusetts with the Registry of Motor Vehicles.

113.    During the period between October 6, 2020 and October 9, 2020, investigators obtained the precise location information of COSITA's telephone. During this time period, COSITA's telephone was located in Ayden, North Carolina. Specifically, the telephone was frequently in the area of Fifth Street and High Street, Ayden, North Carolina. Using Clear, investigators identified that Tatiana Lopez is associated with 4205 Martin Luther King Street, Ayden, North Carolina through credit reports. Lopez's vehicle is also registered to this North Carolina address. This address is within several hundred meters from where COSITA's telephone was located. On October 15, 2020, a DEA agent conducted surveillance of 4205 Martin Luther King Street in Ayden, North Carolina. The agent photographed Lopez and COSITA around the front porch of the property. COSITA was carrying a new rolled-up carpet into the residence. The agent also observed a Honda Accord, bearing North Carolina registration HLR7250, at the residence. Lopez is the registered owner of the vehicle. The Clear inquiry also identified that in February 2020, Lopez was in a motor vehicle accident in Andover, Massachusetts. During the accident, Lopez's child was in the vehicle. The child was born in 2019, which is consistent with the photographs of Lopez and COSITA expecting a child in 2019, as discussed above. The birth certificate of the child lists the father as Jorge Luis Diaz, born in Bani, Dominican Republic. I have reviewed Jorge Luis Diaz's photo identification from the Dominican Republic and I believe that

Jorge Luis Diaz is COSITA's true identity.

114.     Between November 27, 2020 and December 7, 2020, the most recent Customer Telephone Number has been located within feet of 4205 Martin Luther King Street, Ayden, North Carolina. The telephone rarely moves and is consistently in the area of that address throughout the day and is frequently turned off at night. As stated above, I believe that COSITA is the user of the Customer Telephone Number and is now directing the FLACO DTO from North Carolina.

### September 23, 2020: FLACO called FREDDY for 700 grams of drugs

115.     Continuing on September 23, 2020, at 2:28 p.m., an individual identified only as "Freddy" called FLACO, who was using Target Telephone 3. FLACO asked, "Are you ready, buddy?" Freddy replied, "I have something there. But, it's not complete, maybe 700 or 800." FLACO asked, "You think there's seven?" Freddy answered, "Yes, around there." Based on the investigation, I believe that FLACO contacted a drug supplier, Freddy, and asked if he had fentanyl available ("Are you ready, buddy?"). I believe that Freddy stated that he did not have a complete kilogram but had 700 to 800 grams of fentanyl available ("It's not complete, maybe 700 or 800."). I believe that FLACO contacted FREDDY to obtain the 700 grams of fentanyl to sell to CRUZ.

116.     On the same day, at 4:22 p.m., an investigator observed FLACO sitting on the patio outside Target Location 2 speaking on a cell phone. No calls were intercepted over Target Telephone 3 during this observation. Based on this observation, I believe that FLACO uses encrypted communication apps, such as WhatsApp and/or has multiple cell phones.

### September 23, 2020: Surveillance of CRUZ and FLACO

117.     Continuing on September 23, 2020, at 6:41 p.m., CRUZ called FLACO, who was using Target Telephone 3. CRUZ stated, "The guy just arrived. I am going to count it. This bag. I will organize it like I always organize it, and then I will call you." FLACO acknowledged,

"Alright." I believe that CRUZ had collected the $27,000 to pay for 700 grams of fentanyl ("The guy just arrived. I am going to count it. This bag. I will organize it like I always organize it and then I will call you.").

118.    On the same day, at 8:50 p.m., FLACO, using Target Telephone 3, called CRUZ. CRUZ stated, "I was about to call you. He is here in… minutes. Start heading down if you want." FLACO replied, "Alright." I believe that CRUZ directed FLACO to meet her at an unspecified location to pay him for a future delivery of 700 grams of fentanyl ("I was about to call you. He is here in… minutes. Start heading down if you want."). At 9:00 p.m., an investigator observed CRUZ parked in her Honda Accord outside Target Location 5, Alamo's residence. An investigator walked past CRUZ and observed her counting money underneath the steering wheel. At 9:11 p.m., an investigator observed FLACO exit the building of Target Location 2 and enter FLACO's vehicle. FLACO was surveilled to the area of Target Location 5. At 9:23 p.m., CRUZ called FLACO, using Target Telephone 3. CRUZ asked, "Where are you?" FLACO replied, "Alright. I'm almost there. We are almost there." CRUZ specified, "Not on Washington. On Fairmont, the street with the little hill." I believe that CRUZ called FLACO because she had been waiting for approximately 20 minutes for FLACO to arrive. I further believe that she clarified to FLACO that they would meet on Fairmont Street, at Target Location 5. At 9:24 p.m., an investigator observed FLACO's vehicle park directly behind CRUZ's Honda Accord. Due to investigators' vantage point and the hill on Fairmont Street, investigators were unable to observe any interaction between CRUZ and FLACO and terminated surveillance shortly thereafter. I believe that during their meeting, CRUZ provided FLACO with $27,000 so that FLACO could provide that money to Freddy and obtain 700 grams of fentanyl for CRUZ (referencing prior conversation above with FLACO: "I will call my man and bother my man and tell him to have that 700 there. So, when I

go I will give him the tickets (slang meaning, money) right away and see you right away, at once."). Investigators did not observe any other meetings between CRUZ and FLACO that day or intercept any further communications about a subsequent meeting. Investigators believe they were unable to surveil the meeting between FLACO and Freddy and subsequent delivery of fentanyl to CRUZ.

<u>October 10, 2020: CRUZ ordered drugs from FLACO</u>

119.   On October 10, 2020, at 2:41 p.m., CRUZ called FLACO, who was using Target Telephone 3. CRUZ stated, "I have a person who wants 45 pesos that has that on hand." FLACO asked, "How should we do it?" CRUZ replied, "Let me grab the money so you can swing by Washington." FLACO responded, "Can you pass by to get it?" CRUZ stated, "No, I can't. I don't have a car. Don't forget that… I'm antsy." FLACO responded, "Yes. I'm going to send my brother, you heard?" CRUZ answered, "Oh no. No problem." FLACO stated, "No, it's alright. You can give it to him. It's not a problem. Don't worry. Give it to him." CRUZ stated, "I will hand it to him in an envelope." I believe that CRUZ called FLACO to order 450 grams of fentanyl for a third party ("I have a person who wants 45 pesos (meaning 45 "fingers") that has that on hand."). I believe that FLACO told CRUZ that he would send Andy, his brother, to collect the money from CRUZ in the area of Target Location 1 (CRUZ: "Let me grab the money so you can swing by Washington" FLACO: "Yes. I'm going to send my brother, you heard?").

120.   On the same day, at 3:21 p.m., CRUZ called FLACO, who was using Target Telephone 3. FLACO asked, "Are you ready?" CRUZ responded, "I'm waiting on the guy. He'll be here in 10 minutes." I believe that FLACO called CRUZ to inquire if she was ready to provide Andy with the money. At 3:59 p.m., investigators observed CRUZ arrive and park her Honda Accord in front of Target Location 1. The front seat passenger exited the vehicle and entered the residence. CRUZ then left the area and surveillance officers were unable to maintain surveillance

of her vehicle.

121.     On the same day, at 5:03 p.m., CRUZ called FLACO, using Target Telephone 3. CRUZ stated, "Tell your brother to start heading out." I believe that CRUZ called FLACO to inform him to send Andy to Target Location 1 to collect the money for the drug order. At 5:12 p.m., investigators observed CRUZ arrive in her Honda Accord and park in front of Target Location 1. CRUZ exited the driver's seat and stood outside the residence. An unidentified male was in the front passenger seat of the Honda Accord. At 5:25 p.m., a Jeep Compass parked behind the Honda Accord. An unidentified Hispanic male, believed to be Andy, exited the Jeep Compass and walked to the passenger side of the Honda Accord. The driver of the Jeep Compass and the passenger in the Honda Accord appeared to have a brief conversation. At 5:27 p.m., the driver of the Jeep Compass returned to the Jeep Compass and left the area. At 5:50 p.m., an investigator observed the Jeep Compass parked in the parking lot of Target Location 2. I believe that Andy delivered drugs to the male seated in CRUZ's Honda Accord outside of Target Location 1.

<u>October 16, 2020: CRUZ arranged to pay FLACO $59,000 for a drug debt</u>

122.     On October 16, 2020, at 3:25 p.m., FLACO, who was using Target Telephone 3, called CRUZ. CRUZ stated, "Send me a message so I can send it to him… so I can tell him, 'Boom! This is the balance.' Because he says that he wants to cancel what he owes you… to see if you give him 500 or 600." FLACO replied, "Of course, I told you that I could give him even one as long as it is taken care of, you know?" I believe that FLACO called CRUZ about an outstanding debt of the FLACO DTO. I believe that CRUZ asked FLACO for the balance so she could inform COSITA ("Send me a message so I can send it to him… so I can tell him, 'Boom! This is the balance.'"). I further believe that CRUZ was interested in ordering another 500-600 grams of fentanyl from FLACO (To see if you give him 500 or 600."). I believe that FLACO stated

that he could even provide a whole kilogram of fentanyl if the FLACO DTO's debt was paid ("Of

course, I told you that I could give him even one as long as it is taken care of, you know?").

123.     At 5:22 p.m., FLACO, using Target Telephone 3, called CRUZ. CRUZ stated, "He

told me to tell you that you had told him the other time that you will reduce it to 40 for him."

FLACO replied, "Yes, but I haven't reduced it to 40 yet. He and I haven't talked." FLACO

continued, "He owes me 59." CRUZ replied, "I told him that." FLACO stated, "He owes me 55,

right?" CRUZ acknowledged. FLACO continued, "So, he gave me 5. You gave me 5 and I brought

him 200." FLACO later stated, "So, 50 plus 200 equals 59." CRUZ replied, "Right." FLACO

stated, "This is the balance between him and me." CRUZ stated, "So, are you going to give him

the 1.5?" FLACO replied, "Alright, I'll do it… But, listen… tell him that he has to get going with

my payments so I can supply him. Because he takes too long." CRUZ asked, "So, are you going

to give him the stuff now for 40 or not?" FLACO answered, "No, I can't yet because I still have

too much work. Things have gotten hard with the pandemic and stuff." FLACO continued, "I had

told him that I was going to give it to him at 40, but that was if he saw me fast. But not the way

he's doing it, taking so long." I believe that CRUZ asked if FLACO would reduce his price to $40

per gram of fentanyl ("You had told him the other time that you will reduce it to 40 for him"). I

believe that FLACO reminded CRUZ that COSITA previously owed FLACO $55,000 ("He owes

me 55, right? So, he gave me 5. You gave me 5 and I brought him 200."). I believe that CRUZ

paid FLACO $5,000 on behalf of the FLACO DTO ("You gave me 5") and that FLACO provided

another 200 grams of fentanyl ("I brought him 200"). I believe that FLACO charged $45 per gram

of fentanyl and that the COSITA now owed $59,000 ("50 plus 200 (200 grams x $45 = $9,000)

equals 59."). I believe that FLACO refused to reduce his price to $40 per gram because COSITA

was not timely in paying his debt ("I had told him that I was going to give it to him at 40, but that

was if he saw me fast."). Lastly, I believe that CRUZ asked if FLACO would provide the FLACO

DTO with 1.5 kilograms of fentanyl if the debt was paid off and FLACO agreed (CRUZ: "So, are

you going to give him the 1.5?" FLACO: "Alright, I'll do it.").

124.    At 8:03 p.m., FLACO, using Target Telephone 3, again called CRUZ. After

discussing the debt again, FLACO stated, "I am going to wait for you, by Ferry, where I saw you

the other day." Call me when you are heading down." I believe that FLACO asked to meet CRUZ

in the area of Target Location 3. Thereafter, investigators established surveillance of Target

Location 3.

125.    At 9:24 p.m., investigators observed a gray Mercedes C300, registered to Alamo,

parked in the driveway of Target Location 3 on Saxonia Avenue. CRUZ's Honda Accord was

already parked on Saxonia Avenue across the street from Target Location 3. At 9:32 p.m.,

investigators observed a Liberty Taxi stop in front of Target Location 3 and CRUZ exit the taxi.

CRUZ entered the building of Target Location 3 and the taxi departed the area. At 9:43 p.m.,

CRUZ exited the rear door of Target Location 3 (on the first floor) and spoke briefly with

occupants of a Honda CR-V that recently arrived. CRUZ then re-entered the rear door of Target

Location 3. At 10:06 p.m., investigators observed CRUZ and two unidentified males sitting on the

porch outside Target Location 3 socializing and smoking. At that time, FLACO, using Target

Telephone 3, called CRUZ. CRUZ stated, "I'm going to send you the address. I changed the

location. Give me a minute." FLACO asked, "Should I head out?" I believe that CRUZ asked to

change the meeting location with FLACO.

126.    At 10:16 p.m., a male, later identified as DEMONIO, exited the front door of Target

Location 3 and entered into a waiting Liberty Taxi. Due to the investigator's vantage point, the

male was not identified at that time. Investigators surveilled the Liberty Taxi to 229 Jackson Street

in Lawrence. At 10:23 p.m., an investigator observed DEMONIO exit the Liberty Taxi and crossed the street to 229 Jackson Street. At 10:27 p.m., investigators observed a Liberty Taxi stop in front of Target Location 3. An unidentified individual exited the building of Target Location 3, approached the taxi, and returned into Target Location 3. At 10:40 p.m., FLACO, using Target Telephone 3, called CRUZ. CRUZ stated, "Wait there for me, you hear?" FLACO asked, "What happened?" CRUZ answered, "The fucker left the money in the taxi with Nino." FLACO asked, "So, where are you so I can go get the money?" CRUZ answered, "No, I'm going to you. Wait there for me because I'm going there." FLACO replied, "Can I go to you?" CRUZ stated, "No, that is why I moved DEMONIO over there because there's a cop parked there in front." I believe that CRUZ identified police surveillance outside of Target Location 3 and changed the meeting location with FLACO ("No, that is why I moved DEMONIO over there because there's a cop parked there in front."). I believe that CRUZ had sent DEMONIO to meet FLACO outside 229 Jackson Street, but DEMONIO left the money to pay the drub debt in the taxi ("The fucker left the money in the taxi with Nino."). I believe that CRUZ stated she would go meet FLACO ("I'm going to you.").

127.    At 10:56 p.m., FLACO, using Target Telephone 3, called CRUZ. CRUZ stated, "I'm waiting for a taxi on Ferry." FLACO replied, "But, you have the tickets there?" CRUZ answered, "Of course I do! Didn't you hear that Nino brought it to me because this fucker left it there?" FLACO stated, "Wait for me there. I'd rather go to you. Wait for me there." I believe that FLACO wanted to meet CRUZ at Target Location 3 because she had money for him at that location (CRUZ: "I'm waiting for a taxi on Ferry" FLACO: "But, you have the tickets there?" CRUZ: "Of course I do!").

128.    At 10:59 p.m., FLACO, using Target Telephone 3, called CRUZ. FLACO stated,

"I'm here where the taxi is." CRUZ stated, "You are going to follow me. It's the one out front. Because the cop came back." I believe that CRUZ continued to identify police surveillance and directed FLACO to follow her to another location for her to pay him the $59,000. Around that time, investigators observed a Jeep Compass, previously observed on October 10, 2020 as described above, arrive outside Target Location 3. Investigators infer that FLACO was driving the Jeep Compass, his brother's vehicle. CRUZ exited Target Location 3 and entered a Liberty Taxi parked outside. Both CRUZ and FLACO left the area. Due to CRUZ's awareness of police vehicles conducting surveillance, surveillance was terminated.

### D. Communications intercepted over Target Telephone 4, Used by CIBAO

#### August 24, 2020: CIBAO called CRUZ to discuss a drug debt

129.    On August 24, 2020, at 1:07 p.m., CIBAO, using Target Telephone 4, called CRUZ. After the parties greeted, CRUZ stated, "Pardon me, I haven't seen him because I don't know of *Gringuito* (a nickname for COSITA). They were supposed to see me since Friday, but they haven't seen me at all. I spoke with the kid on Saturday. He was supposed to see me at 9:00 p.m., but he didn't see me either. He was going to see me yesterday at noon, but didn't see me either." CRUZ continued, "I don't know. I sent *Gringuito* a message through the app saying that you are in a pinch because you have the people there. But, she told me he was going to call me later after 5:00 p.m. to let me know what to do. I told him that he can't be doing this every day because you have commitments." CIBAO replied, "Yes, because I give the dates. Whatever you tell me is what I tell them." CRUZ agreed, "Yes, that's what I told him, 'If we had agreed that we were going to give you something then look, soon enough it will be the next month and we'll have to give him the 2,000 pesos for the old stuff.'" CRUZ continued about how she was attempting to collect money. CIBAO replied, "It's 6,200. Its 6,200 pesos. If he needs any little thing he could give me the 6,200

so I can give him at least 200 or 150." Based on the investigation, I believe that CIBAO reminded CRUZ that the FLACO DTO still owed him $6,200, as referenced in text messages detailed above from August 20, 2020 ("It's 6,200. Its 6,200 pesos. If he needs any little thing he could give me the 6,200 so I can give him at least 200 or 150."). Lastly, I believe that CRUZ still had not paid CIBAO, and CIBAO would not supply the FLACO DTO with any more drugs without payment ("If he needs any little thing he could give me the 6,200 so I can give him at least 200 or 150 (meaning, 200 or 150 grams of fentanyl)").

130.    On August 27, 2020, at 11:49 p.m., CIBAO, using Target Telephone 4, called CRUZ. CIBAO asked, "What have you done?" CRUZ replied, "I forwarded your messages to *Gringuito*. I don't know how to tell him. Because they have me waiting every day." CRUZ later continued, "If it's my money I don't play it no matter how much you call me. It's *Gringo's* problem, not mine. And that's where we left off the last time. Right? So, if *Gringo* doesn't see me. I can't see you. And I'm calling him every day. When you call me. I call him, right? And there are times that I'm at the plant, and I'm working and I can't answer the phone. There. Right now, I sent him the messages that I saw that you sent me. Don't worry. As soon as he sees that he will call me immediately." I believe that CIBAO called CRUZ to collect the outstanding $6,200 debt owed to him by the FLACO DTO ("What have you done?"). I further believe that CRUZ attempted to contact COSITA to get the money to CIBAO ("There. Right now, I sent him the messages that I saw that you sent me. Don't worry. As soon as he sees that he will call me immediately.").

131.    On August 27, 2020, starting at 9:57 p.m., CIBAO, using Target Telephone 4, sent a series of text messages to CRUZ. CIBAO stated, "Tell me. You didn't tell him? To check. I am. Closing. All of the. Doors. With this. Guy." On August 28, 2020, starting at 11:33 a.m., CRUZ sent a series of text messages to CIBAO, intercepted over Target Telephone 4.  CRUZ stated,

"Hey. I told him that you need it for Saturday the latest. He told me that also." Based on the investigation and intercepted communications, I believe that as of August 28, 2020, CRUZ still had not paid the outstanding $6,200 debt to CIBAO and CIBAO was cutting ties with the FLACO DTO ("I am. Closing. All of the. Doors. With this. Guy.").

<u>August 28, 2020: CIBAO identified during phone call</u>

132.    On August 28, 2020, at 12:17 p.m., CIBAO, using Target Telephone 4, called Banco Ademi in Bani, Dominican Republic. CIBAO told the representative that he is in the U.S. and his brother went to the bank to pay a loan, but ran into issues. The representative asked for CIBAO's name and CIBAO replied, "Jorge Ramon Rodriguez Jimenez." CIBAO also provided his Dominican identification number.

<u>August 28, 2020: GUAYACAN inventoried fentanyl for CIBAO</u>

133.    On August 28, 2020, at 3:30 p.m., CIBAO, using Target Telephone 4, called GUAYACAN, using telephone number (781) 469-3367. Investigators have confirmed that GUAYACAN is the user of the phone based on surveillance and his subsequent arrest described below.  CIBAO asked, "How many fingers did you take?" GUAYACAN replied, "Two, I think." CIBAO stated, "You told me that there were six. And that way the numbers don't add up for the guy because I have 400 and 200 that you gave me the day before yesterday. That's 600. So, we have to give him 1,250 and we won't have enough to do so." CIBAO continued explaining to GUAYACAN that they did not have enough money, "I've only got $1,570 here because I used $950. I used 950. 300 for the cable, 610 that I gave to Carlos, and 40 that I took to buy the cut at Duva's. You understand?" CIBAO continued, "That's what I've got here, 1,570. That's what I'm telling you GUAYACAN!" I believe that CIBAO asked GUAYACAN how much fentanyl he took from their stash ("How many fingers (a finger is a common street term for 10 grams of fentanyl)

did you take?"). I believe that CIBAO realized that they did not have enough drugs to sell to pay a $1,250 debt to an unidentified individual ("We have to give him 1,250 and we won't have enough to do so."). I believe that GUAYACAN took 20 grams of fentanyl ("two fingers") and CIBAO assumed they had 60 grams of fentanyl ("You told me that there were six.").

<u>August 29, 2020: Identification of CIBAO and GUAYACAN's residence</u>

134.    As stated above, investigators learned that CIBAO used a vehicle registered to GUAYACAN at 158 Water Street in Lawrence. On August 29, 2020, at 1:39 p.m., CIBAO received a call from an individual asking, "Are you home?" CIBAO answered, I'm heading over there in a little while." This call was intercepted over Target Telephone 4. Thereafter, investigators established surveillance in the area of 158 Water Street. At 2:35 p.m., CIBAO sent a text message to the same individual stating, "I'm here. At the house." Moments later, an investigator observed the same brown Ford Escape observed on July 13, 2020 at Target Location 1 arrive and park in the rear lot of 158 Water Street. Based on the timing of the intercepted communications and surveillance observations, I believe that CIBAO resided at 158 Water Street and was driving the brown Ford Escape.

<u>September 9, 2020: Surveillance of CIBAO and arrest of GUAYACAN</u>

135.    On September 9, 2020, at 4:59 p.m., GUAYACAN called CIBAO, who was using Target Telephone 4. GUAYACAN stated, "Make eight balls for me." After clarifying what GUAYACAN wanted CIBAO stated, "Let me know once you're outside." Based on my training and experience, I know that a "ball" is a common street term for one eighth-of-an-ounce quantity (deriving from the term "eight ball") of cocaine. I believe that GUAYACAN had requested eight "balls," meaning one ounce of cocaine from CIBAO.

136.    At 5:15 p.m. that day, investigators established surveillance of 158 Water Street in Lawrence, CIBAO's residence. At 5:54 p.m., GUAYACAN called CIBAO, who was using Target Telephone 4. GUAYACAN stated, "Head down with that." Two minutes later, investigators observed CIBAO walk out of 158 Water Street carrying an orange shoebox and wait in the rear parking lot observing the entrance. At 5:59 p.m., investigators observed GUAYACAN arrive in the area of 158 Water Street driving the brown Ford Escape and drive into the rear parking lot. As stated above, GUAYACAN is the registered owner of the brown Ford Escape. An investigator observed CIBAO approach the Ford Escape carrying the orange shoebox. Due to the investigator's vantage point, he could not see the interaction between CIBAO and GUAYACAN. Shortly thereafter, GUAYACAN left the parking lot in the Ford Escape and CIBAO walked towards the rear entrance of 158 Water Street no longer holding the orange shoebox. Investigators attempted to stop the Ford Escape by activating their lights and sirens. The Ford Escape slowed to a stop and then abruptly speed up, striking a police vehicle. The Ford Escape drove erratically from the scene of the stop, driving approximately 100 feet on the sidewalk, through intersections and traffic. Due to GUAYACAN's dangerous driving, investigators terminated the pursuit and soon lost sight of the Ford Escape. At 6:07 p.m., GUAYACAN called CIBAO, who was using Target Telephone 4. GUAYACAN stated twice, "I'm locked up!" (In fact, investigators had not apprehended GUAYACAN.)   GUAYACAN continued, "I got rid of everything. I got rid of everything." CIBAO replied, "Okay."   At 6:15 p.m., investigators located the abandoned Ford Escape in neighboring Andover, Massachusetts. With the assistance of a K-9 unit, and witness reports of a male fleeing into the woods, agents located and arrested GUAYACAN and charged him with reckless operation of a motor vehicle and assault and battery with a dangerous weapon. During his booking, an investigator called the telephone GUAYACAN had been using to communicate with

CIBAO, and one of the two phones seized from GUAYACAN rang. The phones were photographed and logged into evidence. Despite searching the woods and flight path, agents were unable to locate the orange shoebox. Investigators maintained surveillance of 158 Water Street but did not see CIBAO again. Based on the investigation, I believe that CIBAO moved out of 158 Water Street.

137.    On September 10, 2020, at 11:14 a.m., GUAYACAN, using a new telephone number (likely from the Lawrence District Court), called CIBAO, who was using Target Telephone 4. GUAYACAN stated "Here at the court." CIBAO asked, "So, what did they tell you?" GUAYACAN stated, "They didn't tell me anything about drugs or anything. They didn't talk to me about that nor about the box or anything. They are saying that I took off incorrectly." I believe that GUAYACAN was surprised that he was not charged with anything drug related and that the court and court filings did not mention the shoebox of cocaine that CIBAO handed to him the prior day. Thereafter, GUAYACAN remained in custody at the Essex County Jail.

### E.    Communications intercepted over Target Telephone 5, Used by CRUZ

September 20, 2020: CRUZ explained the color-coding system of drugs to COSITA

138.    On September 20, 2020, at 5:46 p.m., CRUZ, using Target Telephone 5, called COSITA, using telephone number (603) 952-0317. CRUZ stated, "There is only 3 yellow and 3 black ones." COSITA asked, "What is the difference?" CRUZ explained, "The black one is a little higher. The yellow ones are lower. The yellow ones are like the *regalos* and the black ones are like the food." Based on the investigation, I believe that CRUZ uses different colored packaging to differentiate the type and potency of drugs after they are processed for resale. I believe that the drugs packaged in yellow are more diluted and less potent than drugs packaged in black. I believe that drugs packaged in black are closer to the drugs originally received from sources of supply

("The black one is a little higher. The yellow ones are lower. The yellow ones are like the *regalos* and the black ones are like the food.").

September 21, 2020: CANN complained about poor quality fentanyl

139.   On September 21, 2020, at 12:40 p.m., CANN called CRUZ, who was using Target Telephone 5. CANN stated, "Hey, where you got another bad batch of shit. Everyone's complaining about it, again." CANN continued, "It's the same thing. It fucking gives you a weird feeling and people are freaking out." CRUZ asked, "You got a lot left?" CANN replied, "A lot, yeah." CRUZ stated, "Okay, let me see if I can see you tonight." I believe that CANN informed CRUZ that she provided him with poor quality fentanyl and that customers were complaining ("Hey, where you got another bad batch of shit. Everyone's complaining about it, again."). I further believe that CRUZ made arrangements to meet CANN to swap out the poor-quality fentanyl with better quality fentanyl ("Okay, let me see if I can see you tonight.").

September 21, 2020: Surveillance of DEMONIO

140.   On the same day, September 21, 2020, at 6:18 p.m., CRUZ, who was using Target Telephone 5, called MENDOZA. CRUZ stated, "DEMONIO is gonna see you there with the tablet." CRUZ provided the address, "229 Jackson." I believe that CRUZ informed MENDOZA that DEMONIO would provide him with a drug package (a "tablet") at 229 Jackson Street. Shortly after the call, investigators established surveillance in the area of 229 Jackson Street in Lawrence. An investigator observed DEMONIO standing on the front porch of 229 Jackson Street. At 6:52 p.m., MENDOZA called CRUZ, who was using Target Telephone 5. MENDOZA stated, "Tell him I'm outside." CRUZ asked, "In a black TO?" MENDOZA stated, "Nah, in a gray CR-V." Around that time, an investigator observed DEMONIO approach a CR-V across the street from

229 Jackson Street. Due to the vantage point, investigators did not observe any exchange. Thereafter, DEMONIO returned to a side door at 229 Jackson Street.

141.    At 7:15 p.m., an investigator observed DEMONIO leave 229 Jackson Street on a moped and travel directly to the porch of Target Location 3. DEMONIO spent a short time on the porch before entering the passenger seat of a vehicle and going to a liquor store and then a market. An investigator then surveilled DEMONIO travel to Target Location 5 and walk up the driveway of Target Location 5 carrying bags.

### September 21, 2020: CANN flees police after receiving drugs from DEMONIO

142.    Still on September 21, 2020, at 9:26 p.m., CANN called CRUZ, who was using Target Telephone 5. CANN stated, "I'm on my way, where am I going?" CRUZ replied, Go to Washington." Based on the following call, I believe CANN was preparing to meet CRUZ at Target Location 1 to remit drug proceeds and receive a new package of drugs for re-distribution. At 9:24 p.m., an investigator observed CANN's vehicle, a red Mini Cooper, leave his residence at Target Location 7 and travel to Target Location 1. At 9:59 p.m., CANN called CRUZ, who was using Target Telephone 5. CANN stated, "I'm in the Mini." CRUZ clarified, "You are in the Mini Cooper?" CANN stated, "Yeah." CRUZ stated, "He's going to be right there. He's got a black vest and a blue sweater. So you know who he is." CANN asked," Give him the money?" CRUZ replied, "Yeah." I believe that CRUZ clarified that a male (DEMONIO) would come retrieve drug proceeds from CANN outside Target Location 1.

143.    At 10:01 p.m., an investigator observed CANN's vehicle arrive outside Target Location 1. At 10:08 p.m., CANN called CRUZ, who was using Target Telephone 5. CANN stated, "I've been sitting here. There is nobody around." CRUZ stated, "Alright, give me two seconds because he says he's right down the street." Immediately following this call, an investigator

observed DEMONIO exit the building of Target Location 5 and enter a taxi. Investigators surveilled the taxi travel from Target Location 5 to Target Location 1. DEMONIO exited the taxi and approached the passenger side of CANN's vehicle.  DEMONIO made a quick exchange with CANN through the passenger side window. DEMONIO then returned to the taxi and left.

144.     At 10:30 p.m., investigators coordinated with local law enforcement officers to stop CANN after he left the meeting at Target Location 1. Investigators planned to stop CANN in Tewksbury, a town between Lawrence and CANN's residence in Billerica, Massachusetts. Upon stopping CANN for speeding, two uniformed Tewksbury Police Officers observed a plastic bag, tightly wrapped into the size of a baseball, on the floor of the rear passenger seat. The vehicle was otherwise clean and had nothing else in plain view. Based on the above calls and their knowledge of the investigation, the officers suspected that the plastic bag contained drugs. When asked about the plastic bag, CANN threw it under the front passenger seat and said, "It's nothing." Throughout their interaction, CANN was breathing heavily and shaking. An officer asked CANN to turn off the vehicle. Instead, CANN put the vehicle into gear and drove away at a high rate of speed. One of the officers had to push off the passenger side door to avoid being struck by the vehicle. Officers located CANN's vehicle, abandoned and crashed into a fence at the intersection of 5 Whipple Road in Billerica. The plastic bag was no longer under the seat. Officers canvassed the area, with the assistance of a K-9, for CANN and the drugs, but could not find either. Officers sought a state court warrant for CANN based on his reckless driving. Billerica officers arrested CANN the following day at Target Location 7 and he was bailed out the following day after appearing in court.

145.     On September 25, 2020, at 1:25 p.m., CANN called CRUZ, who was using Target Telephone 5. CANN stated, "The police pulled me over in Tewksbury." CRUZ replied, "I know.

Mike told me." CANN assured, "Everything is cool. I got away." CRUZ stated, "I know." CANN clarified, "I spent the night in the woods. I spent the night in the police station. I got a good lawyer, so, we're all good." CANN later assured, "Everything is safe though." I believe that CANN called CRUZ to assure her that he was not arrested with drugs in his possession and that the drugs were safe, and police did not seize them ("Everything is safe.").

September 21, 2020: COSITA told CRUZ about an order for 420 grams of fentanyl

146.   On September 21, 2020, at 3:11 p.m., COSITA called CRUZ, who was using Target Telephone 5. COSITA asked, "How much does he have… 600?" CRUZ answered, "He has 600, but 200 are for someone. So, he told me to go, so I can grab some before he takes the 200 for the guy." COSITA stated, "Look. I have someone who wants 17 sticks, and the guy from Maine is also calling me." COSITA later clarified, "The one who buys 250 from me, and the other one who wants 17 sticks. See if he gives you enough to do that." Based on the investigation, I believe that COSITA had two customers make orders for fentanyl, one who ordered 250 grams and another who ordered 170 grams ("The one who buys 250 from me (the guy from Maine), and the other one who wants 17 sticks (a "stick" is a common street term for 10 grams of fentanyl).") I believe that CRUZ had a supplier who could only provide her with 400 grams of fentanyl because 200 of his 600 grams were already set aside for someone else. ("He has 600, but 200 are for someone.").

147.   On the same day, September 21, 2020, at 3:47 p.m., MANGUERA, using Target Telephone 7, called CRUZ, who was using Target Telephone 5. This call was intercepted over Target Telephone 5. MANGUERA stated, "I have to leave for New York. I am going to leave it for you, and we will see each other when I get back." CRUZ replied, "Alright then, leave that for me on Washington. Let me tell the girl." Based on the investigation, I believe that MANGUERA was the source of supply that CRUZ was referring to above in the conversation with COSITA. I

believe that MANGUERA was leaving for New York and would drop off fentanyl to Target Location 1 sometime before he left (MANGUERA: "I am going to leave it for you." CRUZ: "Leave that for me on Washington."). At 4:02 p.m., MANGUERA called CRUZ, who was using Target Telephone 5 and stated, "I left 300 for you there with her." I believe that MANGUERA dropped off 300 grams of fentanyl to REBUSERA at Target Location 1 in Lawrence for CRUZ.

148.   On the same day, at 5:09 p.m., CRUZ, using Target Telephone 5, called COSITA. CRUZ asked, "Okay, the 250 and 17 both the same, right?" COSITA answered, "Yes. But, press the 170 very well." CRUZ asked, "How should I do it?" COSITA clarified, "Very well pressed, the 170." CRUZ stated, "Of course! The 17 can be all together, right?" COSITA asked, "Are you doing it right now?" CRUZ replied, "I am weighing it right now to do it so that I just have to take out exactly what they need to do that." Based on the investigation, I believe that CRUZ obtained 300 grams of fentanyl from MANGUERA and was diluting it into 420 grams of fentanyl, 250 grams for a customer in Maine and 170 grams, which would be pressed into "sticks" for another customer.

### September 22, 2020: CRUZ met with MANGUERA to deliver payment

149.   On September 22, 2020, at 7:47 p.m., MANGUERA, using Target Telephone 7, called CRUZ, who was using Target Telephone 5. This call was intercepted over Target Telephone 5. MANGUERA asked, "What are you doing? All good?" CRUZ replied, "Yes, I have the… the guy's." MANGUERA asked, "Are you busy now or are you local?" CRUZ answered, "If you want to, stop by the hotel." I believe that CRUZ informed MANGUERA that she had collected payment for the drugs he left for her on September 21, 2020 ("Yes, I have the… the guy's."). I further believe that she directed MANGUERA to meet her at the Sonesta Hotel to collect the payment.

On the same day, at 8:24 p.m., an investigator observed a rented pickup truck enter the parking lot of the Sonesta Hotel. At 8:26 p.m., MANGUERA called CRUZ, who was using Target Telephone 5. MANGUERA stated, "I'm out here." Based on the timing of the call, I believe that MANGUERA was driving the pickup truck. At 8:32 p.m., an investigator observed CRUZ and an unidentified female approach MANGUERA's vehicle on the driver's side. After a few minutes, the pickup truck departed the parking lot. Surveillance officers followed the pickup truck to the area of Route 110 in Methuen when investigators lost sight of the vehicle and surveillance was terminated. Based on the intercepted calls and surveillance observations, I believe that CRUZ delivered payment to MANGUERA in the parking lot of the Sonesta Hotel for fentanyl delivered on September 21, 2020.

<u>September 23, 2020: CRUZ, DEMONIO, and COSITA discussed delivering drugs to couriers and collecting proceeds.</u>

150.    On September 23, 2020, at 6:23 p.m., CRUZ, who was using Target Telephone 5, called DEMONIO. CRUZ asked, "Where should I send the guy to meet you?" DEMONIO replied, "Head over here, you know. 27 Fairmont." CRUZ asked, "What number?" DEMONIO re-stated, "27." CRUZ replied, "27… 28. He's already down there." DEMONIO stated, "Go for it. How much is he going to give me?" CRUZ answered, "I'm going to send it to you right now." DEMONIO asked, "How much should I give him?" CRUZ replied, "Only 100. Two *tabletas* (code meaning, drug package)." Based upon my training and experience and knowledge of the investigation, I believe that CRUZ was sending a drug courier to meet DEMONIO in the area of 27 Fairmont Street (across the street from the side of Target Location 5) in Lawrence for the purpose of being resupplied with 100 grams of fentanyl ("Only 100. Two *tabletas*"). Further, I believe that CRUZ would let DEMONIO know how much drug proceeds to expect from this

courier (DEMONIO: "How much is he going to give me?" CRUZ: "I'm going to send it to you right now.").

151.     On the same day, at 6:26 p.m., CRUZ, using Target Telephone 5, called COSITA. CRUZ asked, "Elvin is on his way to DEMONIO. How much is he supposed to give him?" COSITA asked, "Is he arriving now?" CRUZ stated, "I just talked to him and he asked me for the address. He's on his way." COSITA stated, "Yes, but… the time. Give one to Nati. I've got those people over there. They are arriving and they don't… I can't wait for him." CRUZ asked, "Okay, but how much he has to give? He's on his way there." COSITA answered, "I am going to ask him how much money he has. But do me a favor. Tell DEMONIO to give a *tableta* to Nati." CRUZ replied, "To give a *tableta* of 100 to this guy and another *tableta* to Nati?" COSITA clarified, "No. No. Don't give more of 100 to Elvin. Give one of 100 to Nati and that's all." CRUZ asked, "Okay, But, I'm asking, 100 for Nati and 100 for Elvin?" COSITA clarified, "Don't give from that one to Elvin. Nope!" CRUZ stated, "But, there's nothing else. That's the only one that's available." COSITA stated, "That's why. Just give 100 to Nati and that's all." Based on the investigation, I believe that COSITA directed CRUZ to give the 100 grams of drugs to a drug courier, Nati, rather than to drug courier, MENDOZA ("Just give 100 to Nati and that's all."). I further believe that COSITA would check to see how much in drug proceeds MENDOZA should remit to DEMONIO when they met in the area of 27 Fairmont Street (CRUZ: "Elvin is on his way to DEMONIO. How much is he supposed to give him?" COSITA: "I am going to ask him how much money he has.").

152.     On the same day, at 6:28 p.m., CRUZ, using Target Telephone 5, called DEMONIO. CRUZ stated, "Give the *tableta* to the *grandulon* (Spanish meaning, the tall guy) on Tenney Street. I told him that you didn't want to go over there." DEMONIO responded, "No. I am not going to go over there. I am here." CRUZ stated, "Call him. On the 603, COSITA, and let him

know." DEMONIO stated, "Tell him to call me." Based on the investigation, I believe that CRUZ directed DEMONIO to give the 100 grams of drugs to Nati ("the *grandulon*") on Tenney Street in Methuen. I further believe that DEMONIO did not want to go and CRUZ told DEMONIO to discuss it with COSITA ("Call him. On the 603, COSITA, and let him know."). At the time, COSITA's telephone number bore a (603) area code.

<u>September 23, 2020: CRUZ wary of wiretap</u>

153.    On September 23, 2020, at 10:15 p.m., CRUZ, using Target Telephone 5, called ROJAS. CRUZ stated, "We need to stop saying names on this shit. You never know when the line is going to be recording." ROJAS replied, "With me as well, you heard." CRUZ replied, "That's why I say Jay." ROJAS responded, "Alright. So, what name should I call you?" CRUZ replied, "Whatever you want. Just don't mention my name." Based on the investigation, I believe that CRUZ instructed ROJAS not to use her name during phone calls because phone calls may be monitored and recorded ("We need to stop saying names on this shit. You never know when the line is going to be recording."). I further believe that CRUZ will refer to ROJAS as "Jay," the first letter of Jesus ROJAS's first name. I believe this further emphasizes how surveillance conscious CRUZ is and the lengths she has gone to thwart law enforcement detection.

<u>September 24, 2020: Surveillance of drug couriers receiving drug packages at Target Location 1</u>

154.    On September 24, 2020, at 11:15 a.m., investigators conducted surveillance at the Sonesta Hotel. An investigator observed CRUZ exit the hotel and enter her Honda Accord. An investigator surveilled CRUZ drive from the hotel to Target Location 1. CRUZ parked and approached the rear door of Target Location 1 and out of view.

155.    At 12:35 p.m., CRUZ, using Target Telephone 5, called ROJAS. CRUZ stated that she was picking up DEMONIO and that DEMONIO can "see him (ROJAS) at Washington."

ROJAS acknowledged. CRUZ further stated, "That way we can give you the white, you give me the money, and you take all the work." I believe that CRUZ directed ROJAS to meet DEMONIO at Target Location 1 ("Washington") to provide CRUZ with money and retrieve drugs ("work") for re-distribution from DEMONIO.

156.    At 1:01 p.m., investigators observed Liberty Taxi #59 arrive outside the rear door of Target Location 1. Investigators observed CRUZ exit the rear door area of Target Location 1 and enter the front passenger seat of Liberty Taxi #59. Investigators maintained surveillance of Liberty Taxi #59. Investigators observed Liberty Taxi #59 make one stop outside 19 Swan Street, where CRUZ exchanged bags with TIO.[19] At 1:13 p.m., an investigator observed Liberty Taxi #59 approach and park in the driveway of Target Location 3, DEMONIO's residence. Moments later, DEMONIO exited from the building of Target Location 3 and entered the rear seat of the taxi.

157.    At 1:24 p.m. CRUZ, using Target Telephone 5, called COSITA. CRUZ stated, "I have everyone lined up, but I can't do anything if I don't have *comida* (Spanish meaning, food) in hand. DEMONIO is here with me and we can't do anything, okay! So, we are waiting for the fucking key." CRUZ continued, "We are going to go over there to see if DEMONIO can jump in through the bathroom door." As will be discussed below, I believe that CRUZ and DEMONIO were seeking to get into Target Location 5 because they did not have the keys to get into the apartment to process drugs ("I have everyone lined up, but I can't do anything if I don't have *comida* in hand. DEMONIO is here with me and we can't do anything, okay! So, we are waiting for the fucking key.").

158.    At 1:29 p.m., investigators observed Liberty Taxi #59 parked outside of Target

---

[19] Intercepted communications indicate that CRUZ was resupplying TIO with drugs. Those calls are not quoted for the purposes of this affidavit.

Location 5. Moments later the taxi departed the area and drove to Target Location 1. There, investigators observed CRUZ and DEMONIO exit the taxi and approach the rear door of Target Location 1 and go out of view. Investigators inferred they went inside Target Location 1.

159.    At 1:36 p.m., CRUZ, using Target Telephone 5, called COSITA. CRUZ stated, "*Prepotente* should have money because he only gave the money for the tablet last time. COSITA replied, "He's not ready for *regalos* yet." CRUZ stated, "He told DEMONIO he was." COSITA stated, "If he's ready he has to give you the money." CRUZ stated, "That's what I told DEMONIO… I already have everyone lined up." CRUZ then informed COSITA that "El P" and "Gordo" were about to arrive. I believe that CRUZ informed COSITA that drug couriers *Prepotente* a/k/a "El P" and ROJAS a/k/a "Gordo" were about to arrive to remit drug proceeds and obtain drugs.

160.    At 1:37 p.m., investigators observed an Acura sedan arrive outside Target Location 1. The driver exited and approached the rear door of Target Location 1 and out of view. Investigators inferred that he went inside Target Location 1. Approximately 30 seconds later, the driver emerged from the rear door area of Target Location 1, returned to the Acura sedan, and left the area.

161.    At 1:44 p.m., investigators observed a Honda Civic ("Civic-3"), bearing Massachusetts registration 2BBX86, registered to Tanisha Flores. Tanisha Flores is the paramour of ROJAS.[20] Civic-3 parked next to Target Location 1. A passenger exited Civic-3 and approached

---

[20] During this investigation, ROJAS drove two different Honda Civic vehicles registered to Flores. On February 11, 2019, ROJAS drove a Honda Civic ("Civic-1"), registered to Flores, to sell fentanyl to an undercover officer, on behalf of the FLACO DTO. On February 22, 2019, ROJAS was stopped driving another Honda Civic ("Civic-2"), registered to Flores, and officers seized nearly 200 grams of fentanyl from the vehicle. ROJAS has pled guilty to charges related to both incidents. On September 11, 2020, investigators learned that ROJAS reported his telephone number to U.S. Probation as (978) 242-3730. Between July 29, 2020 and August 11, 2020, ROJAS had 53 telephone contacts with CRUZ, who at the time was using (646) 348-4879.

the rear door of Target Location 1 and went out of view. Investigators inferred that this passenger went inside Target Location 1. Approximately 30 seconds later, the same passenger emerged from the rear door area of Target Location 1, entered Civic-3, and departed the area.

162.     Based on the intercepted calls on this day and surveillance observations at Target Location 1, I believe that *Prepontente* and ROJAS went to Target Location 1 to meet with CRUZ and DEMONIO, remit drug proceeds, and receive new drug packages for distribution.

163.     At 2:01 p.m., investigators observed CRUZ and DEMONIO emerge from the area of the rear door of Target Location 1 and walk to a store around the corner. After some time in the store and socializing on the street, investigators surveilled CRUZ enter her Honda Accord and leave the area. Investigators maintained surveillance of CRUZ. At 2:47 p.m., investigators observed CRUZ park in the parking lot of the Sonesta Hotel and approach the hotel building. Thereafter, surveillance was terminated.

### September 29, 2020: Arrest of CS-3 and seizure of suspected fentanyl

164.     On September 29, 2020, at 10:26 a.m., COSITA, called CRUZ, who was using Target Telephone 5. During the call, COSITA asked, "Is *Vecino* going to see you?" CRUZ replied, "Yes, *Vecino* said he will later on because he just woke up. While *Vecino* gets ready, I will go and buy everything for the preparation and all the things we need." Based on the investigation, I know that CRUZ and COSITA refer to FLACO as "*Vecino*," which is Spanish meaning, neighbor. I believe that CRUZ was expecting to be supplied with drugs from FLACO and that in the meantime, she was going to obtain diluents and supplies to prepare drugs for distribution ("While *Vecino* gets

---

Investigators did not have authorization to intercept (646) 348-4879, used by CRUZ. U.S. Probation indicated that in mid-September, ROJAS reported a new telephone number to U.S. Probation. ROJAS's new telephone number as of mid-September was not intercepted during the investigation.

ready, I will go and buy everything for the preparation and all the things we need.").

165. On the same day, at 10:45 a.m., CRUZ, using Target Telephone 5, called FLACO. FLACO asked, "Does he want 300?" CRUZ replied, "Yes, give him that." FLACO replied, "That's fine. I will give it to him." FLACO continued, "I have to collect tickets, it's cool… Hit this crazy *gringo* up! Tell him to get on it, because he is slow." CRUZ replied, "I will text that f***** shortly. I will hit him up early, in case he has to collect money." FLACO stated, "Yes, hit him up because I have to get ready." I believe that CRUZ confirmed that she was ordering 300 grams of fentanyl from FLACO for COSITA (FLACO: "Does he want 300?" CRUZ: "Yes, give him that."). I further believe that FLACO was looking to collect money from COSITA because he is slow in paying for drugs ("I have to collect tickets, it's cool… Hit this crazy *gringo* (a nickname for COSITA) up! Tell him to get on it, because he is slow.").

166. On the same day, at 11:39 a.m., COSITA called CRUZ, who was using Target Telephone 5. COSITA asked, "What did *Vecino* say?" CRUZ replied, "*Vecino* is ready. He is just waiting for me to tell him to get going." COSITA acknowledged, "Alright." I believe that COSITA was wondering if FLACO was ready to supply him with drugs and CRUZ conveyed that FLACO was ready based on her earlier call with him.

167. On the same day, at 11:46 a.m., FLACO, using Target Telephone 3, called CRUZ, who was using Target Telephone 5. FLACO stated, "Talk to me." CRUZ replied, "Where you saw me last time." CRUZ clarified, "Head over to where you saw me last time." FLACO asked, "Oh, yeah. Are you ready?" CRUZ stated, "Yes." I believe that CRUZ conveyed to FLACO that she was ready to obtain 300 grams of drugs from him and that they would meet in the area of Target Location 5 on Fairmont Street as they did on September 23, 2020. In anticipation of the meeting, investigators established surveillance in the area of Target Locations 1 and 6. At 12:51 p.m., an

investigator observed DEMONIO arrive to the building of Target Location 5 operating a moped. At 12:54 p.m., an investigator observed CRUZ park a Nissan Altima next to Target Location 1 and approach Target Location 1 out of view. The investigator inferred CRUZ went into Target Location 1. One minute later, CRUZ re-emerged from the rear door of Target Location 1 and re-entered the Nissan Altima.  At 12:56 p.m., an investigator observed CRUZ arrive in the area of Target Location 5 driving the Nissan Altima. At 1:06 p.m., an investigator observed DEMONIO cleaning his moped with a hose from the building of Target Location 5.

168.    On the same day, at 1:16 p.m., CRUZ, using Target Telephone 5, called FLACO. FLACO stated, "I'm here dear. Give me two minutes. I'm right here. I'm about to cross Essex right now. I'll see you in the same place, right?" CRUZ replied, "Yes, right there by the school, by the old prison." FLACO stated, "Yea, be aware so you can get out. You heard?" I believe that FLACO called CRUZ to inform her that he was close to Target Location 5. Target Location 5 is across the street from Central Catholic High School. At 1:25 p.m., FLACO, using Target Telephone 3, called CRUZ, who was using Target Telephone 5. CRUZ stated, "I see you." FLACO interrupted, "I am down here." I believe that FLACO called CRUZ to inform her that he was in the area of Target Location 5. At that time, an investigator observed FLACO's vehicle arrive on Fairmont Street. At 1:27 p.m., investigators observed CRUZ approach the driver's side of FLACO's vehicle and lean into the driver's side of the vehicle. Minutes later, investigators observed FLACO's vehicle departed the area. I believe that CRUZ obtained drugs from FLACO during this meeting.

169.    On the same day, at 1:38 p.m., COSITA called CRUZ, who was using Target Telephone 5. CRUZ stated, "DEMONIO is already bringing the machine, to mash it." COSITA stated, "That's fine. Call the woman to um… so you can have her go around there." CRUZ replied,

"Send me the number." COSITA acknowledged, "Okay." I believe that CRUZ confirmed to COSITA that she obtained 300 grams of fentanyl from FLACO and that DEMONIO was preparing to process the drugs for distribution, specially to bring a drug press to compress the fentanyl ("DEMONIO is already bringing to machine, to mash it."). I further believe that COSITA had arranged for an unidentified female to come collect the processed drugs ("Call the woman to um… so you can have her go around there."). No text messages were intercepted between COSITA and CRUZ. I believe COSITA and CRUZ may have used an encrypted communications app to exchange the telephone number of the unidentified woman. At 1:52 p.m., COSITA called CRUZ, who was using Target Telephone 5. CRUZ stated, "She's not answering. Tell her to head over to El Pilon." I believe that CRUZ attempted to call this unidentified woman, but she did not answer her telephone. No attempted phone call was intercepted over Target Telephone 5. I believe that CRUZ either used a telephone other than Target Telephone 5 or an encrypted communications app to contact the unidentified woman. I further believe that CRUZ asked COSITA to direct her to El Pilon Market at 262 Hampshire Street in Lawrence.

170.   On the same day, at 1:52 p.m., investigators observed DEMONIO leave the building of Target Location 5 on his moped and travel to El Pilon Market. I believe that DEMONIO had received the fentanyl from CRUZ and had processed and packaged it at Target Location 5, just as CRUZ explained to COSITA. At 1:56 p.m., CRUZ, using Target Telephone 5 received an incoming text message from an unidentified female (hereinafter, "UF-0337") stating, "I'm at work right now." At 1:57 p.m., COSITA called CRUZ, who was using Target Telephone 5. CRUZ stated, "She texted me back and said, 'I'm sorry that I didn't pick up the phone, I am at work.'" COSITA replied, "I am going to have Elvin go." CRUZ stated, "DEMONIO is already at Pilon. So, tell me! You know that we can't be going in and out of here. Tell me." COSITA stated,

"Alright! Give me a minute. I am going to have Elvin go. What do you want me to do? I didn't know that she was working." CRUZ interrupted, "Okay. It's not about that! You have to be sure because you are not the one who's out on the street. So, don't tell me to wait a minute! You know very well about the people who are headed out to the street. So, you have to be sure about what they are going to do!" I believe that UF-0337 is the unidentified female who COSITA had arranged to retrieve drugs from CRUZ after they were processed and packaged for distribution. I believe that UF-0337 was unavailable to retrieve the drugs. I further believe that COSITA would arrange to have MENDOZA retrieve the drugs from DEMONIO at El Pilon ("I am going to have Elvin go."). I believe that CRUZ was upset with COSITA's unpreparedness because DEMONIO was in public with drugs and in danger of law enforcement detection ("You have to be sure because you are not the one who's out on the street.").  At 1:58 p.m., CRUZ, using Target Telephone 5, called DEMONIO and told him, "He is going to send you the other guy. The one we… you saw last night. Go inside the *bodega* to buy things." I believe that CRUZ informed DEMONO that MENDOZA would see him at El Pilon (the "*bodega*") to retrieve the drugs and told him to go inside to buy things as not to arouse suspicion.

171.    On the same day, at 1:58 p.m., CRUZ, using Target Telephone 5, called MENDOZA. CRUZ asked, "Can you meet up DEMONIO right there on the Pilon Market, next to Elaine's Pizza?" MENDOZA answered, "Yes sir. He just told me right now." I believe that CRUZ asked MENDOZA to meet DEMONIO at El Pilon to retrieve drugs from him. I further believe that COSITA had also separately asked MENDOZA to do the same ("Yes sir. He (COSITA) just told me right now."). At 2:11 p.m., DEMONIO called CRUZ, who was using Target Telephone 5. DEMONIO stated, "Where is he? Look…" CRUZ asked, "I should go there?" DEMONIO replied, "No. There are two cars there at Pilon, of what I don't like. You saw the car that was there last

time on the corner?" CRUZ replied, "Yes." DEMONIO stated, "Now he's in a Jeep, an Odyssey. Tell him to call me now." I believe that DEMONIO detected law enforcement surveillance vehicles in the area of El Pilon and asked CRUZ to tell MENDOZA to call him. At 2:13 p.m., an investigator observed a green Dodge Charger (the "Dodge Charger") arrive at El Pilon Market driven by MENDOZA.[21] A few minutes later, MENDOZA left El Pilon and drove to the intersection of Arlington Street and Lawrence Street in Lawrence. In that area, investigators observed MENDOZA drive towards DEMONIO who was on his motorized scooter. Due to investigators' vantage points, they could not observe the meeting. Minutes later, DEMONIO was seen riding away on his scooter. I believe that MENDOZA met with DEMONIO to obtain drugs for delivery. Investigators maintained surveillance of MENDOZA who travelled directly to the Rockingham County Mall in nearby Salem, New Hampshire.

172.    At 2:34 p.m., MENDOZA arrived at the mall and walked around inside. Investigators maintained surveillance of MENDOZA inside the mall. At 2:58 p.m., MENDOZA left the mall and approached a black Ford F-150 in the garage area of the mall. MENDOZA then returned to his vehicle briefly and re-approached the driver's side of the Ford F-150. There, investigators observed him conduct a hand-to-hand exchange with the driver of the Ford F-150, later identified as CS-3.[22] Investigators maintained surveillance of CS-3 as he departed the

---

[21] Investigators had previously conducted a controlled purchase of fentanyl from MENDOZA, discussed in Part II.

[22] Numerous confidential informants or confidential sources were utilized during this investigation. A second confidential informant was used between the time of CS-1 and CS-3 but is not mentioned for the purposes of this affidavit. CS-3 is a drug user and has a criminal history including arrests and convictions for drug offenses. CS-3 is currently on parole for a drug offense. CS-3 is cooperating with law enforcement in exchange for consideration in a pending drug charge. Based on the corroboration described, I believe that information received from CS-3 is reliable. CS-3 is available to testify.

shopping mall. Investigators arranged for a uniformed Salem Police Officer to stop CS-3. After CS-3 failed to stop at a red light, investigators stopped CS-3. An investigator asked CS-3 to exit the vehicle and provided CS-3 with *Miranda* warnings. CS-3 admitted to purchasing 20 grams of fentanyl from MENDOZA (who CS-3 only identified as the driver of the Dodge Charger). CS-3 advised that the drugs were in the rear part of the center console. An investigator retrieved a clear sandwich bag that contained four plastic bags of a tan powdery substance. The suspected fentanyl was transported to the DEA Northeast Regional Laboratory for confirmatory analysis, which remains pending. In a subsequent interview, CS-3 provided further details of the FLACO DTO. CS-3 provided (978) 376-3010 as the most recent Customer Telephone Number of the FLACO DTO. I have reviewed the telephone tolls of the Customer Telephone Number used on September 29, 2020 and confirmed that CS-3 exchanged calls to and from the Customer Telephone Number the day he was arrested. CS-3 stated that he was given the FLACO DTO's Customer Telephone Number six months before his arrest and ordered drugs from the FLACO DTO several times per week. I am unable to corroborate calls dating back to March 2020 based on the frequent changes in the Customer Telephone Number.  CS-3 stated that he received drugs from about 10 different drug couriers during that time period and the Customer Telephone Number changed every two to three weeks. Typically, a new Customer Telephone Number was sent to him via text message advertising the sale of quality fentanyl, cocaine, and pills. CS-3 stated that the user of the Customer Telephone Number is a male or female with a Spanish accent and charged $200 per "finger." CS-3 has purchased up to 40 grams of fentanyl at one time and has seen drug couriers in possession of up to 100 "fingers," meaning one kilogram of fentanyl, at one time.

      <u>October 1, 2020: COSITA and CRUZ discussed CANN retrieving drugs he lost</u>

      173.    On October 1, 2020, at 2:35 p.m., COSITA called CRUZ, who was using Target

Telephone 5. COSITA asked, "What about Rick's food? Is he going to go get it today?" CRUZ replied, "He is going to go get it. But, he can't go like that. He has to go at dawn. He has to go like at 4:00 or 5:00. He said that tomorrow, Friday, there were two dudes going to sleep over at his place. So, he can go with them because in reality, he can't go. He's going to go with the dudes and stay in the car to show them where it is. He said it's secured because he hid it underneath a swimming pool and that it's well hidden. But, he cannot go near there for now." Based on the motor vehicle stop of CANN on September 21, 2020, I believe that CRUZ informed COSITA that CANN ("Rick") hid the drugs he received from CRUZ underneath a swimming pool and had plans to retrieve it early in the morning hours on Saturday, October 3, 2020 with unidentified individuals. I believe that COSITA was inquiring about the drugs that CANN lost because he is still expecting payment for those drugs and expects CANN to retrieve and re-distribute them to pay COSITA.

<u>October 2, 2020: Salem Police seized drugs and cash from MENDOZA</u>

174.   Three days later, on October 2, 2020, at 11:28 a.m., a uniformed Salem, New Hampshire police officer was patrolling the area of South Broadway in Salem. At that time, the officer observed the Dodge Charger, driven by MENDOZA, exit a hotel parking lot without yielding to traffic, causing another vehicle to abruptly stop. The officer stopped MENDOZA for failing to yield. MENDOZA verbally identified himself with his name and date of birth to the officer. The officer then queried MENDOZA's driving information through dispatch. Dispatch informed the officer that MENDOZA's license was suspended. The officer asked MENDOZA to exit the vehicle and placed him under arrest for operating after suspension. During a search incident to arrest, the officer removed a fanny pack from MENDOZA's waist. The officer searched MENDOZA, found nothing else, and sat him in the rear of the cruiser. The officer then searched MENDOZA's fanny pack and found $5,043 cash in two bundles held together by rubber bands.

The officer also located a blue plastic baggie containing a brown powdery substance. Based on the officer's training and experience, he believed that the substance was either heroin or fentanyl.  At that time, dispatch clarified to the officer that MENDOZA's license was not fully suspended, but his registration privileges were suspended in New Hampshire. MENDOZA was transported and booked at the Salem Police Department for possession of a controlled drug and bailed out shortly thereafter. MENDOZA told the officer that he was currently unemployed but had saved the $5,043 cash over a period of several months. DEA investigators went to the Salem Police Department, took custody of the cash, and logged it into evidence. The blue plastic baggie containing a brown powdery substance was submitted to the New Hampshire State Police Laboratory for analysis, which remains pending.

175.    On the same day, at 1:06 p.m., COSITA called CRUZ, who was using Target Telephone 5. COSITA stated, "Jesus called me, telling lies, saying that they stopped him." CRUZ asked, "That they pulled him over?" COSITA stated, "Yes. But I don't care about that. He doesn't have work (slang meaning, drugs)." CRUZ asked, "So what? The money?" COSITA stated, "That's what he's saying. But I don't care." CRUZ replied, "That's a lie. He said at 10:30 that he was going to brush his teeth. Then, at 11:15, another lie. And I'm calling and calling him and then he says that he is coming to see me after 12:00. He hasn't picked up again." COSITA stated, "Call Jesus and tell him…. Give me his number and tell him just like this, 'That's not even my problem.' Because he didn't have anything from my work. He had gotten rid of it all yesterday. Tell Jesus that, just like that, 'If not in the future, he'll pay that money.'" I believe that ROJAS called COSITA to inform him that police stopped MENDOZA and seized drug proceeds from him. I believe that COSITA did not care that police stopped MENDOZA because COSITA did not believe that MENDOZA had any drugs on him at the time ("I don't care about that. He doesn't

have work."). I further believe that COSITA instructed CRUZ to inform ROJAS that MENDOZA needed to repay the money that was seized by police ("If not in the future, he'll pay that money."). None of the phone calls referenced above between MENDOZA and CRUZ were intercepted over Target Telephone 5 ("I'm calling and calling him and then he says that he is coming to see me after 12:00. He hasn't picked up again.").

176.   At 1:33 p.m., CRUZ, using Target Telephone 5, called the Salem Police Department. CRUZ stated, "I'm calling to double check. They told me that my nephew got arrested. His name is Elvin Rojas." The dispatcher replied, "We don't have anybody by that name here." At 1:54 p.m., ROJAS called CRUZ, who was using Target Telephone 5. ROJAS stated, "He got bailed out. He got the paper too but this n**** is saying he doesn't want to know anything about papers. That supposedly he called. But, he called with a different, wrong name. It's Elvin MENDOZA … Have somebody call Salem Department New Hampshire." ROJAS continued, "He's still with the money from the package, from the tablet. So, that's five G's and the extra 5 G's I guess it was his." CRUZ asked, "Who bailed him out?" ROJAS replied, "My cousin, his little brother. And my sister went with his girlfriend, his ex-fiance." At 2:10 p.m., CRUZ, using Target Telephone 5, called the Salem Police Department again. CRUZ asked if her cousin is with them, "Elvin MENDOZA." The dispatcher replied that he was released on bail. I believe that CRUZ assumed that Jesus ROJAS and Elvin MENDOZA shared the same last name because they are cousins. I believe that ROJAS clarified to CRUZ that Elvin's last name is MENDOZA, not ROJAS.

177.   At 3:06 p.m., COSITA again called CRUZ, who was using Target Telephone 5. CRUZ stated, "It was 5,043 pesos they took from him. It was the girl who thought it was 10,000. The paper says 5,043." COSITA replied, "But, they didn't grab anything." CRUZ interrupted,

"And that there is a drug investigation. And when he was leaving, they stopped him... It only says, 'Seized 5,043.' And that they won't give it to him just yet until the investigation." COSITA asked, "What type of investigation?" CRUZ answered, "That there is a drug operation and it says that he was selling drugs out of his room. But they didn't find drugs." I believe that CRUZ obtained a copy of the police report from the Salem Police Department and learned that police seized $5,043 from MENDOZA and were conducting a drug investigation.

<u>October 3, 2020: Alamo received drugs from CRUZ at Target Location 1</u>

178.    On October 3, 2020, at 11:41 a.m., CRUZ, using Target Telephone 5, called Alamo. CRUZ asked, "How much you need?" Alamo responded, "Depending if he could do 10, I'll just take 10. But if he has to do more then I take more. Depending on the price, I'll take 50." CRUZ asked again, "Like 10?" Alamo responded, "Yea., I mean if he doesn't wanna do 10, I'll take 50. But depending on the price." CRUZ replied, "Let me call the n****." I believe that CRUZ asked Alamo how much fentanyl he was looking to purchase ("How much you need?"). I believe that Alamo was looking to purchase 10 grams, but could purchase up to 50 grams depending on the price ("Depending if he could do 10, I'll just take 10. But if he has to do more then I take more. Depending on the price, I'll take 50.").

179.    At 12:02 p.m., Alamo called CRUZ, who was using Target Telephone 5. Alamo asked, "You ever reach him?" CRUZ replied, "He told me he's going home. So, to give him about half an hour… You said 10, right?" Alamo asked, "How much is it?" CRUZ replied, "450." I believe that CRUZ informed Alamo that her source was charging $450 for 10 grams of fentanyl. This is consistent with the price of fentanyl of a quality that can be diluted and re-distributed for profit in the Merrimack Valley region.

180.    At 12:05 p.m., CRUZ, who was using Target Telephone 5, called FLACO. CRUZ

stated, "I have a guy there. He doesn't buy too much. He wants to buy 10 to check… It's better this way. He will pay it right away." FLACO responded, "Okay. In how long do you want me to bring you the 10?" CRUZ answered, "I'm going to see him now to grab the 450 pesos. Let me get that from him and I will call you back in like 10 minutes." I believe that CRUZ informed FLACO that Alamo ("a guy") wanted to purchase 10 grams of fentanyl and had the $450 on-hand to make the purchase. I believe that CRUZ informed FLACO that she would obtain the $450 to complete the transaction.

181.    At 12:59 p.m., CRUZ, using Target Telephone 5, called Alamo. CRUZ stated, "The guy is on his way to see me." Alamo replied, "Alright. I'mma drive to my spot now and then you just call me. You want me to drive you the money? Drive to you?" CRUZ responded. How you call it. I was gonna pay with the money I got... I have you." I believe that Alamo offered to drive the $450 to CRUZ, but CRUZ informed Alamo that she would pay out of the money she had with her.

182.    At 1:04 p.m., CRUZ, using Target Telephone 5, called FLACO and informed him that she was on her way to "Washington." FLACO informed CRUZ that he was not far. I believe that CRUZ and FLACO arranged to meet in the area of Target Location 1 to complete the deal.

183.    At 1:56 p.m. Alamo called CRUZ, who was using Target Telephone 5. Alamo asked, "Still nothing?" CRUZ responded, "I'm on Washington." Alamo asked, "You got it?" CRUZ stated, "Yeah." Alamo replied, "Alright, I'mma go over there right now." I believe that Alamo was inquiring with CRUZ about the 10 grams of fentanyl he ordered. I believe that CRUZ informed Alamo that she had the 10 grams of fentanyl he had ordered. I believe that Alamo informed CRUZ that he would go to Target Location 1 to meet her ("Alright, I'mma go over there right now.").

184.    At 1:57 p.m., using a pole camera, an investigator observed a dark colored SUV arrive in the area of Target Location 1. No further details of the SUV could be observed. An investigator observed CRUZ approach the dark colored SUV and have a brief interaction with the driver. Based on the timing of the intercepted call, I believe that Alamo went to Target Location 1 to retrieve the 10 grams of fentanyl he had ordered through CRUZ.

October 5, 2020: TIO received drugs from Target Location 1, which are seized by police

185.    On October 4, 2020, at 5:49 p.m., CRUZ, using Target Telephone 5, called TIO, who was using telephone number (857) 361-9959. CRUZ stated, "Ossipee for tomorrow." TIO replied, "No problem." I believe that CRUZ directed TIO to deliver a drug package to UF-6877 in the area of Ossippee, New Hampshire, the following day and that TIO acknowledged.

186.    On October 5, 2020, in the afternoon hours, investigators conducted surveillance in the area of Target Location 1. At 1:56 p.m., TIO called CRUZ, who was using Target Telephone 5, and stated, "Outside." At that same time, an investigator observed a Ford Explorer park on Washington Street near Target Location 1 and directly behind CRUZ's Honda Accord. Based on the timing of the call and subsequent observations, investigators learned TIO was driving the Ford Explorer.  Further, the Ford Explorer is registered to Hector Mejia (a/k/a TIO, as described below). CRUZ came outside from the rear door of Target Location 1 and opened the passenger door of the Ford Explorer. CRUZ leaned inside and appeared to place something on the front passenger floor. Investigators maintained surveillance of the Ford Explorer as it left the area. TIO made several stops in Lawrence before arriving at 137 Saratoga Street at 3:11 p.m. There, TIO exited the Ford Explorer and entered the residence. At 3:20 p.m., a White female arrived at 137 Saratoga Street driving a Nissan Murano bearing a New Hampshire registration. The White female exited the Murano and entered the residence. At 3:30 p.m., TIO exited the residence carrying an object in his

hand. TIO entered the driver's seat of the Murano and, as the singular occupant of the vehicle, proceeded directly to Manchester, New Hampshire.

187.    At the direction of investigators, at 4:15 p.m., a marked New Hampshire State Police unit stopped the Murano, with TIO as the driver, in the area of 269 Varney Street in Manchester, New Hampshire. Manchester is between Lawrence and Ossipee, New Hampshire. Investigators conveyed to the New Hampshire State Trooper that TIO's license was suspended. During the stop, TIO identified himself to the trooper as Hector Mejia and informed the trooper that his license was "expired." The trooper pointed out that the vehicle inspection sticker did not match the expiration of the vehicle registration, as is typical in New Hampshire. The trooper asked TIO to step out of the vehicle. During a pat-frisk, the trooper felt three large golf-ball-sized objects in TIO's vest. The trooper asked TIO what those items were. TIO put his hands in his pockets and said, "Cigarettes." The trooper clarified that he was asking about the pocket with the golf-ball-sized objects. TIO then reached into the pocket and removed a tan, cloth bag. The trooper asked TIO if he could look into the bag. TIO nodded and told the trooper he could look inside. Inside, the trooper saw three smaller bags. One of the bags was clear, and the trooper observed it to contain a compressed white substance, believed to be cocaine. The other two bags were opaque, and the trooper did not open them. The trooper asked TIO what the items were, and TIO replied, "Drugs." TIO clarified that one bag contained pills, one contained heroin, and one contained cocaine. TIO informed the trooper that a man named "Oliver," nicknamed "DEMONIO," from Boston, paid him $200 to deliver the drugs to someone named "Bobby" at 4 Harriet Street in Manchester, New Hampshire. TIO provided the telephone number for "Bobby." I reviewed the tolls of the Customer Telephone Number at the time and confirmed that the telephone number for "Bobby" exchanged phone calls to and from the Customer Telephone Number on the date that TIO was stopped. TIO

explained that DEMONIO's girlfriend lent him the car. After the roadside conversation, the trooper issued TIO a citation for operating a vehicle with a suspended license and released him from the scene. TIO left the scene on foot. The vehicle was towed due to no licensed operator available to remove it from the roadside. The trooper later provided the drugs seized from TIO to investigators, who transported them to the DEA Northeast Regional Laboratory for analysis. The laboratory confirmed the bag of suspected cocaine contained 13.7 grams of cocaine. The testing of the bag of pills and suspected fentanyl remain pending. The drugs in the opaque bags were not opened due to concerns for officer safety that the "heroin" and "pills" may have been mixed with fentanyl.

188.    Later that day, at 5:23 p.m., TIO called CRUZ, who was using Target Telephone 5. TIO stated, "The police grabbed me and found the thing." CRUZ stated, "No way. So, what happened?" TIO explained, "Oh, the cop. When he found it, he told me, 'If you are honest with me. I will give you a chance.' He took the car, but he let me go." CRUZ asked, "What did you tell him?" TIO replied,

> "No, impossible! No. I told him that I was going to deliver it. He said, 'Whose car is this?' I said, 'They lent me this car.' So then… the problem with that is that I thought she was okay. But it seems like she found the inspection ticket somewhere or she got it somewhere or whatever. The registration expires on the seventh month and the ticket is for the tenth month. And you know those tickets have the exact date on them. So, he told me, 'The inspection ticket doesn't match the registration.' So, we were talking, and he told me, 'In order for me to handcuff you, I have to be sure of what this is. I have to send it over to the lab. So, I am going to give you a chance. You are going to walk out of here.'"

I believe that TIO explained to CRUZ that he was stopped by the police and that police seized the drugs that he was planning to deliver to UF-6877.

189.    On the same day, at 5:33 p.m., UF-6877 called CRUZ, who was using Target Telephone 5. UF-6877 stated, "I missed your call, babe. What's up?" CRUZ replied, "TIO hasn't gotten to you?" UF-6877 replied, "Nope." CRUZ exclaimed, "Fuck." I believe that CRUZ called

UF-6877 to confirm TIO's account that he was stopped by the police and never arrived to deliver drugs to UF-6877.

190.   Later that day, at 6:05 p.m., COSITA called CRUZ, using Target Telephone 5. COSITA asked, "So, how much did they grab him with?" CRUZ answered, "He said that he had three sticks, two sticks that I gave to him for Ossipee, which I had told you I had there because she wanted something today." CRUZ clarified, "20 children's Tylenol and half a dove." COSITA asked, "They grabbed that from him?" CRUZ answered, "Yes." I believe that CRUZ explained to COSITA that TIO was stopped by the police and the police seized 30 grams of fentanyl ("Three sticks"), 20 pills ("20 children's Tylenol") and half an ounce of cocaine ("half a dove"). As stated above, the bag of cocaine weighed 13.7 grams or approximately half an ounce.

### October 7, 2020: CRUZ ordered drugs from MANGUERA

191.   On October 7, 2020, at 1:30 p.m., CRUZ, using Target Telephone 5, called MANGUERA. CRUZ asked, "If he pays the four, can you give him five? And you give me the two and a half that you have there for the guy?" MANGUERA replied, "For you to give it to him, yes." CRUZ asked, "To give it to him. What do you think?" MANGUERA answered, "Yes. And the guy? Because he was supposed to give me something before yesterday." CRUZ stated, "I know, my love. Don't worry. He just called me. You called me with your mind because I was talking to him and hung up to call you back." MANGUERA asked, "Do I have to prepare that or will you do it? I have it like I give it to you." CRUZ replied, "If you want, I can prepare it. I just have to look for the decorations (slang meaning, cutting agents)." I believe that CRUZ asked MANGUERA if he could supply COSITA with 500 grams of fentanyl if she paid for 400 ("If he pays the four, can you give him five?"). I further believe that MANGUERA agreed to provide the drugs, but inquired about an outstanding debt from COSITA ("He was supposed to give me something before

yesterday.") I believe that CRUZ stalled and stated that she was speaking with COSITA earlier about the debt. In fact, there was no preceding call with COSITA over Target Telephone 5 ("Don't worry. He just called me."). I believe that MANGUERA asked if CRUZ wanted the drugs diluted, or if she would do it herself. I believe that CRUZ stated that she could dilute the drugs herself, but would need to find cutting agents. (MANGUERA: "Do I have to prepare that or will you do it? I have it like I give it to you." CRUZ: "If you want, I can prepare it. I just have to look for the decorations.").

192.    At 2:25 p.m., MANGUERA called CRUZ, who was using Target Telephone 5. CRUZ stated, "The guy is here in 15 minutes. I will go pick up the money and I will see you." MANGUERA replied, "Okay. It's that I'm going to have to move at 4:00." I believe that CRUZ informed MANGUERA that she would pick up the money for the above-mentioned drug debt.

193.    At 2:47 p.m., MANGUERA called CRUZ, who was using Target Telephone 5. MANGUERA stated, "My love, is your girl at Washington? So that I can get done with that." CRUZ replied, "I was about to call you. If you want, head over there. I'm here by Andover picking up the money." I believe that MANGUERA asked to meet CRUZ at Target Location 1 to provide her with 500 grams of fentanyl. CRUZ replied that she was not in the area but was retrieving money from the Sonesta Hotel ("If you want, head over there. I'm here by Andover picking up the money.").

194.    At 2:53 p.m., MANGUERA called CRUZ, who was using Target Telephone 5. MANGUERA stated, "Tell your girl to come out." CRUZ replied, "She's not there." MANGUERA stated, "Get here then." CRUZ stated, "I'm about to get on the highway, close by." MANGUERA replied, "Alright. I'm going to get off. I'll go the hallway. I'll leave the car." Investigators had established surveillance at the address of Target Locations 1 and 4. Around the

time of this call, investigators observed a Mini Cooper, bearing Massachusetts registration 17G750, park directly alongside Target Location 1. Investigators observed MANGUERA exit from the driver's seat of the Mini Cooper and walk towards the rear door of Target Location 1 and out of view.

195.    Several minutes later, investigators observed CRUZ's Honda Accord, which was being trailed by Liberty Taxi # 77, arrive at the hotel of the Sonesta Hotel. An investigator observed CRUZ exit the Honda Accord and walk to the side entrance of the hotel out of view. Several minutes later, CRUZ emerged from the same door with a white bag and entered Liberty Taxi #77.

196.    The Liberty Taxi was surveilled back to Target Location 1. Once the Liberty Taxi parked, investigators observed CRUZ exit from the taxi and walk towards the side entrance of Target Location 1 and out of view. CRUZ was accompanied by two unidentified males. A short duration later, the lights on the Mini Cooper flashed, indicating that the door locks were remotely unlocked.  Investigators then observed CRUZ and one of the unidentified males walk towards the passenger door of the Mini Cooper. CRUZ opened the front passenger door. An investigator observed CRUZ reaching into the Mini Cooper and appear to be manipulating items in the front passenger seat area. The unidentified male reached into the passenger seat area and retrieved an object and carried it towards the rear door of Target Location 1 and out of view. CRUZ then had a brief conversation with MANGUERA next to the Mini Cooper and returned towards the rear door of Target Location 1 holding an object in her hand. Simultaneously, MANGUERA appeared from the rear door area of Target Location 1, entered the Mini Cooper, and drove away.  Based on my training and experience, I believe CRUZ retrieved drugs from inside the Mini Cooper. I believe that MANGUERA went inside Target Location 1 to distance himself from CRUZ while she and the unidentified male retrieved drugs from his vehicle.

197.    Investigators maintained surveillance of MANGUERA as he left Target Location 1. Investigators observed him travel to the parking lot of Target Location 6 and walk into the building.

October 7, 2020: CRUZ and Alamo discussed processing drugs

198.    On October 7, 2020, at 5:00 p.m., after CRUZ had received drugs from MANGUERA, Alamo called CRUZ, who was using Target Telephone 5. CRUZ asked, "Aren't we gonna work? DEMONIO said you were on your way over there." Alamo replied, "He said we were gonna pick up the shit or some shit." CRUZ stated, "Yea, he was gonna meet me up to then go over there." Alamo replied, "No. No. He said we were gonna pick up the… the tools or whatever." CRUZ asked, "But he said… So, where are we gonna work?" Alamo replied, "I don't know. He said probably at *cunada's* (Spanish meaning, sister-in-law) or some shit." CRUZ stated, "Because he told me not at *cunada's*, that he… he's going to you right now. Let me know because I'm not in my car. I was gonna call a cab." I believe that CRUZ called Alamo to discuss processing drugs ("Aren't we gonna work?"). I believe that Alamo and DEMONIO had not decided where they would process drugs, but that DEMONO arranged to retrieve drug processing tools ("He said we were gonna pick up the… the tools or whatever.").

199.    On the same day, at 5:07 p.m., CRUZ, using Target Telephone 5, called DEMONIO. CRUZ stated, "Edwin called me now to tell me that you were going to get the tools." DEMONIO replied, "No. It wasn't possible. I told him, 'See what you'll do. I left the stuff over there, the *purina* and I came to get the cut.' Call him back." I believe that DEMONIO clarified that had undiluted drugs for processing and he went to retrieve cutting agents for the drugs.

200.    On the same day, at 5:14 p.m., DEMONIO called CRUZ, who was using Target Telephone 5. CRUZ stated to DEMONIO that she told Alamo they can't meet at *Cunada's* house

because the kids might be there. DEMONIO replied, "If he says, 'No.' I will take out the tools and we'll go to the house, okay?" CRUZ asked, "Where? To Sove's?" DEMONIO replied, "Yes. If I take out the tools, he won't work at all." DEMONIO continued, "Tell him to take out the tools. I'll stop and pick them up." Based on the investigation, I know that DEMONIO and CRUZ refer to Alamo as *Cunao* (Spanish meaning, brother-in-law) because DEMONIO is married to Alamo's sister. Based on the investigation, I believe that DEMONIO kept drug processing tools at Target Location 5, Alamo's residence. I believe that CRUZ and DEMONIO decided they could not process drugs at Alamo's residence (*Cunada's,* referring to Alamo's wife), but needed to find an alternate location. I believe that CRUZ and DEMONIO decided to go to Target Location 3, DEMONIO's wife's residence ("Sove's") and that Alamo would not work with them that day (DEMONIO: "If I take out the tools, he won't work at all.").

### October 8, 2020: CRUZ and ROJAS discussed being resupplied with drugs

201. On October 8, 2020, at 12:50 p.m., ROJAS called CRUZ, who was using Target Telephone 5. ROJAS asked, "When is the other stuff gonna be ready?" CRUZ replied, "It's been ready. I told you to let me know. That's what I text you. I'm like, 'Just let me know.'" CRUZ continued, "Because I put it out for you yesterday. But, it was late. The f***** got here around 11:30, 12:00. So, I wasn't gonna bother you at that time. So what I did, I made sure that I grabbed it and gave it to DEMONIO so that way it would be at [unintelligible]." ROJAS asked, "Okay. So, I just got to hit up DEMONIO?" CRUZ replied, "Yes. You got money to give me?" ROJAS responded, "Jay. I'm still waiting for Jay. Jay should be done by tonight though." CRUZ acknowledged, "Oh, okay. So, Elvin needs a gift, right?" ROJAS answered, "Yeah. Elvin." CRUZ interrupted, "There's six in your bag. So, I'm going to tell DEMONIO to give you the extra one for… for him and then uh… I don't know. Let me check with this f***** because I got your

godmother… gifts and tablets too. I guess you are going to be getting rid of the tablets. So, let me see. That way, they could hand you everything right away. You don't have to be going back and forth." ROJAS stated, "Say no more. Do I call DEMONIO?" CRUZ replied, "Yes. But, let me call him so that way he could give you everything that I'm going to tell him to give you. Because right now, he would only give you six." I believe that ROJAS called CRUZ to inquire about being resupplied with drugs ("When is the other stuff gonna be ready?"). I believe that CRUZ was preparing to provide ROJAS with drugs for him, MENDOZA, and ROJAS's godmother. I believe that ROJAS was instructed to contact DEMONIO to arrange the drug delivery ("Let me call him (DEMONIO) so that way he could give you everything that I'm going to tell him to give you.").

202. On the same day, at 2:36 p.m., CRUZ, using Target Telephone 5, called DEMONIO. CRUZ stated, "You have to see Jesus." DEMONIO replied, "Yes. Send me his number." CRUZ instructed, "Give Jesus his *regalos* and one extra. So, give him seven instead of six." DEMONIO asked, "Do I add another… another regalo?" CRUZ replied, "Another one out of your bag. Add another one." DEMONIO stated, "Alright. Tell him to call me. He's not going to give anything?" CRUZ answered, "No." I believe that CRUZ arranged for DEMONIO to supply ROJAS with drugs, including an extra package of drugs for MENDOZA. ("Give Jesus his *regalos* and one extra. So, give him seven instead of six."). I believe DEMONIO asked if ROJAS would be providing drug proceeds. Consistent with the conversation with ROJAS above, ROJAS did not have money ready for CRUZ.

203. At 2:45 p.m., pursuant to a search warrant, investigators located DEMONIO's telephone in the area of Target Location 3. Investigators established surveillance in the area anticipating that DEMONIO would supply ROJAS with drugs. Investigators did not observe DEMONIO in the area. As stated above, DEMONIO operates a moped, which is difficult to

surveil. Between 4:04 p.m. and 4:32 p.m., location information was not available for DEMONIO's telephone. At 4:24 p.m., DEMONIO called CRUZ, who was using Target Telephone 5. DEMONIO stated, "Listen, I have this one me. I already saw Jesus." I believe that DEMONIO supplied ROJAS with drugs somewhere other than the area of Target Location 3 and agents were unable to surveil the transaction.

204.    At 4:54 p.m., DEMONIO called CRUZ, who was using Target Telephone 5. CRUZ asked, "How many gifts do you have left, DEMONIO? Because I told you to keep four gifts, right? Of the five that were yours, to put one to Jesus inside. He was supposed to have seven and you were supposed to keep four." DEMONIO replied, "Yes, Jesus has seven." CRUZ asked, "And you have four. One is Jessy's, of those four and the other three you will put aside. The gift that has all the tablets and that gift, right?" I believe that DEMONIO confirmed to CRUZ that he provided ROJAS with seven drug packages ("Yes, Jesus has seven."). I further believe that CRUZ reminded DEMONIO to leave one drug package aside for a drug courier Jessy ("One is Jessy's, of those four and the other three you will put aside.").

### F.   Communications intercepted over Target Telephone 7, used by MANGUERA

#### November 8, 2020: CRUZ ordered 500 grams of drugs from MANGUERA

205.    On November 8, 2020, at 6:20 p.m., CRUZ called MANGUERA, who was using Target Telephone 7. CRUZ stated, "*Perezoso*… he says he has 10. He is trying to get the other five. If he gets at least three more, 13, he would only owe two. He is asking if you can give him the five again." MANGUERA replied, "Alright, tell him, yes." Based on this call and the following call, I believe CRUZ told MANGUERA that DEMONIO had $10,000 of payment for MANGUERA. I believe that CRUZ asked if MANGUERA would supply DEMONIO with 500 grams of drugs ("If you can give him the five again.") if DEMONIO paid down his debt by $13,000

("If he gets at least three more, 13"). I believe that MANGUERA agreed to supply CRUZ with drugs if she could pay $13,000 towards an outstanding debt. CRUZ and MANGUERA agreed to meet the following day for the transaction.

206. On November 8, 2020, 10 minutes after CRUZ called, MANGUERA, using Target Telephone 7, called an unidentified male (hereinafter, "UM-4365,"). MANGUERA stated, "I'm going to need for tomorrow. They are calling me now for half. You call me when you see fit. But, call me tomorrow so we can get together." I believe that MANGUERA called UM-4365 to obtain 500 grams of drugs for CRUZ and the FLACO DTO ("They are calling me now for half.") and asked UM-4365 to meet him the following day to prepare the drugs for CRUZ ("Call me tomorrow so we can get together.").

### November 16, 2020: MANGUERA retrieved drug proceeds from CRUZ

207. On November 16, 2020, at 12:20 p.m., MANGUERA, who was using Target Telephone 7, received a call from CRUZ. CRUZ stated, "The guy who owes you 15 called me!" CRUZ continued, "He is resolving something up there to complete that for you and he will come down so you can give him that." MANGUERA acknowledged, "Alright." CRUZ stated, "I told him that he can't grab that on top of the other one. So, he has to have it complete because he told me that he only has 10. I told him, 'Come up with the other five, that's nothing.'" MANGUERA responded, "Cool. Just call me. I will be ready." CRUZ stated, "I will call you. Don't disappear on me, you heard? He said he is going to be ready before 2:00." Based on the investigation, I believe that CRUZ was ready to provide $15,000 to MANGUERA for an outstanding drug debt ("The guy who owes you 15 called me"). I believe that CRUZ was aware that COSITA cannot obtain more drugs from MANGUERA without first paying off this $15,000 debt completely ("I told him that he can't grab that (meaning, more drugs) on top of the other one (meaning, drugs previously

provided). So, he has to have it complete (meaning, the payment for the drugs previously received)").

208.     On the same day, at 2:00 p.m., CRUZ called MANGUERA, who was using Target Telephone 7. CRUZ stated, "I am going to owe you 500 pesos. But it's because I used them so that I didn't have to go home. I will give it to you later. Is that fine?" MANGUERA answered, "That's fine… There's no problem with you." CRUZ stated, "I have 14,500… So, later on I will give you the 500. I will bring them over to the house." MANGUERA responded, "That's fine." MANGUERA continued, "Where do I see you?" CRUZ responded, "Head over to Washington." MANGUERA answered, "Okay. 20 minutes, you heard?" Based on the investigation, I believe that CRUZ had $14,500 to provide to MANGUERA and would owe him $500 ("I have 14,500… So, later on I will give you the 500."). I believe that MANGUERA found this acceptable and asked where he could meet CRUZ ("That's fine… Where do I see you?"). I believe CRUZ directed MANGUERA to Target Location 1 to retrieve the money ("Head over to Washington.").

209.     In response to this call, investigators established surveillance in the area of Target Location 1. At 2:38 p.m., investigators observed a white Mercedes park next to Target Location 1. This white Mercedes is registered to Alamo. An investigator observed DEMONIO exit from the front passenger seat and walk towards the rear door of Target Location 1 and out of view. The white Mercedes then departed the area. At 2:45 p.m., an investigator observed Liberty Taxi #77 arrive and park next to Target Location 1. Two minutes later, an investigator observed CRUZ exit the driver's seat of the taxi carrying a large bag and walk towards the rear door of Target Location 1. Investigators inferred that DEMONIO and CRUZ entered Target Location 1.

210.     At 2:47 p.m., an investigator observed a Dodge Ram (hereinafter, "MANGUERA's vehicle"), registered to Target Location 6, park behind the Liberty Taxi. An investigator observed

MANGUERA exit the driver's seat of MANGUERA's vehicle and walk towards the rear door of Target Location 1 and out of view. Investigators inferred that MANGUERA entered Target Location 1. After one minute inside the residence, an investigator observed MANGUERA emerge from the rear door of Target Location 1 carrying a small black object. MANGUERA walked to the front passenger door of MANGUERA's vehicle and appeared to place the object into the vehicle. MANGUERA then returned to the sidewalk outside Target Location 1 and appeared to have a conversation with CRUZ and DEMONIO. After two minutes, CRUZ and DEMONIO entered the taxi and departed the area. MANGUERA entered his vehicle and departed the area.

211.    Investigators surveilled MANGUERA's vehicle drive directly to the building of Target Location 6. At 3:00 p.m., MANGUERA parked the vehicle in the rear lot of Target Location 6. Due to investigators' vantage points, they were unable to see if MANGUERA entered the building. However, an investigator observed that MANGUERA's vehicle was left running. At 3:21 p.m., investigators observed MANGUERA's vehicle depart from the lot of Target Location 6 and drive to a restaurant at 125 Hampshire Street in Lawrence. An investigator observed MANGUERA exit the driver's seat and an unidentified female exit the front passenger seat. Both MANGUERA and the unidentified female entered the restaurant. Investigators maintained surveillance of MANGUERA driving MANGUERA's vehicle throughout the Merrimack Valley region before terminating surveillance at 5:28 p.m.

<u>Identification of MANGUERA</u>

212.    On November 17, 2020, I conducted an internet query of Target Telephone 7. I learned that Oscar Mejia Rodriguez was associated with Target Telephone 7 advertising on a website named "Omnilife." Investigators then conducted a social media inquiry for Oscar David Mejia and identified MANGUERA's social media page, which contained photographs of

MANGUERA. Investigators later received the Dominican photo identification of Oscar David Mejia Rodriguez and identified him as MANGUERA.

<u>November 19, 2020: MANGUERA residence identified as Target Location 6</u>

213.   On November 19, 2020, investigators conducted extensive surveillance of MANGUERA and MANGUERA's vehicle as it drove throughout the Merrimack Valley region. At 10:25 a.m., investigators observed MANGUERA's vehicle parked outside Target Location 6 in the spot marked "9-5." MANGUERA then had numerous errands and meetings throughout the Merrimack Valley. At 3:26 p.m., MANGUERA, using Target Telephone 7, called CRUZ. MANGUERA stated, "I've been calling you… the guy regarding the 30 hadn't said anything." CRUZ replied, "I know. I told you that I was going to see him this weekend. Today is Thursday." MANGUERA stated, "You left me waiting for that thing." CRUZ responded, "Oh. Meet up with me on Washington. I'll be there in 2 minutes." MANGUERA stated, "I'm about to arrive at the house to then head down to Washington." I believe that MANGUERA was asking CRUZ about an outstanding $30,000 from the FLACO DTO ("I've been calling you… the guy regarding the 30 hadn't said anything."). I believe that CRUZ said that she would not have it until the weekend but could met with MANGUERA at Target Location 1 to discuss the debt ("I know. I told you that I was going to see him this weekend. Today is Thursday… Meet up with me on Washington."). I believe that MANGUERA stated he would stop by his residence before meeting with CRUZ at Target Location 1 ("I'm about to arrive at the house to then head down to Washington.").

214.   At 3:35 p.m., investigators observed MANGUERA's vehicle arrive and park in the rear lot of Target Location 6. MANGUERA and his unidentified passenger then switched seats with MANGUERA now in the passenger seat. Investigators then surveilled MANGUERA's vehicle drive directly to Target Location 1. MANGUERA then exited the passenger seat and

walked to CRUZ's Honda Accord, which was also parked outside Target Location 1. MANGUERA bent over the front passenger seat window and had a conversation with the occupants of the Honda Accord. Due to investigators' vantage points, they were unable to determine who was inside the Honda Accord. After approximately three minutes, MANGUERA left the Honda Accord, entered MANGUERA's vehicle, and departed the area. I believe that MANGUERA and CRUZ met outside Target Location 1 to discuss a debt owed to him by the FLACO DTO. MANGUERA continued to have meetings and run errands throughout the Merrimack Valley region. Surveillance was terminated at approximately 5:45 p.m.

**G.  Communications intercepted over Target Telephone 9, used by CRUZ**

December 7, 2020: TIO delivered 140 grams of fentanyl to CANN at Target Location 7

215.    On December 7, 2020, at 3:23 p.m., CRUZ, using Target Telephone 9, called TIO, who was using (978) 641-1571. CRUZ stated, "I am going to call you back. I am waiting for Rick's orders so you can leave with the two of them together. And call Eric. I think he wanted another one." TIO acknowledged, "Ok." I believe that CRUZ was preparing TIO to deliver drugs to CANN ("Rick") and an unidentified courier, Eric.

216.    On the same day, at 5:15 p.m., CRUZ, using Target Telephone 9, called CANN. CRUZ stated, "Hey, I sent you 140, okay?" CANN acknowledged, "Okay." CRUZ stated, "And I thought it was somebody else's package so… I think that's a special order. So, it's going to be way much better than anything you ever see. It was better than all of them. But then he's gonna talk shit to me because I opened the wrong package, but I wasn't going to put it back, you know?" CANN acknowledged, "Okay, Hector is calling me right now." I believe that CRUZ informed CANN that he was getting a drug package of 140 grams of fentanyl ("I sent you 140"). I believe that CRUZ informed CANN that it was a special order and that the quality was better than what

CANN was accustomed to delivering ("I think that's a special order. So, it's going to be way much better."). Lastly, I believe that TIO was calling CANN at the end of his call with CRUZ ("Hector is calling me right now.").

217.    In response to this call, investigators established surveillance in the area of Target Location 7.  At 5:45 p.m., investigators observed TIO's Ford Explorer arrive and park in the driveway of Target Location 7. TIO exited the vehicle and approached the residence. At 5:48 p.m., investigators observed TIO's Ford Explorer leave the driveway of Target Location 7. Investigators followed TIO's Ford Explorer as it left Target Location 7 and confirmed that he was driving the Ford Explorer and was the sole occupant of the vehicle. I believe that TIO delivered 140 grams of fentanyl to CANN as instructed by CRUZ.

<u>December 7-10, 2020: CIBAO's residence identified</u>

218.    On December 7, 2020, at 3:21 p.m., CIBAO, using Target Telephone 4, called CRUZ, who was using Target Telephone 9. CRUZ stated, "Hey, I'm waiting for the guy that has the food. So that way after, I'll head your way." CIBAO responded, "Okay. The guy in Newton is going cuckoo." CIBAO then asked, "Is he going to come? How long do you think?" CRUZ responded, "I'm waiting for the guy. He said he'll be home around 4:00." I believe CRUZ was waiting for someone who had drugs to sell ("the guy that has the food.") so that she could collect money from him to pay CIBAO. I believe that CIBAO asked how long it would take, and CRUZ informed CIBAO that they would meet after 4:00 p.m. ("He said he'll be home around 4:00.").

219.    At 9:12 p.m., CIBAO, using Target Telephone 4, called CRUZ, who was using Target Telephone 9. CRUZ stated, "I haven't forgotten about you. I am waiting for the ride. Unless you want to stop by." CIBAO stated, "4 Inman, you heard?" CIBAO continued, "4 Inman, park in

the back. Go in the parking lot and call me." I believe that CIBAO informed CRUZ to meet him at 4 Inman Street in Lawrence for the abovementioned meeting.

220.    On December 8, 2020, at 11:53 a.m., CIBAO, using Target Telephone 4, called CRUZ, who was using Target Telephone 9. CIBAO stated, "I fell asleep." CRUZ replied, "So did I. Where are you? In South Lawrence?" CIBAO acknowledged. CRUZ stated, "Okay. I'll cross over there now." I believe that the meeting planned last night at 4 Inman Street did not occur because CRUZ and CIBAO fell asleep. I believe that CRUZ stated she would meet CIBAO after the call. ("In South Lawrence? Okay. I'll cross over there now."). Target Location 1 is in North Lawrence and 4 Inman Street is in South Lawrence, across the Merrimack River.

221.    On the same day, at 3:43 p.m., CIBAO, using Target Telephone 4, called CRUZ, who was using Target Telephone 9. CIBAO asked, "Tell me where I can find you." CRUZ stated, "Pass by Washington." I believe that the abovementioned meeting at 4 Inman Street did not occur and that CIBAO was planning to meet CRUZ at Target Location 1 ("Pass by Washington."). At 4:12 pm., CIBAO called CRUZ. CRUZ informed CIBAO that she was in a black car on Washington Street. At the same time, using a pole camera, an investigator observed CRUZ's black Honda Accord parked on Washington Street outside of Target Location 1. CRUZ was walking around her vehicle accessing the trunk before entering the driver's seat. At 4:20 p.m., the investigator observed a Nissan sedan stop in front of CRUZ's vehicle. CRUZ exited her vehicle and reached into the passenger window of the Nissan. After a brief interaction, the Nissan departed the area.

222.    An investigator conducting physical surveillance observed the Nissan drive from Target Location 1 to 4 Inman Street in Lawrence. The Nissan parked in the back lot of 4 Inman Street. The investigator observed CIBAO enter 4 Inman Street using the front steps.

223.    On December 10, 2020, investigators retrieved surveillance footage from the management company at 4 Inman Street on December 8, 2020. Upon reviewing the surveillance footage from December 8, 2020, at 4:43 p.m. (the same time an investigator observed CIBAO arrive at 4 Inman Street), investigators observed CIBAO enter 4 Inman Street and proceed to Target Location 8. CIBAO used a key to access the deadbolt and then entered the apartment. I believe that CIBAO resides at Target Location 8.

### December 8, 2020: CRUZ and DEMONIO observed at Target Location 3

224.    On December 8, 2020, at 5:20 p.m., DEMONIO, using (978) 902-2913, called CRUZ, who was using Target Telephone 9. CRUZ asked, "Where did you go?" DEMONIO responded, "To the mother-in-law." CRUZ asked, "Are you grinding there?" DEMONIO answered, "No. I am waiting for her to arrive. She will arrive like in 15 minutes. What about you?" CRUZ stated, "I am here at the house." DEMONIO stated, "Do you have everything there?" CRUZ replied, "No. I am here since a long time." DEMONIO continued, "Are you going out to the street? Take the new machine." CRUZ responded, "For what?" DEMONIO stated, "To grind over there. There is one at the mother-in-law's." I believe that DEMONO was asking CRUZ to take a drug processing machine from his mother-in-law's residence to process drugs ("To grind over there. There is one at the mother-in-law's."). Anticipating that CRUZ and DEMONO were preparing to process drugs, investigators established surveillance, specifically outside of Target Location 3, DEMONIO's residence.

225.    At 6:45 p.m., investigators observed CRUZ's vehicle parked outside of Target Location 3. At 6:54 p.m., CRUZ, using Target Telephone 9, called DEMONIO. CRUZ stated, "I knew you were going to bring the bags with fragrance." DEMONIO replied, "I am going to buy them right now." At 7:15 p.m., an investigator observed DEMONIO arrive outside Target Location

3 in a pick-up truck. DEMONIO exited the passenger seat and approached the front door of the building to Target Location 3. I believe that DEMONIO purchased bags for packaging drugs and met CRUZ at Target Location 3 to process and package drugs.

### DRUG TRAFFICKERS' USE OF RESIDENCES AND CELLULAR TELEPHONES

226.    Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

227.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers

and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

228.    Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

229.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences. For example, on numerous occasions, investigators have observed FLACO's vehicle at a Western Union vendor. Investigators are attempting to identify FLACO's Western Union transactions as he has not conducted any using his alias. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

230.    Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and

businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

231.    When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

232.    Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

233.    It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones can

often be evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

234.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

235.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of

120

deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

236.   I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the Target Subjects. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

   a.   controlled substances;

   b.   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

   c.   books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

   d.   personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the

distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification

numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.   firearms and other dangerous weapons; and

i.   identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

237.   Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking.  I believe that evidence of their drug trafficking offenses will be found inside each of the Target Locations and on certain cellular telephones seized therefrom.

## CONCLUSION

238.   Based on the information set forth above, I believe probable cause exists to conclude that the Target Subjects have conspired and continue to conspire to possess with intent to distribute 400 grams or more of fentanyl and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi), 841(a)(1)(C), and 846, and that evidence of said criminal offenses, as set forth in Attachment B of each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

239.   Because the complaint, warrants and accompanying affidavit and applications in support thereof reveal an ongoing investigation, it is further requested that the complaint, warrants and accompanying affidavit and applications be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better

ensure the safety of agents and others, except that copies of the complaint and warrants in full or

redacted form may be maintained by the United States Attorney's Office, and may be served on

Special Agents, Task Force Officers, and other investigative and law enforcement officers of the

DEA, federally deputized state and local law enforcement officers, and other government and

contract personnel acting under the supervision of such investigative law enforcement officers, as

necessary to effectuate the warrants.

240.    I, James Keczkemethy, having signed this Affidavit under oath as to all assertions

and allegations contained herein, state that its contents are true and correct to the best of my

knowledge, information, and belief.

Respectfully submitted,


*/s/ James Keczkemethy*
James Keczkemethy
Special Agent
Drug Enforcement Administration


Attested and sworn to telephonically in accordance with Fed. R. Crim. P. 4.1 on December 14,
2020.


HON. MARIANNE B. BOWLER
United States Magistrate Judge

## ATTACHMENT A-1

## (Location to be searched)

36 Lake Street, Lawrence, Massachusetts ("Target Location 1") is the right side of a duplex, 34-36 Lake Street. 36 Lake Street has one side of the residence and its rear on Washington Street. The residence has light blue vinyl siding and a white front door. There is one mailbox hanging to the left of the front door. The number "36" is affixed to the left-hand side of the front door. The rear door of the address is on Washington Street and is recessed from the sidewalk. There are two rear doors, adjacent to each other, both white, and they are both accessible from Washington Street. Photographs of Target Location 1 are attached. The front door is circled in yellow. One of the rear doors is circled in red.





**ATTACHMENT A-2**

**(Location to be searched)**

115 Thoreau Way, Apartment 413, Lawrence, Massachusetts ("Target Location 2") is an apartment within a large, beige apartment building, which is further part of a large apartment complex known as TGM Andover Park.  Apartment 413 has a front door on the first floor of the building. The apartment is accessible through a steel gate outside of the building. There is a brass door knocker in the middle of the door with a black sign bearing the white numbers "413." The door, which is red in color, is encased in beige trim with a white light on the upper right-hand side on the wall. Photographs of the building of Target Location 2 and the door to Target Location 2 are attached.

 

**ATTACHMENT A-3**

**(Location to be searched)**

103 Ferry Street, #1, Lawrence, Massachusetts ("Target Location 3") is the first floor of a three-family, three-story residence. The building is beige with a wood-colored front door. There are three mailboxes hanging to the left of the front door on the front porch. Unit #1, which is the first floor apartment, is accessed by common front and rear doors. The rear door to the apartment is on Saxonia Avenue and has a steel-colored screen door and wood-colored rear door. Photographs of the front and rear doors of the building of Target Location 3 are attached.





**ATTACHMENT A-4**

**(Location to be searched)**

114 Monsignor Patrick J. Lydon Way, Apartment 9, Dorchester, Massachusetts ("Target Location 4") is an apartment within a multi-unit brick apartment building. The building has multiple points of entry and egress. A photograph of the building of Target Location 4 is attached.



**ATTACHMENT A-5**

**(Location to be searched)**

22 Fairmont Street, #2, Lawrence, Massachusetts ("Target Location 5") is the second floor of a yellow, two-family, two-story residence. It has yellow siding and a red front door. The number "22" is affixed above the front door and there are two mailboxes hanging on either side of the front door. Photographs of the building of Target Location 5 are attached.





**ATTACHMENT A-6**

**(Location to be searched)**

9 Granite Street, #5, Methuen, Massachusetts ("Target Location 6") is an apartment within a large brick multi-unit apartment building, which is part of an apartment complex spanning 9-13 Granite Street. The building has multiple points of entry and egress. Apartment #5 is located on the garden level down a flight of stairs. The apartment door has a gold-colored number "5" on the door. Photographs of the building of Target Location 6 and the apartment door to Target Location 6 are attached.




**ATTACHMENT A-7**

1 Utopia Road, Billerica, Massachusetts ("Target Location 7") is a single-family residence. The property has a driveway that sets the residence back from the road approximately 20 yards. The residence has white siding and a dark green front door. There is a dark green garage door to the right of the front door. The garage door has two light sconces on either side of the garage door.  A photograph of Target Location 7 is attached.



## ATTACHMENT A-8

4 Inman Street, Apartment 20, Lawrence, Massachusetts ("Target Location 8") is an apartment within a brown brick apartment building. The building has a glass front door. Apartment 20 is on the second floor of the building. The door to Apartment 20 is labeled with the number "20."  Photograph of the building and door of Target Location 8 are attached.





**ATTACHMENT B**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses"):

1.     Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3.     Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4.     Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5.     Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.     Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.     Cellular telephones, computers, and other electronic storage media, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including but not limited to:

    a.     Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

    b.     Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

    c.     Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

    d.     Any information involving the travel to obtain controlled substances or the transportation of controlled substances

    e.     Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

    f.     Any GPS data;

    g.     Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

    h.     Any documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

    i.     All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.      Service Provider handset unlock password(s) and any other passwords
        used to access the electronic data described above.